FILED
U.S DISTRICT COURT

BRETT L. TOLMAN (#8821), United States Attorney
DANIEL D. PRICE (#2646), Assistant United States Attorney
185 South State Street, Suite 300
Salt Lake City, UT 84111
(801) 524-5682 (PHONE); (801) 325-3269 (FAX)
daniel.price2@usdoj.gov

2008 FEB 29  P 3:47

DISTRICT OF UTAH

BY_____
      DEPUTY CLERK

JEREL ("JERRY") L. ELLINGTON (*Pro hac vice*)
JAMES D. FREEMAN (*Pro hac vice*)
MARK C. ELMER (*Pro hac vice*)
Attorneys, Environmental Enforcement Section
United States Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
(303) 844-1363 (PHONE)   (303) 844-1350 (FAX)
jerry.l.ellington@usdoj.gov

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> QUESTAR GAS MANAGEMENT COMPANY, <br><br> Defendant. | Case: 2:08cv00167 <br> Assigned To : Nuffer, David <br> Assign. Date : 2/29/2008 <br> Description: USA v. Questar Gas Management |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United

States and through the undersigned attorneys, acting at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as

follows:

## NATURE OF ACTION

1.     This is a civil action pursuant to Section 113(b) of the Clean Air Act ("CAA"), 42

U.S.C. § 7413(b), for civil penalties and permanent injunctive relief brought against Questar Gas

Management Company for violations of the Act's program to control emissions of hazardous air

pollutants ("HAPs") as set forth in Section 112 of the Act, 42 U.S.C. § 7412, and the regulations promulgated thereunder; the Act's program for the Prevention of Significant Deterioration of Air Quality ("PSD") as set forth at Part C, Title 1 of the Act, 42 U.S.C. §§ 7470-7479, and the regulations promulgated thereunder; and the Act's program for Federal operating permits as set forth at Title V of the Act, 42 U.S.C. §§ 7661, and the regulations promulgated thereunder.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345 and 1355.

3.      Venue is proper in this district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. § 1391(c), because the violations at issue occurred in this judicial district and Questar Gas Management Company is located in and doing business in this district.

### NOTICE TO STATE

4.      Notice of the commencement of this action has been given to the State of Utah as required under Section 113(b) of the Act, 42 U.S.C. § 7413(b).

### DEFENDANT

5.      Defendant Questar Gas Management Company ("QGM") is a Utah corporation headquartered in Salt Lake City, Utah, and is licensed to do business in the State of Utah. QGM is a wholly-owned subsidiary of Questar Market Resources, Inc. (QMR). QGM provides mid-stream field services such as natural gas gathering, compression, dehydration, and processing to upstream natural gas companies that include other subsidiaries of Questar Corp. or QMR, as well as independent third parties.

6.      QGM is a "person" as defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e), and will be referred to herein as "Defendant."

### DESCRIPTION AND HISTORY OF THE FACILITIES

7.      This action concerns five compressor stations that are part of QGM's Uinta Basin

hub operations known as Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend. QGM is the owner and/or operator of each of these five compressor stations. All five compressor stations are located within the historic boundaries of that portion of the Uinta and Ouray Indian Reservation known as the Uncompahgre Reservation. A general description and brief history of these five compressor stations and some of the emitting units at the facilities follows.

**Coyote Wash Compressor Station**

8.      The Coyote Wash Compressor Station ("Coyote Wash facility") is located in Section 16 (or 15), T9S (or T8S), R22E, in Unitah County, Utah. The Coyote Wash facility compresses, dehydrates, and processes (by removing natural gas liquids or NGLs) natural gas from upstream areas that is gathered and routed directly to it, and/or boosts the pressure of natural gas routed to it from the nearby Chapita compressor station. Natural gas from the Coyote Wash facility is transmitted (or soon will be transmitted) to one or more of the following: QGM's Red Wash 24B Gas Plant, QGM's Coach Gas Plant, Main Line 59 owned and/or operated by QGM or Questar Pipeline Company, and/or Colorado Interstate Gas Company's Saddle Draw tie-in.

9.      Initial construction of the Coyote Wash facility was completed when it went on-line in or around October 2005. It has been in a near constant state of reconstruction or expansion since then. Based upon the best available information currently available, the Coyote Wash facility was equipped with at least the following three compressor engines at startup in or around October 2005: two Caterpillar model G3608SITA 4-stroke lean burn (4SLB) compressor engines each site rated at 2275 brake horsepower ("bhp") (designated by QGM as C-100 and C-200), and one Waukesha model L7042GSI 4-stroke rich burn ("4SRB") compressor engine site rated at 1478bhp (designated by QGM as BC-100). In addition, at startup or soon thereafter the Coyote Wash facility was also equipped with two 400 bbl condensate storage tanks.

10.     As of June 28, 2007, the following equipment had been installed at the Coyote

Wash facility: ten compressor engines with a combined output of approximately 22,000 bhp; a 55 MMscfd triethylene glycol ("TEG") dehydrator; two 400-bbl condensate storage tanks; and a Joule-Thompson unit to separate natural gas liquids (NGLs) from the gas stream. Construction of a foundation had also been completed for the installation of an eleventh compressor engine, a Caterpillar model G3616 4SLB compressor engine site-rated at 4,735 bhp (which will be the third such compressor engine at the Coyote Wash facility).

**Chapita Compressor Station**

11. The Chapita Compressor Station ("Chapita facility") is located in Section 15, T9S, R22E, in Uintah County, Utah. Natural gas from upstream areas is gathered and routed to either the Chapita facility or the Coyote Wash CS. Natural gas routed to the Chapita facility is compressed and dehydrated. Natural gas from the Chapita facility is routed to either the Coyote Wash CS where its pressure is boosted as described in the preceding paragraph, and/or Kerr-McGee Corporation's Bridge Station compressor station.

12. Initial construction of the Chapita facility was completed when it went on-line in or around May 2004 with two Caterpillar model G3606 4SLB compressor engines each site rated at 1522 bhp (designated by QGM C-100 and C-200), a 60 MMscfd TEG dehydrator, and two 400 bbl condensate storage tanks. QGM installed a third Caterpillar model G3606 4SLB compressor engine site rated at 1522 bhp in or around April 2007 (designated by QGM as C-300).

**Island Compressor Station**

13. The Island Compressor Station ("Island facility") is located in Section 7, T10S, R20E, in Uintah County, Utah. The Island facility compresses and dehydrates natural gas from upstream areas gathered and sent to it. Natural gas from the Island facility is added to Main Line 40 owned and/or operated by Questar Pipeline Company.

14. Initial construction of the Island facility was completed when it went on-line in or around September 2004 with two Waukesha model L7042GSI 4SRB compressor engines each

site rated at 1478 bhp (designated by QGM as ENG01 and ENG02), a 20 MMscfd TEG

dehydrator, and two 400 bbl condensate storage tanks.  A Caterpillar model G399TA 4SRB

compressor engine site rated at 621 bhp (designated by QGM as emitting unit "Recompressor")

was installed at the Island facility in or around June 2006.

**Wonsits Valley Compressor Station**

15.     The Wonsits Valley Compressor Station ("Wonsits Valley facility") is located in

Section 12, T8S, R21E, in Uintah County, Utah.   The Wonsits Valley facility compresses and

dehydrates natural gas from upstream areas gathered and sent to it.  Natural gas from the Wonsits

Valley facility is transmitted to the Red Wash 24B Gas Plant for further processing.

16.     Construction of the Wonsits Valley facility began in or around October 2000 with

the installation of at least one temporary field compressor.  Four Waukesha model 12V-AT27GL

4SLB compressor engines, each site rated at 2872 bhp, were installed at the Wonsits Valley

facility in or around June 2001.  A 100 MMscfd TEG glycol dehydrator was installed at the

Wonsits Valley facility in or around July 2001.  A Waukesha model 12V-AT27GL 4SLB

compressor engine site rated at 2872 (designated by QGM as C202) was installed at the Wonsits

Valley facility in or around April 2003.   A Caterpillar model G3608SITA 4SLB compressor

engine site rated at 2225 bhp (designated by QGM as C207) was installed at the Wonsits Valley

facility in or around August 2004.  A Waukesha model 12V-AT27GL 4SLB compressor engine

site rated at 2872 bhp (designated by QGM as C204) was installed at the Wonsits Valley facility

(replacing an existing compressor engine) in or around April 2005.

**River Bend Compressor Station**

17.     The River Bend Compressor Station ("River Bend facility") is located in Section

15, T10S, R19E, in Uintah County, Utah. The River Bend facility compresses and dehydrates

natural gas from upstream areas gathered and sent to it.   Natural gas from the River Bend facility

is added to Main Line 40 which is owned and/or operated by Questar Pipeline Company.

18. Initial construction of the River Bend facility was completed when it went on-line in or around March 1993 with one compressor engine, two 18 MMscfd TEG dehydrators, and three 400 bbl condensate storage tanks. Several compressor engines were installed after the initial startup of the River Bend facility. One or more of these compressor engines were replaced. A Waukesha model L5790GL 4SLB compressor engine site-rated at 1215 bhp (designated by QGM as ENG01) was installed at the River Bend facility in or around August 2003. A Waukesha model L5790GSI 4SRB compressor engine site-rated at 1155 bhp (designated by QGM as ENG04) was installed at the River Bend facility in or around April 2005.

## STATUTORY AND REGULATORY BACKGROUND

19. As set forth in Section 101(b)(1), 42 U.S.C. § 7401(b)(1), the Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare.

### National Emission Standards For Hazardous Air Pollutants

20. Section 112 of the Act, 42 U.S.C. § 7412, establishes a program for controlling emissions of HAPs, also known as air toxics, called the National Emission Standards for Hazardous Air Pollutants (or "NESHAPs"), through the use of maximum achievable control technology ("MACT") to minimize HAP emissions. HAPs are pollutants which are known or suspected to cause cancer or other serious health effects such as birth defects or reproductive effects in humans.

21. HAPs are listed in Section 112(b) of the Act, 42 U.S.C. § 7412(b), and include benzene, toluene, ethyl benzene, xylenes, and hexane (five toxic air pollutants typically contained in emissions from oil and natural gas production facilities) and formaldehyde (typically emitted from compressor engines at such facilities).

22. A "major source" of HAPs is "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to

-6-

emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air

pollutant or 25 tons per year or more of any combination of hazardous air pollutants." Section

112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2 (definition of "major source").

Section 112(n)(4) of the Act further provides that:

> Notwithstanding the provisions of subsection (a) of this section, emissions from
> any oil or gas exploration or production well (with its associated equipment) and
> emissions from any pipeline compressor or pump station shall not be aggregated
> with emissions from any other similar units, whether or not such units are in a
> contiguous area or under common control, to determine whether such units or
> stations are major sources, and in the case of any oil or gas exploration or
> production well (with its associated equipment), such emissions shall not be
> aggregated for any purpose under this section.

42 U.S.C. § 7412(n)(4).

23.     Pursuant to the authority under Section 112 of the Act, 42 U.S.C. § 7412, the

Administrator of EPA promulgated, as relevant to this action, 40 C.F.R. Part 63, Subpart A titled

General Provisions (the "Subpart A regulations"), and two specific NESHAPs codified at 40

C.F.R. Part 63, Subpart HH titled National Emission Standards for Hazardous Air Pollutants

from Oil and Natural Gas Production Facilities (the "Subpart HH regulations"); and 40 C.F.R.

Part 63, Subpart ZZZZ titled National Emission Standards for Stationary Source Reciprocating

Internal Combustion Engines (the "Subpart ZZZZ regulations"). The effective date of the

Subpart HH regulations was June 17, 1999; the effective date of the Subpart ZZZZ was June 15,

2004.

24.     An "affected source," for purposes of the NESHAP regulations set forth at 40

C.F.R. Part 63, means the

> stationary source, the group of stationary sources, or the portion of the stationary
> source that is regulated by a relevant standard or other requirement established
> pursuant to section 112 of the Act. Each relevant standard will define the
> 'affected source' for the purposes of that standard . . . .

40 C.F.R. § 63.2.

25.     The construction of any new, or the reconstruction of any existing, major source

of HAPs is subject to a pre-construction approval process. Section 112(i)(1) of the Act, 42

U.S.C. § 7412(i)(1), provides that:

> [a]fter the effective date of any emission standard, limitation, or regulation under
> subsection (d), (f), or (h) of this section, no person may construct any new major
> source subject to such emission standard, regulation, or limitation unless the
> Administrator . . . determines that such source, if properly constructed,
> reconstructed and operated, will comply with the standard, regulation or
> limitation.

40 C.F.R. § 63.5(b)(3) similarly provides that:

> [a]fter the effective date of any relevant standard promulgated by [EPA] under this
> part, no person may, without obtaining written approval in advance from [EPA] in
> accordance with the procedures specified in paragraphs (d) and (e) of this section.
> . . . (i) [c]onstruct a new affected source that is major-emitting and subject to such
> standard; . . ."

*See also* 40 C.F.R. § 63.5(d)(1).

26.     In general, the Subpart A, HH, and ZZZZ regulations require the owner or

operator of an affected source to: install MACT level controls on affected sources; demonstrate

the effectiveness of such controls; certify compliance with applicable regulatory requirements;

continuously monitor the controls; record applicable monitoring data; comply with applicable

emission restrictions/control requirements at all times except during periods of startup,

shutdown, or malfunction; prepare a startup/shutdown/malfunction ("s/s/m") plan for affected

sources; comply with, and document compliance with, the s/s/m plan during period of startup,

shutdown, and malfunction; and submit various notifications and reports regarding the affected

source to assure compliance with applicable HAP emission control requirements.

### Subpart HH Regulations

27.     The Subpart HH regulations apply to specific emission points that are located at

an oil or natural gas production facility that is a major HAP source. 40 C.F.R. § 63.760(a) & (b).

Those natural gas production facilities that "process, upgrade, or store natural gas prior to the

point at which natural gas enters the natural gas transmission and storage source category or is

delivered to the final end user" are subject the Subpart HH regulations. 40 C.F.R. § 63.760(a)(3).

Another set of regulations, set forth at 40 C.F.R. Part 63, Subpart HHH, apply to those natural gas production facilities that are located after the point that natural gas enters the natural gas transmission and storage category. Gas is deemed to enter the "natural gas and storage source category" after leaving a natural gas processing plant if there is one; if there is not a natural gas processing plant then natural gas is deemed to enter the "natural gas and storage source category" after the point of custody transfer. 40 C.F.R. § 63.760(a)(3).

28.     The specific emission points that are subject to the Subpart HH regulations include (as relevant to this action) glycol dehydration units ("dehydrators"), and storage vessels ("tanks") with the potential for flash emissions. 40 C.F.R. § 63.760(b)(1) & (2).

29.     A compressor station is an example of a natural gas production field facility that is subject to the Subpart HH regulations. 40 C.F.R. § 63.761 (definition of "facility"). A natural gas production field facility, such as a compressor station, includes all production and processing equipment, typically within close proximity of each other, that are located within the boundaries of an individual surface site. *Id.* A "surface site" is defined as "any combination of one or more graded pad sites, gravel pad sites, foundations, platforms, or the immediate physical location upon which equipment is physically affixed." 40 C.F.R. § 63.761.

30.     In determining whether a natural gas production field facility such as a compressor station is a "major source," HAP emissions from dehydrators and the storage tanks with potential flash emissions are to be added together. 40 C.F.R. § 63.761 (definition of "major source").

31.     Pursuant to 40 C.F.R. § 63.760(f)(2) the owner or operator of an affected source, the construction or reconstruction of which commenced on or after February 6, 1998, shall achieve compliance with the provisions of 40 C.F.R. Part 63, Subpart HH immediately upon initial start up or June 17, 1999, whichever is later. 40 C.F.R. § 63.760(f)(1) specifies when compliance with the provisions of 40 C.F.R. Part 63, Subpart HH must be achieved for an

-9-

affected source, the construction or reconstruction of which commenced before February 6, 1998.

### Subpart ZZZZ Regulations

32. The Subpart ZZZZ regulations establish national emission and operating limitations for HAPs emitted from stationary reciprocating internal combustion engines ("RICE") located at major sources of HAP emissions. 40 C.F.R § 63.6580.

33. Affected sources under the Subpart ZZZZ regulations are defined at 40 C.F.R. § 63.6590(a) as "any existing, new, or reconstructed stationary RICE with a site-rating of more than 500 brake horsepower located at a major source of HAP emissions . . . ."

34. Specific rules apply to determine if a gas production facility is a major source. 40 C.F.R. § 63.6585. HAP emissions from glycol dehydrators, storage vessels with the potential for flash emissions, combustion turbines, and RICE located at the same gas production facility are to be added together. 40 C.F.R. § 63.6675 (definition of "major source").

35. A gas production facility means "any grouping of equipment . . . where natural gas is processed, upgraded, or stored prior to entering the natural transmission and storage source category." 40 C.F.R § 63.6675 (definition of "oil and gas production facility"). Examples of facilities in the natural gas production source category include "a compressor station that transports natural gas to a natural gas processing plant." *Id.* The natural gas processing and production equipment "must be located within the boundaries of an individual surface site" and "will typically be located in close proximity to other equipment located at the same facility." *Id.* A "surface site" is defined as "any combination of one or more graded pad sites, gravel pad sites, foundations, platforms, or the immediate physical location upon which equipment is physically affixed." 40 C.F.R § 63.6675 (definition of "surface site").

36. Pursuant to 40 C.F.R. § 63.6595(a)(1) the owner or operator of an affected RICE existing prior to December 19, 2002 shall achieve compliance with the provisions of 40 C.F.R. Part 63, Subpart ZZZZ by June 15, 2007. 40 C.F.R. § 63.6595(a)(2) requires compliance with

Subpart ZZZZ by August 16, 2004 for any RICE that was newly constructed or reconstructed prior to August 16, 2004 but after December 19, 2002.  40 C.F.R. § 63.6595(a)(3) requires compliance with Subpart ZZZZ upon startup for any RICE that was newly constructed or reconstructed after August 16, 2004.

### PSD Program

37.     As set forth in Section 161 of the Act, 42 U.S.C. § 7471, and the regulations promulgated thereunder, Part C of the Act is designed to prevent the significant deterioration of air quality where air quality meets or exceeds federal National Ambient Air Quality Standards ("NAAQS") in areas designated as "attainment" or "unclassifiable."  In accordance with Section 161 of the Act, 42 U.S.C. § 7471, EPA has designated Uintah County as an Unclassifiable/Attainment area.  *See* 40 C.F.R. § 81.345.

38.     The regulation approving the State of Utah's State Implementation Plan ("SIP") for the implementation of the Act and the attainment and maintenance of NAAQS, as set forth in 40 C.F.R. § 52.2346, provides that:

(a)  The Utah plan, as submitted, is approved as meeting the requirements of Part C, Title I, of the Clean Air Act, except that it does not apply to sources proposing to construct on Indian Reservations.

(b)  Regulation for Prevention of Significant Deterioration of Air Quality.  The provisions of § 52.21 (b) through (v) are hereby incorporated by reference and made a part of the Utah State Implementation Plan and are applicable to proposed major stationary sources or major modifications to be located on Indian Reservations.

39.     In promulgating the rule approving the Utah SIP referred to in the preceding paragraph, as set forth at 47 Fed. Reg. 6428 (February 12, 1982), EPA stated that:

As explained in the proposed approval, there is one major difference between the State and Federal programs.  That difference is that the State's regulation does not necessarily apply on Indian Reservations.  Therefore, EPA approves the State regulation and removes the federal regulation except as it applies on Indian Reservations.

40.     Section 165(a) of the Act, 42 U.S.C. § 7475(a), provides that no "major emitting facility" on which construction began after August 7, 1977, may be constructed in attainment or

unclassifiable areas unless a permit is issued pursuant to the preconstruction review provisions in the Act. In addition, Section 165(a)(4) of the Act, 42 U.S.C. § 7475(a)(4), provides that "the proposed facility [must be] subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility." EPA's regulations implementing the Act as set forth in 40 C.F.R. § 52.21(a)(2)(iii) similarly impose such restrictions on any "major stationary source," or any "major modification" of a stationary source.

41.     A "major emitting source" is defined by Section 169(1) of the Act, 42 U.S.C. § 7479(1), and a "major stationary source" is defined by 40 C.F.R. § 52.21(b)(1)(i)(b), *inter alia*, as any stationary source which emits or has the potential to emit 250 tons per year of any pollutant subject to regulation under the Act. Volatile organic compounds ("VOCs"), nitrogen oxides ("NOx"), and carbon monoxide ("CO") are regulated pollutants under the Act and for which national standards are in effect as set forth at 40 C.F.R. Part 50. Pursuant to 40 C.F.R. § 52.21(b)(1)(i)(c), a "major stationary source" is also defined to include "[a]ny physical change that would occur at a stationary source not otherwise qualifying under [§52.21(b)(1)], as a major stationary source, if the changes would constitute a major stationary source by itself."

42.     Pursuant to 40 C.F.R. § 52.21(b)(2)(i), a "major modification" is any physical change or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act.

43.     As set forth in 40 C.F.R. § 52.21(b)(23)(i), "significant" means, in reference to a net emissions increase or the potential of a source to emit, *inter alia*, 40 tons per year of VOCs or NOx, or 100 tons per year of CO.

**Federal Operating Permit Programs**

44.     As set forth in Title V of the Act, 42 U.S.C. §§ 7661 - 7661f, and the regulations promulgated thereunder at 40 C.F.R. Part 71, any "Part 71 source," which includes a "major

source," is required to have a comprehensive federal air quality operating permit. *See* 40 C.F.R.
§§ 71.1 and 71.3(a).

45.     A "major source" means "any stationary source (or group of stationary sources
located within a contiguous area and under common control) that is . . . defined in section 7412
of this title [Section 112 of the Act]." Section 501(2) of the Act, 42 U.S.C. § 7661(2). *See also*
40 C.F.R. § 63.760(h) (an owner or operator of an affected source subject to the 40 C.F.R. Part
63, Subpart HH regulations that is a "major source" of HAPs "is also subject to 40 C.F.R. part 70
or part 71 operating permit requirements").

46.     A "Part 71 Source" is required to submit an annual report of its actual emissions
for the preceding year, a fee calculation worksheet, and payment of annual emission fees
pursuant to 40 C.F.R. § 71.9(h)(1).

47.     A Part 71 Source that underpays emission fees shall be assessed a penalty of 50%
of the amount by which the fee was underpaid, and assessed interest on such penalty amount. 40
C.F.R. § 71.9(l)(1) & (3).

48.     The Federal operating permits program became effective on March 22, 1999. *See*
64 Fed. Reg. 8247 (Feb. 19, 1999).

## FIRST CLAIM FOR RELIEF
### (Violation of NESHAP Subpart HH Requirements – Coyote Wash Facility)

49.     Paragraphs 1 through 48 are realleged and incorporated by reference.

50.     The Coyote Wash facility is a compressor station that is a "facility" located at a
"surface site" where natural gas is processed, upgraded, or stored prior to the point at which
natural gas enters the natural gas transmission and storage source category or is delivered to the
final user as defined by 40 C.F.R. § 63.761.

51.     The Coyote Wash facility is a "major source" of HAP emissions within the
meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. § 63.761
(definition of "major source"). The Coyote Wash facility became a major HAP source for

purposes of the Subpart HH regulations in or around November 2006 upon the installation and startup of the 55 MMscfd TEG dehydrator, at which time there were also two 400-bbl condensate storage tanks at this facility.

52.     The 55 MMscfd TEG dehydrator is an affected source under the Subpart HH regulations as defined by 40 C.F.R. §§ 63.760(b)(1) & 63.765(a).

53.     QGM failed to submit an application and required information for approval of construction of a new source (as described in paragraphs 8 - 10, and 51) subject to the Subpart HH regulations before construction as required by 40 C.F.R. §§ 63.5(b)(3), 63.5(d) and 63.9(b)(4).

54.     The Coyote Wash facility was constructed after February 6, 1998.  Pursuant to 40 C.F.R. § 63.760(f)(2), affected sources at the Coyote Wash Facility were to have been in compliance with the Subpart HH regulations upon startup.

55.     QGM failed to comply with the HAP emission control requirements for the 55 MMscfd TEG dehydrator as required by 40 C.F.R. §§ 63.764(c)(1)(i), 63.765, 63.771(c) & (d), and 40 C.F.R. § 63.11(b). While QGM asserts that HAP emissions from the 55 MMscfd TEG dehydrator were controlled by a flare upon startup, QGM failed to demonstrate that the closed vent system leading to the flare, and the flare itself, were designed and operated in accordance with the requirements set forth in §§ 63.771(c) and (d), by the date specified by 40 C.F.R. § 63.7(a)(2).  QGM also shut-in the flare while production continued, so that HAP emissions were uncontrolled, from March 3, 2007 though April 20, 2007, in violation of 40 C.F.R. §§ 63.11(b)(3) & (5) and 63.771(d)(4)(i).

56.     QGM failed to continuously monitor and record the continuous ignition of the pilot flame in the flare to ensure the destruction of HAP emissions from the 55 MMscfd TEG dehydrator as required by 40 C.F.R. §63.773(d)(3)(i)(C).  QGM failed to monitor the closed vent system conveying HAP emissions to the flare to ensure no detectable emissions in accordance

-14-

with 40 C.F.R. § 63.773(c)(2)(i) and (ii).

57.    QGM failed to keep records of monitoring data as required by 40 C.F.R. § 63.774, including flare design determinations as required by 40 C.F.R. § 63.774(e), and confirming no detectable emissions with 40 C.F.R. § 63.774(b)(7) and (8).

58.    QGM violated numerous other reporting provisions of the Subpart HH regulations including the following:

a.    QGM failed to notify EPA in writing of the actual date of startup within 15 days of startup of 55 MMscfd TEG as required by 40 C.F.R. §63.9(b)(4)(v);

b.    QGM failed to submit a Notification of Compliance Status to EPA within 180 days after the initial startup of the 55 MMscfd TEG dehydrator as required by 40 C.F.R. § 63.775(b)(4) and (d), including initial inspection results of the closed vent system as required in 40 C.F.R. § 63.775(d)(2) and flare design calculations as required in 40 C.F.R. § 63.775(d)(2);

c.    QGM failed to submit an initial Periodic Report to EPA within 240 days after the Notification of Compliance Status as required by 40 C.F.R. § 63.775(b)(5) and (e);

d.    QGM failed to submit subsequent semi-annual Periodic Reports to EPA as required by 40 C.F.R. § 63.775(b)(5) and (e); and

e.    QGM failed to prepare a startup, shutdown, malfunction ("s/s/m") plan, follow such plan, keep records that such plan was followed, submit required reports to EPA, and comply with other requirements of 40 C.F.R. §§ 63.6(e) & 63.762.

59.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the Subpart HH regulations, and QGM is liable for civil penalties for each day of each such violation.

## SECOND CLAIM FOR RELIEF
### (Violation of NESHAP Subpart ZZZZ Requirements – Coyote Wash Facility)

60.    Paragraphs 1 through 59 are realleged and incorporated by reference.

-15-

61.     The Coyote Wash facility is compressor station that is a "gas production facility" at a "surface site" where natural gas is processed, upgraded, or stored prior to entering the natural gas transmission and storage source category or is delivered to the final user as defined in 40 C.F.R. § 63.6675.

62.     The Coyote Wash facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. §§ 63.6585(b) & 63.6675 (definition of "major source"). The Coyote Wash facility became a major HAP source for purposes of the Subpart ZZZZ regulations upon its startup in or around October 2005. The Coyote Wash facility was also a major HAP source for purposes of the Subpart ZZZZ regulations upon its startup in October 2005 if it is shown that QGM fragmented construction to avoid regulation by a relevant standard as prohibited by 40 C.F.R. § 63.4(c)(3).

63.     Numerous RICE units have been installed at the Coyote Wash that are affected sources under the Subpart ZZZZ regulations as defined by 40 C.F.R. § 63.6590(a).

64.     QGM failed to submit an application and required information for approval of construction of a new source (as described in paragraphs 8 - 10 and 62) subject to the Subpart ZZZZ regulations before construction as required by 40 C.F.R. §§ 63.5(b)(3), 63.5(d), and 63.9(b)(4). QGM also failed to submit one or more initial notification reports as required by 40 C.F.R. §§ 63.9(b) and 63.6645(c).

65.     The Coyote Wash facility was constructed after August 16, 2004. Pursuant to 40 C.F.R. §§ 63.6595 and 63.6(b)(2), affected sources at the Coyote Wash Facility were to have been in compliance with the Subpart ZZZZ regulations upon startup.

66.     QGM failed to control HAP emissions from at least four RICE units at the Coyote Wash facility, designated by QGM as C-100, C-200, C-300, and C-250, at least from initial startup for a period of up to several months, in violation of the applicable emission limitations and operating limitations of 40 C.F.R. § 63.6600.

-16-

67. Pursuant to 40 C.F.R. §§ 63.7(a)(2) and 63.6610(a), QGM was required to have conducted an initial performance test or other compliance demonstration for each of the RICE units at the Coyote Wash facility within 180 days of the applicable compliance date. Pursuant to 40 C.F.R. § 63.7(b), QGM was required to provide advance notice of such testing to EPA. QGM was required to submit a Notice of Compliance Status, including the performance test results, to EPA within 60 days after the initial performance test or other compliance demonstration as set forth in 40 C.F.R. §§ 63.6645(f)(2) and 63.10(d)(2).

68. On February 3, 2006, QGM notified EPA of initial performance testing on five of the RICE units. QGM failed to provide any notice of initial performance testing for any of the other RICE units at the Coyote Wash facility in violation of 40 C.F.R § 63.7(a) & (b). QGM failed to submit any Notice of Compliance Status or performance test results to EPA for any of the RICE units at the Coyote Wash facility in violation of 40 C.F.R. §§ 63.6630(c), 63.6645(f)(2), and 63.10(d)(2). QGM also failed to submit a first Compliance report to EPA by January 31, 2006 as required by 40 C.F.R. § 63.6650(b)(1) & (2).

69. QGM failed to conduct semi-annual performance tests subsequent to the initial performance test as required by 40 C.F.R. § 63.6615. Pursuant to 40 C.F.R. § 63.6645(e), QGM was required to submit Notification of Intent to conduct these subsequent performance tests 60 days before the tests were to have taken place. Pursuant to 40 C.F.R. §§ 63.6645(f) and 63.9(h)(2)(ii), QGM was required to submit a Notice of Compliance Status within 60 days of any subsequent test having taken place. QGM failed to conduct semi-annual performance tests, and failed to submit any required Notification of Intent to conduct performance tests prior to such tests or any required Notice of Compliance Status following such tests. QGM failed to submit any semi-annual Compliance reports to EPA regarding the compliance status of any of the RICE units at the Coyote Wash facility as required by 40 C.F.R. § 63.6650(b).

70. QGM failed to install, operate, and maintain a continuous parameter monitoring

-17-

system ("CPMS") on any of the RICE units at the Coyote Wash facility in violation of 40 C.F.R. § 63.6625(b). QGM failed to demonstrate continuous compliance for each RICE unit in violation of 40 C.F.R. § 63.6640. QGM failed to comply with reporting requirements regarding, among other things, data from each CPMS as required by 40 C.F.R. § 63.6640(a) - (e).

71. QGM failed to prepare a s/s/m plan for each of the RICE units at the Coyote Wash facility by the applicable compliance date, and as applicable to follow such plan, keep records that such plan was followed, submit required reports to EPA, and otherwise comply with other requirements of 40 C.F.R. §§ 63.6(e), 63.6640(c), and 63.6655(a)(2).

72. Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the NESHAP Subpart ZZZZ regulations, and QGM is liable for civil penalties for each day of each such violation.

### THIRD CLAIM FOR RELIEF
### (Violation of PSD Requirements – Coyote Wash Facility)

73. Paragraphs 1 through 72 are realleged and incorporated by reference.

74. The Coyote Wash facility is a "major emitting facility" as defined by Section 169(1) of the Act, 42 U.S.C. § 7479(1), and a "major stationary source" as defined by 40 C.F.R. § 52.21(b)(1)(i)(b). It has the potential to emit more than 250 tons per year of CO, NOx and VOCs.

75. The Coyote Wash facility became a major emitting facility/major stationary source when initial construction was completed. Initial construction may have been completed at startup in or around October 2005, or sometime later as QGM continued to install compressor engines, condensate storage tanks, and the 55 MMscfd TEG dehydrator. In the alternative, QGM completed construction of a major emitting facility/major stationary source in October 2005, and thereafter made one or more major modifications of the Coyote Wash facility, as defined by 40 C.F.R. § 52.21(b)(2), by installing one or more emitting units increasing the actual potential of

-18-

the Coyote Wash facility to emit by more than 40 tons per year of VOCs or NOx, or more than 100 tons per year of CO.

76.     QGM failed to comply with the pre-construction application and permit requirements now codified at 40 C.F.R. §§ 52.21(a)(2)(iii), and (j) - (q) (2007) in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a).  QGM has continued to operate the Coyote Wash facility without complying with these requirements in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21(r).

77.     Pursuant to 40 C.F.R. §§ 52.21(r) and 52.23, the construction or operation of a major stationary source, or a major modification of a major stationary source, without compliance with the applicable requirements of 40 C.F.R. § 52.21, is subject to an enforcement action under Section 113 of the Act, 42 U.S.C. § 7413.

78.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of the construction and continued operation of a major stationary source, or major modification of a major stationary source, without complying with the requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and QGM is liable for civil penalties for each day for each violation of the Act.

## FOURTH CLAIM FOR RELIEF
### (Violation of Title V/Part 71 Requirements – Coyote Wash Facility)

79.     Paragraphs 1 through 78 are realleged and incorporated by reference.

80.     The Coyote Wash facility is a major stationary source, a major emitting source, a major source of HAP emissions, and subject to the requirements of the Subparts HH and ZZZZ regulations.  The Coyote Wash facility is a "Part 71 Source" within the meaning of 40 C.F.R. §§ 71.1 and 71.3, and subject to the operating permit program set forth in Title V of the Act at 42 U.S.C. § 7661 - 7661f.

81.     QGM submitted an application to EPA for a Title V operating permit for the

Coyote Wash facility on October 3, 2006, and an amendment to that application on December 11, 2006 (collectively the "Coyote Wash Title V application").

82.     Pursuant to 40 C.F.R. § 71.5(b), any applicant who "fails to submit any relevant facts or who has submitted incorrect information in a permit application shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information."

83.     The Coyote Wash Title V application does not disclose all significant emitting units at the Coyote Wash facility, and erroneously implied that emissions from all listed compressor engines were controlled by catalysts upon startup. QGM is aware that there are more significant emitting units at the Coyote Wash facility than disclosed in the Coyote Wash Title V application, and that at least four compressor engines were operated without functional controls from startup for a period of months.

84.     QGM failed to promptly submit supplemental information to EPA regarding the significant emitting units that were installed after the Coyote Wash Title V application was submitted, and failed to promptly correct the false information contained in the Coyote Wash Title V application regarding the emission controls on the compressor engines.

## FIFTH CLAIM FOR RELIEF
### (Violation of NESHAP Subpart HH Requirements – Chapita Facility)

85.     Paragraphs 1 through 84 are realleged and incorporated by reference.

86.     The Chapita facility is a compressor station that is a "facility" located at a "surface site" where natural gas is processed, upgraded, or stored prior to the point at which natural gas enters the natural gas transmission and storage source category or is delivered to the final user as defined by 40 C.F.R. § 63.761.

87.     The Chapita facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. § 63.761 (definition of "major source"). It became a major HAP source for purposes of the Subpart HH regulations

upon its startup in or around May 2004 when a 60 MMscfd TEG dehydrator and two 400-bbl condensate storage tanks had been installed at this facility.

88.     The 60 MMscfd TEG dehydrator is an "affected source" as defined by 40 C.F.R. §§ 63.760(b)(1) & 63.765(a).

89.     QGM failed to submit an application and required information for approval of construction of a new source (as described in paragraphs 11, 12, and 87) subject to the Subpart HH regulations before construction as required by 40 C.F.R. §§ 63.5(b)(3), 63.5(d) and 63.9(b)(4).

90.     The Chapita facility was constructed after February 6, 1998.  Pursuant to 40 C.F.R. § 63.760(f)(2), affected sources at the Chapita facility were to have been in compliance with the Subpart HH regulations upon startup.

91.     QGM failed to comply with HAP emission control requirements for the 60 MMscfd TEG dehydrator as required by 40 C.F.R. §§ 63.764(c)(1)(i), 63.765, 63.771(c) & (d), and 40 C.F.R. § 63.11(b).  While QGM asserts that HAP emissions from the 60 MMscfd TEG dehydrator were controlled by a flare upon startup, QGM failed to demonstrate that the closed vent system leading to the flare, and the flare itself, were designed and operated in accordance with the requirements set forth in §§ 63.771(c) and (d), by the date specified by 40 C.F.R. § 63.7(a)(2).  Since August 1, 2005, the pilot light for the flare was not lit, so that the flare was inoperative, on at least 22 occasions, in violation of 40 C.F.R. §§ 63.11(b)(3) & (5) and 63.771(d)(4)(i).

92.     QGM failed to continuously monitor and record the continuous ignition of the pilot flame in the flare to ensure the destruction of HAP emissions from the 60 MMscfd TEG dehydrator as required by 40 C.F.R. §63.773(d)(3)(i)(C).  QGM failed to monitor the closed vent system conveying the emissions to the flare to ensure no detectable emissions in accordance with 40 C.F.R. § 63.773(c)(2)(i) and (ii).

-21-

93.     QGM failed to keep records of monitoring data as required by 40 C.F.R. § 63.774, including flare design determinations as required by 40 C.F.R. § 63.774(e), and confirming no detectable emissions with 40 C.F.R. § 63.774(b)(7) and (8).

94.     QGM violated numerous other reporting provisions of the Subpart HH regulations including the following:

a.      QGM failed to notify EPA in writing of the actual date of startup within 15 days of startup of 60 MMscfd TEG as required by 40 C.F.R. §63.9(b)(4)(v);

b.      QGM failed to submit a Notification of Compliance Status to EPA within 180 days after the initial startup of the 60 MMscfd TEG dehydrator as required by 40 C.F.R. § 63.775(b)(4) and (d), including initial inspection results of the closed vent system as required in 40 C.F.R. § 63.775(d)(2) and flare design calculations as required in 40 C.F.R. § 63.775(d)(2);

c.      QGM failed to submit an initial Periodic Report to EPA within 240 days after the Notification of Compliance Status as required by 40 C.F.R. § 63.775(b)(5) and (e);

d.      QGM failed to submit subsequent semi-annual Periodic Reports to EPA as required by 40 C.F.R. § 63.775(b)(5) and (e); and

e.      QGM failed to prepare a startup, shutdown, malfunction ("s/s/m") plan, follow such plan, keep records that such plan was followed, submit required reports to EPA, and comply with other requirements of 40 C.F.R. §§ 63.6(e) & 63.762.

95.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the Subpart HH regulations, and QGM is liable for civil penalties for each day of each such violation.

## SIXTH CLAIM FOR RELIEF
### (Violation of NESHAP Subpart ZZZZ Requirements – Chapita Facility)

96.     Paragraphs 1 through 95 are realleged and incorporated by reference.

97.     The Chapita facility is compressor station that is a "gas production facility" at a

"surface site" where natural gas is processed, upgraded, or stored prior to entering the natural gas transmission and storage source category or is delivered to the final user as defined in 40 C.F.R. § 63.6675.

98.     The Chapita facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. §§ 63.6585(b) & 63.6675 (definition of "major source"). It became a major source for purposes of the Subpart ZZZZ regulations upon its startup in or around May 2004 when a 60 MMscfd TEG dehydrator, two 400-bbl condensate storage tanks, and the RICE designated by QGM as C-100 and C-200 had been installed at this facility.

99.     The Chapita facility has at least three RICE (designated by QGM as C-100, C-200, and C-300) that are affected sources under the Subpart ZZZZ regulations as defined by 40 C.F.R. § 63.6590(a).

100.    QGM failed to submit an application and required information for approval of construction of a new source (as described in paragraphs 11, 12, and 98) subject to the Subpart ZZZZ regulations before construction began as required by 40 C.F.R. § 63.5(d) and 63.9(b)(5). QGM also failed to submit one or more initial notification reports as required by 40 C.F.R. §§ 63.9(b) and 63.6645.

101.    As QGM started up the RICE units designated as C-100 and C-200 after December 19, 2002, but before August 16, 2004, these two RICE units were to have been in compliance with the Subpart ZZZZ regulations by no later than August 16, 2004 as required by 40 C.F.R. §§ 63.6590(a)(2) & 63.6595(a)(2). As QGM started up the RICE unit designated as C-300 in or around April 2007, it was to have been in compliance with the Subpart ZZZZ regulations upon startup as required by 40 C.F.R. § 63.6595(a)(3),

102.    Pursuant to 40 C.F.R. §§ 63.7(a)(2) and 63.6610(a) & (b), QGM was required to have conducted an initial performance test or other compliance demonstration for RICE units C-

-23-

100 and C-200 by February 10, 2005, and for RICE unit C-300 within 180 days of the applicable compliance date. Pursuant to 40 C.F.R. § 63.7(b), QGM was required to provide advance notice of such testing to EPA. QGM was required to submit a Notice of Compliance Status, including the performance test results, to EPA within 60 days after the initial performance test or other compliance demonstration as set forth in 40 C.F.R. §§ 63.6645(f)(2) and 63.10(d)(2).

103.    By letter dated December 3, 2004, QGM notified EPA of initial performance testing on two of the RICE units. QGM failed to provide any such notice with regard to the third RICE unit at the Chapita facility in violation of 40 C.F.R § 63.7(a) & (b). QGM failed to submit any Notice of Compliance Status or performance test results to EPA for any of the RICE units at the Chapita facility in violation of 40 C.F.R. §§ 63.6630(c), 63.6645(f)(2), and 63.10(d)(2). QGM also failed to submit a first Compliance report to EPA by January 31, 2005 as required by 40 C.F.R. § 63.6650(b)(1) & (2).

104.    QGM failed to conduct required semi-annual performance tests subsequent to the initial performance test as required by 40 C.F.R. § 63.6615. Pursuant to 40 C.F.R. § 63.6645(e), QGM was required to submit Notification of Intent to conduct these subsequent performance tests 60 days before the tests were to have taken place. Pursuant to 40 C.F.R. §§ 63.6645(f) and 63.9(h)(2)(ii), QGM was required to submit a Notice of Compliance Status within 60 days of any subsequent test having taken place. QGM failed to conduct semi-annual performance tests, and failed to submit any required Notification of Intent to conduct performance tests prior to such tests or any required Notice of Compliance Status following such tests. QGM failed to submit any semi-annual Compliance reports to EPA regarding the compliance status of any of the RICE units at the Chapita facility as required by 40 C.F.R. § 63.6650(b).

105.    QGM failed to install, operate, and maintain a CPMS on any of the RICE units at the Chapita facility in violation of 40 C.F.R. § 63.6625(b). QGM failed to demonstrate continuous compliance for each RICE unit in violation of 40 C.F.R. § 63.6640. QGM failed to

-24-

comply with the reporting requirements regarding, among other things, data from each CPMS system as required by 40 C.F.R. § 63.6640(a) - (e).

106.    QGM failed to prepare a s/s/m plan for each of the RICE units at the Chapita facility by the applicable compliance date, and as applicable to follow such plan, keep records that such plan was followed, submit required reports to EPA, and otherwise comply with other requirements of 40 C.F.R. §§ 63.6(e), 63.6640(c), and 63.6655(a)(2).

107.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the NESHAP Subpart ZZZZ regulations, and QGM is liable for civil penalties for each day of each such violation.

## SEVENTH CLAIM FOR RELIEF
### (Violation of PSD Requirements – Chapita Facility)

108.    Paragraphs 1 through 107 are realleged and incorporated by reference.

109.    The Chapita facility is a "major emitting facility" as defined by Section 169(1) of the Act, 42 U.S.C. 7479(1), and a "major stationary source" as defined by 40 C.F.R. § 52.21(b)(1)(i)(b). It has the potential to emit more than 250 tons per year of VOCs and NOx.

110.    The Chapita facility became a major emitting facility/major stationary source when it started up in or around May 2004.

111.    QGM failed to comply with the pre-construction application and permit requirements now codified at 40 C.F.R. §§ 52.21(a)(2)(iii), and (j) - (q) (2007) in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a). QGM has continued to operate the Chapita facility without complying with these requirements in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21(r).

112.    Pursuant to 40 C.F.R. §§ 52.21(r) and 52.23, the construction or operation of a major stationary source without compliance with the applicable requirements of 40 C.F.R. § 52.21 is subject to an enforcement action under Section 113 of the Act, 42 U.S.C. § 7413.

113.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of the construction and continued operation of a major stationary source without complying with the requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and QGM is liable for civil penalties for each day for each violation of the Act.

### EIGHTH CLAIM FOR RELIEF
### (Violation of Title V/Part 71 Requirements – Chapita Facility)

114.    Paragraphs 1 through 113 are realleged and incorporated by reference.

115.    The Chapita facility is a major stationary source, a major emitting source, a major source of HAP emissions, and subject to the requirements of the Subpart HH and ZZZZ regulations. The Chapita facility is a "Part 71 Source" within the meaning of 40 C.F.R. §§ 71.1 and 71.3, and subject to the operating permit program set forth in Title V of the Act at 42 U.S.C. § 7661 - 7661f.

116.    The Chapita facility became a Part 71 Source upon its startup in or around May 2004.

117.    QGM failed to file an application for a Part 71 federal operating permit for the Chapita facility within 12 months after the Chapita facility became a Part 71 Source in violation of Section 503(c) of the Act, 42 U.S.C. § 7661b(c), and 40 C.F.R. § 71.5(a)(1)(i).

118.    Commencing on the date the Chapita facility became a Part 71 Source, QGM was subject to the requirements of 40 C.F.R. § 71.9 to:  submit an initial calculation work sheet and remit initial fees with its application for a Title V permit; submit an annual emission report to EPA with an emissions calculation worksheet and emission fee calculation worksheet; and remit applicable emission fees. QGM failed to comply with these requirements for that portion of calendar year 2004 after the Chapita facility became a Part 71 Source.

119.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of QGM's failure to timely

apply for a Part 71 federal operating permit and QGM's failure to comply with the requirements of 40 C.F.R. § 71.9, and QGM is liable for civil penalties for each day of each violation of the Act. In addition, pursuant to 42 U.S.C. § 2201, the Court should declare the legal obligation of QGM to comply with the requirements of 40 C.F.R. § 71.9, and pursuant to 40 C.F.R. § 71.9(l) to remit a 50% penalty on the unpaid emission fees and interest until applicable emission fees are paid.

## NINTH CLAIM FOR RELIEF
### (Violation of NESHAP Subpart HH Requirements – Island Facility)

120. Paragraphs 1 through 119 are realleged and incorporated by reference.

121. The Island facility is a compressor station that is a "facility" located at a "surface site" where natural gas is processed, upgraded, or stored prior to the point at which natural gas enters the natural gas transmission and storage source category or is delivered to the final user as defined by 40 C.F.R. § 63.761.

122. The Island facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. § 63.761 (definition of "major source"). It became a major HAP source for purposes of the Subpart HH regulations upon its startup in or around September 2004 when a 20 MMscfd TEG dehydrator and two 400-bbl condensate storage tanks had been installed at this facility.

123. The 20 MMscfd TEG dehydrator is an "affected source" as defined by 40 C.F.R. §§ 63.760(b)(1) & 63.765(a).

124. QGM failed to submit an application and required information for approval of construction of a new source (as described in paragraphs 13, 14, and 122) subject to the Subpart HH regulations before construction as required by 40 C.F.R. §§ 63.5(b)(3), 63.5(d), and 63.9(b)(4).

125. The Island facility was constructed after February 6, 1998. Pursuant to 40 C.F.R. § 63.760(f)(2), affected sources at the Island facility were to have been in compliance with the

Subpart HH regulations upon startup.

126.     QGM failed to control HAP emissions from the 20 MMscfd TEG dehydrator as required by 40 C.F.R. §§ 63.764(c)(1)(i), 63.765, 66.771(c) & (d), and 40 C.F.R. § 63.11(b). While QGM asserts that HAP emissions from the 20 MMscfd TEG dehydrator were controlled by a flare upon startup, QGM failed to demonstrate that the closed vent system leading to the flare, and the flare itself, were designed and operated in accordance with the requirements set forth in §§ 63.771(c) and (d), by the date specified by 40 C.F.R. § 63.7(a)(2). The pilot light for the flare was not lit, so that the flare was inoperative, on at least four occasions in violation of in violation of 40 C.F.R. §§ 63.11(b)(3) & (5) and 63.771(d)(4)(i).

127.     QGM failed to continuously monitor and record the continuous ignition of the pilot flame in the flare to ensure the destruction of HAP emissions from the 20 MMscfd TEG dehydrator as required by 40 C.F.R. §63.773(d)(3)(i)(C). QGM failed to monitor the closed vent system conveying HAP emissions to the flare to ensure no detectable emissions in accordance with 40 C.F.R. § 63.773(c)(2)(i) and (ii).

128.     QGM failed to keep records of monitoring data as required by 40 C.F.R. § 63.774, including flare design determinations as required by 40 C.F.R. § 63.774(e), and confirming no detectable emissions with 40 C.F.R. § 63.774(b)(7) and (8).

129.     QGM violated numerous other reporting provisions of the Subpart HH regulations including the following:

a.     QGM failed to notify EPA in writing of the actual date of startup within 15 days of startup of 20 MMscfd TEG dehydrator as required by 40 C.F.R. §63.9(b)(4)(v);

b.     QGM failed to submit a Notification of Compliance Status to EPA within 180 days after the initial startup of the 20 MMscfd TEG dehydrator as required by 40 C.F.R. § 63.775(b)(4) and (d), including initial inspection results of the closed vent system as required in 40 C.F.R. § 63.775(d)(2) and flare design calculations as required in 40 C.F.R. § 63.775(d)(2);

c.      QGM failed to submit an initial Periodic Report to EPA within 240 days after the Notification of Compliance Status as required by 40 C.F.R. § 63.775(b)(5) and (e);

d.      QGM failed to submit subsequent semi-annual Periodic Reports to EPA as required by 40 C.F.R. § 63.775(b)(5) and (e); and

e.      QGM failed to prepare a startup, shutdown, malfunction ("s/s/m") plan, follow such plan, keep records that such plan was followed, submit required reports to EPA, and comply with other requirements of 40 C.F.R. §§ 63.6(e) & 63.762.

130.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the Subpart HH regulations, and QGM is liable for civil penalties for each day of each such violation.

### TENTH CLAIM FOR RELIEF
### (Violation of NESHAP Subpart ZZZZ Requirements – Island Facility)

131.    Paragraphs 1 through 130 are realleged and incorporated by reference.

132.    The Island facility is compressor station that is a "gas production facility" at a "surface site" where natural gas is processed, upgraded, or stored prior to entering the natural gas transmission and storage source category or is delivered to the final user as defined in 40 C.F.R. § 63.6675.

133.    The Island facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. §§ 63.6585(b) & 63.6675 (definition of "major source"). It became a major HAP source for purposes of the Subpart ZZZZ regulations upon its startup in or around September 2004 when a 20 MMscfd TEG dehydrator, two 400-bbl condensate storage tanks, and the RICE units designated by QGM as ENG01 and ENG02 had been installed at this facility.

134.    The Island facility now has at least three RICE units designated by QGM as ENG01, ENG02, and Recompressor that are affected sources under the Subpart ZZZZ

regulations as defined by 40 C.F.R. § 63.6590(a).

135.    QGM failed to submit an application and required information for approval of construction of a new source (as described in paragraph 13, 14, and 133) subject to the Subpart ZZZZ regulations before construction began as required by 40 C.F.R. §§ 63.5(b)(3), 63.5(d), and 63.9(b)(4). QGM also failed to submit one or more initial notification reports as required by 40 C.F.R. §§ 63.9(b) and 63.6645(c).

136.    The Island facility was constructed after August 16, 2004. Pursuant to 40 C.F.R. §§ 63.6595 and 63.6(b)(2), affected sources at the Island facility were to have been in compliance with the Subpart ZZZZ regulations upon startup.

137.    QGM failed to control HAP emissions from the RICE units designated as ENG01 and ENG02 in violation of the applicable emission limitations and operating limitations of 40 C.F.R. § 63.6600. QGM conducted an emission test on these two RICE units on April 18, 2007. One of these RICE units was emitting formaldehyde at 2.4 times greater than the regulatory limit, and the other was emitting formaldehyde at 1.7 times greater than the regulatory limit. Emissions tests had not been previously been performed on these two RICE units, and QGM conducted no follow-up emission test on either of these two RICE units. An emission test has never been performed on the RICE unit designated by QGM as Recompressor.

138.    Pursuant to 40 C.F.R. §§ 63.7(a)(2) and 63.6610(a), QGM was required to have conducted an initial performance test or other compliance demonstration for each of the RICE units at the Island facility within 180 days of the applicable compliance date. Pursuant to 40 C.F.R. § 63.7(b), QGM was required to provide advance notice of such testing to EPA. QGM was required to submit a Notice of Compliance Status, including the performance test results, to EPA within 60 days after the initial performance test or other compliance demonstration as set forth in 40 C.F.R. §§ 63.6645(f)(2) and 63.10(d)(2).

139.    By letter dated December 3, 2004, QGM notified EPA of initial performance

-30-

testing on two of the RICE units at the Island facility. QGM failed to provide any such notice with regard to the third RICE unit at the Island facility in violation of in violation of 40 C.F.R § 63.7(a) & (b). QGM failed to submit any Notice of Compliance Status or performance test results to EPA for any of the RICE units at the Coyote Wash facility in violation of 40 C.F.R. §§ 63.6630(c), 63.6645(f)(2), and 63.10(d)(2). QGM also failed to submit a first Compliance report to EPA by January 31, 2005 as required by 40 C.F.R. § 63.6650(b)(1) & (2).

140.    QGM failed to conduct required semi-annual performance tests subsequent to the initial performance test as required by 40 C.F.R. § 63.6615. Pursuant to 40 C.F.R. § 63.6645(e), QGM was required to submit Notification of Intent to conduct these subsequent performance tests 60 days before the tests were to have taken place. Pursuant to 40 C.F.R. §§ 63.6645(f) and 63.9(h)(2)(ii), QGM was required to submit a Notice of Compliance Status within 60 days of any subsequent test having taken place. QGM failed to conduct semi-annual performance tests, and failed to submit any required Notification of Intent to conduct performance tests prior to such tests or any required Notice of Compliance Status following such tests. QGM failed to submit any semi-annual Compliance reports to EPA regarding the compliance status of any of the RICE units at the Island facility as required by 40 C.F.R. § 63.6650(b).

141.    QGM failed to install, operate, and maintain a CPMS on any of the RICE units at the Island facility in violation of 40 C.F.R. § 63.6625(b). QGM failed to demonstrate continuous compliance for each RICE unit in violation of 40 C.F.R. § 63.6640. QGM failed to comply with the reporting requirements regarding, among other things, data from each CPMS system as required by 40 C.F.R. § 63.6640(a) - (e).

142.    QGM failed to prepare a s/s/m plan for each of the RICE units at the Island facility by the applicable compliance date, and as applicable to follow such plan, keep records that such plan was followed, submit required reports to EPA, and otherwise comply with other requirements of 40 C.F.R. §§ 63.6(e), 63.6640(c), and 63.6655(a)(2).

-31-

143.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the NESHAP Subpart ZZZZ regulations, and QGM is liable for civil penalties for each day of each such violation.

## ELEVENTH CLAIM FOR RELIEF
### (Violation of PSD Requirements – Island Facility)

144.     Paragraphs 1 through 143 are realleged and incorporated by reference.

145.     The Island facility is a "major emitting facility" as defined by Section 169(1) of the Act, 42 U.S.C. 7479(1), and a "major stationary source" as defined by 40 C.F.R. § 52.21(b)(1)(i)(b). It has the potential to emit more than 250 tons per year of CO and NOx.

146.     The Island facility became a major emitting facility/major stationary source when it started up in or around September 2004.

147.     QGM failed to comply with the pre-construction application and permit requirements now codified at 40 C.F.R. §§ 52.21(a)(2)(iii), and (j) - (q) (2007) in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a). QGM has continued to operate the Island facility without complying with these requirements in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21(r).

148.     Pursuant to 40 C.F.R. §§ 52.21(r) and 52.23, the construction or operation of a major stationary source without compliance with the applicable requirements of 40 C.F.R. § 52.21 is subject to an enforcement action under Section 113 of the Act, 42 U.S.C. § 7413.

149.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of the construction and continued operation of a major stationary source without complying with the requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and QGM is liable for civil penalties for each day for each violation of the Act.

**TWELFTH CLAIM FOR RELIEF**
**(Violation of Title V/Part 71 Requirements – Island Facility)**

150.    Paragraphs 1 through 149 are realleged and incorporated by reference.

151.    The Island facility is a major stationary source, a major emitting source, a major source of HAP emissions, and subject to the requirements of the Subpart HH and ZZZZ regulations.  The Island facility is therefore both a "Part 71 Source" within the meaning of 40 C.F.R. §§ 71.1 and 71.3, and subject to the operating permit program set forth in Title V of the Act at 42 U.S.C. § 7661 - 7661f.

152.    The Island facility became a Part 71 Source upon its startup in or around September 2004.

153.    QGM failed to file an application for a Part 71 federal operating permit for the Island facility within 12 months after the Island facility became a Part 71 Source in violation of Section 503(c) of the Act, 42 U.S.C. § 7661b(c), and 40 C.F.R. § 71.5(a)(1)(i).

154.    Commencing on the date the Island facility became a Part 71 Source, QGM was subject to the requirements of 40 C.F.R. § 71.9 to:  submit an initial calculation work sheet and remit initial fees with its application for a Title V permit; submit an annual emission report to EPA with an emissions calculation worksheet and emission fee calculation worksheet; and remit applicable emission fees.  QGM failed to comply with these requirements for that portion of calendar year 2004 after the Island facility became a Part 71 Source.

155.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of QGM's failure to timely apply for a Part 71 federal operating permit and QGM's failure to comply with the requirements of 40 C.F.R. § 71.9, and QGM is liable for civil penalties for each day of each violation of the Act.  In addition, pursuant to 42 U.S.C. § 2201, the Court should declare the legal obligation of QGM to comply with the requirements of 40 C.F.R. § 71.9, and pursuant to 40 C.F.R. § 71.9(l) to remit a 50% penalty on the unpaid emission fees and interest until applicable emission fees are

-33-

paid.

### THIRTEENTH CLAIM FOR RELIEF
### (Violations of NESHAP Subpart HH Requirements – Wonsits Valley Facility)

156.    Paragraphs 1 through 155 are realleged and incorporated by reference.

157.    The Wonsits Valley facility is a compressor station that is a "facility" located at a "surface site" where natural gas is processed, upgraded, or stored prior to the point at which natural gas enters the natural gas transmission and storage source category or is delivered to the final user as defined by 40 C.F.R. § 63.761.

158.    The Wonsits Valley facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. § 63.761 (definition of "major source"). It became a major HAP source in or around July 2001 upon the startup of the 100 MMscfd TEG dehydrator.

159.    The 100 MMscfd TEG dehydrator is an "affected source" as defined by 40 C.F.R. §§ 63.760(b)(1) & 63.765(a).

160.    QGM failed to submit an application and required information for approval of construction of a new source subject to the Subpart HH regulations (as described paragraphs 15, 16, and 158) before construction as required by 40 C.F.R. §§ 63.5(b)(3), 63.5(d), and 63.9(b)(4).

161.    The Wonsits Valley facility was constructed after February 6, 1998. Pursuant to 40 C.F.R. § 63.760(f)(2), affected sources at the Wonsits Valley facility were to have been in compliance with the Subpart HH regulations upon startup.

162.    QGM failed to control HAP emissions from the 100 MMscfd TEG dehydrator as required by 40 C.F.R. §§ 63.764(c)(1)(i), 63.765, 63.771(c) & (d), and 63.11(b). HAP emissions from the 100 MMscfd dehydrator were effectively uncontrolled from the date of its startup until mid-December 2003. While QGM asserts that HAP emissions from the 100 MMscfd TEG dehydrator were controlled by a flare starting in mid-December 2003, QGM failed to demonstrate that the closed vent system leading to the flare, and the flare itself, were designed

-34-

and operated in accordance with the requirements set forth in §§ 63.771(c) and (d), by the date specified by 40 C.F.R. § 63.7(a)(2).

163.    QGM failed to continuously monitor and record the continuous ignition of the pilot flame in the flare to ensure the destruction of emissions from the 100 MMscfd TEG dehydrator as required by 40 C.F.R. §63.773(d)(3)(i)(C).  QGM failed to monitor the closed vent system conveying HAP emissions to the flare to ensure no detectable emissions in accordance with 40 C.F.R. § 63.773(c)(2)(i) and (ii).

164.    QGM failed to keep records of monitoring data as required by 40 C.F.R. § 63.774, including flare design determinations as required by 40 C.F.R. § 63.774(e), and confirming no detectable emissions with 40 C.F.R. § 63.774(b)(7) and (8).

165.    QGM violated numerous other reporting provisions of the Subpart HH regulations including the following:

a.    QGM failed to notify EPA in writing of the actual date of startup within 15 days of startup of 100 MMscfd TEG dehydrator as required by 40 C.F.R. §63.9(b)(4)(v);

b.    QGM failed to submit a Notification of Compliance Status to EPA within 180 days after the initial startup of the 100 MMscfd TEG dehydrator as required by 40 C.F.R. § 63.775(b)(4) and (d), including initial inspection results of the closed vent system as required in 40 C.F.R. § 63.775(d)(2) and flare design calculations as required in 40 C.F.R. § 63.775(d)(2);

c.    QGM failed to submit an initial Periodic Report to EPA within 240 days after the Notification of Compliance Status as required by 40 C.F.R. § 63.775(b)(5) and (e);

d.    QGM failed to submit subsequent semi-annual Periodic Reports to EPA as required by 40 C.F.R. § 63.775(b)(5) and (e); and

e.    QGM failed to prepare a startup, shutdown, malfunction ("s/s/m") plan, follow such plan, keep records that such plan was followed, submit required reports to EPA, and comply with other requirements of 40 C.F.R. §§ 63.6(e) & 63.762.

-35-

166.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the Subpart HH regulations, and QGM is liable for civil penalties for each day of each such violation.

### FOURTEENTH CLAIM FOR RELIEF
### (Violation of NESHAP Subpart ZZZZ Requirements – Wonsits Valley Facility)

167.    Paragraphs 1 through 166 are realleged and incorporated by reference.

168.    The Wonsits Valley facility is compressor station that is a "gas production facility" at a "surface site" where natural gas is processed, upgraded, or stored prior to entering the natural gas transmission and storage source category or is delivered to the final user as defined in 40 C.F.R. § 63.6675.

169.    The Wonsits Valley facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. §§ 63.6585(b) & 63.6675 (definition of "major source"). It became a major HAP source in or around June 2001 when four Waukesha 4SLB compressor engines, each site rated at 2872 bhp, were installed at the Wonsits Valley facility (in addition to the 100 MMscfd TEG dehydrator).

170.    The Wonsits Valley facility has at least three RICE units (designated by QGM as C202 with a startup date of April 2003, C207 with a startup date of August 2004, and C204 with a startup date of April 2005) that are affected sources under the Subpart ZZZZ regulations as defined by 40 C.F.R. § 63.6590(a).

171.    QGM also failed to submit one or more initial notification reports as required by 40 C.F.R. §§ 63.9(b) and 63.6645.

172.    As set forth in 40 C.F.R. § 63.6595, because of the dates the RICE units were installed, RICE units C202 and C207 were to have been in compliance with the Subpart ZZZZ regulations no later than August 16, 2004, and RICE unit C204 was to have been in compliance with the Subpart ZZZZ regulations upon its startup on April 23, 2005.

173.    Pursuant to 40 C.F.R. §§ 63.7(a)(2) and 63.6610(a) & (b), QGM was required to have conducted an initial performance test or other compliance demonstration for RICE units C-202 by February 10, 2005, and for RICE units C204 and C207 within 180 days of the applicable compliance date. Pursuant to 40 C.F.R. § 63.7(b), QGM was required to provide advance notice of such testing to EPA. QGM was required to submit a Notice of Compliance Status, including the performance test results, to EPA within 60 days after the initial performance test or other compliance demonstration as set forth in 40 C.F.R. §§ 63.6645(f)(2) and 63.10(d)(2).

174.    On December 3, 2004, QGM notified EPA of initial performance testing on RICE unit C207 and on an unknown Waukesha AT25GL, and on April 27, 2005, QGM notified EPA of initial performance testing on RICE unit C204. QGM failed to timely submit any Notice of Compliance Status or performance test results to EPA for any of the RICE units at the Wonsits Valley facility in violation of 40 C.F.R. §§ 63.6630(c), 63.6645(f)(2), and 63.10(d)(2). QGM also failed to submit a first Compliance report to EPA by January 31, 2005 for RICE units C202 and C207, and July 31, 2005 for RICE unit C204, as required by 40 C.F.R. § 63.6650(b)(1) & (2).

175.    QGM failed to conduct all required semi-annual performance tests subsequent to the initial performance test as required by 40 C.F.R. § 63.6615. Pursuant to 40 C.F.R. § 63.6645(e), QGM was required to submit Notification of Intent to conduct these subsequent performance tests 60 days before the tests were to have taken place. Pursuant to 40 C.F.R. §§ 63.6645(f) and 63.9(h)(2)(ii), QGM was required to submit a Notice of Compliance Status within 60 days of any subsequent test having taken place. QGM failed to conduct semi-annual performance tests, and failed to submit any required Notification of Intent to conduct performance tests prior to such tests or any required Notice of Compliance Status following such tests. QGM failed to submit any semi-annual Compliance reports to EPA regarding the compliance status of any of the RICE units at the Wonsits Valley facility as required by 40

-37-

C.F.R. § 63.6650(b).

176. QGM failed to install, operate, and maintain a CPMS on any of the RICE units at the Wonsits Valley facility in violation of 40 C.F.R. § 63.6625(b). QGM failed to demonstrate continuous compliance for each RICE unit in violation of 40 C.F.R. § 63.6640. QGM failed to comply with the reporting requirements regarding, among other things, data from each CPMS system as required by 40 C.F.R. § 63.6640(a) - (e).

177. QGM failed to prepare a s/s/m plan for each of the RICE units at the Wonsits Valley facility by the applicable compliance date, and as applicable to follow such plan, keep records that such plan was followed, submit required reports to EPA, and otherwise comply with other requirements of 40 C.F.R. §§ 63.6(e), 63.6640(c), and 63.6655(a)(2).

178. Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the NESHAP Subpart ZZZZ regulations, and QGM is liable for civil penalties for each day of each such violation.

## FIFTEENTH CLAIM FOR RELIEF
### (Violation of PSD Requirements --Wonsits Valley Facility)

179. Paragraphs 1 through 178 are realleged and incorporated by reference.

180. The Wonsits Valley facility is a "major emitting facility" as defined by Section 169(1) of the Act, 42 U.S.C. 7479(1), and a "major stationary source" as defined by 40 C.F.R. § 52.21(b)(1)(i)(b). It has the potential to emit more than 250 tons per year of VOCs.

181. The Wonsits Valley facility became a major emitting facility/major stationary source in July 2001 upon the installation of the of the 100 MMscfd TEG dehydrator having a potential to emit more than 250 tons per year of VOCs.

182. QGM thereafter made a major modification of the Wonsits Valley facility, as defined by 40 C.F.R. § 52.21(b)(2), by installing RICE unit C202 in April 2003 increasing the actual potential of the Wonsits Valley facility to emit by more than 40 tons per year of NOx.

183.     QGM failed to comply with the pre-construction application and permit requirements now codified at 40 C.F.R. §§ 52.21(a)(2)(iii), and (j) - (q) (2007) in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a). QGM has continued to operate the Wonsits Valley facility without complying with these requirements in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21(r).

184.     Pursuant to 40 C.F.R. §§ 52.21(r) and 52.23, the construction or operation of a major stationary source without compliance with the applicable requirements of 40 C.F.R. § 52.21 is subject to an enforcement action under Section 113 of the Act, 42 U.S.C. § 7413.

185.     Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of the construction and continued operation of a major stationary source without complying with the requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and QGM is liable for civil penalties for each day for each violation of the Act.

### SIXTEENTH CLAIM FOR RELIEF
### (Violations of NESHAP Subpart HH Requirements – River Bend Facility)

186.     Paragraphs 1 through 185 are realleged and incorporated by reference.

187.     The River Bend facility is a compressor station that is a "facility" located at a "surface site" where natural gas is processed, upgraded, or stored prior to the point at which natural gas enters the natural gas transmission and storage source category or is delivered to the final user as defined by 40 C.F.R. § 63.761.

188.     The River Bend facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. § 63.761 (definition of "major source"). It became a major HAP source before the effective date of the Subpart HH regulations.

189.     The two 18 MMscfd TEG dehydrators are each an "affected source" as defined by 40 C.F.R. §§ 63.760(b)(1) & 63.765(a).

-39-

190.     The River Bend facility was constructed prior to February 6, 1998. Pursuant to 40 C.F.R. § 63.760(f)(1), affected sources at the River Bend Valley facility were to have been in compliance with the Subpart HH regulations by no later than June 17, 2002.

191.     QGM failed to submit an initial notification for the two 18 MMscfd TEG dehydrators by June 17, 2003 as required by 40 C.F.R. § 63.775(b)(1).

192.     QGM failed to control emissions from the two 18 MMscfd TEG dehydrators as required by 40 C.F.R. §§ 63.764(c)(1)(i), 63.765, 63.771(c) & (d), and 63.11(b). Upon information and belief, at some unknown date, but after mid-December 2002, QGM connected the process vents from the two 18 MMscfd TEG dehydrators to a pre-existing flare that QGM had used to control flash emissions from the two 400-bbl condensate storage tanks, which flare was later replaced and/or modified on one or more occasions. QGM failed to demonstrate that the closed vent system leading to the flare, and the flare itself, in any of the various configurations, were designed and operated in accordance with the requirements set forth in §§ 63.771(c) and (d), by the date specified by 40 C.F.R. § 63.7(a)(2). QGM also shut-in the flare while production continued, so that HAP emissions were uncontrolled, from July 17, 2006 through October 16, 2006, in violation of 40 C.F.R. §§ 63.11(b)(3) & (5) and 63.771(d)(4)(i).

193.     QGM failed to continuously monitor and record the continuous ignition of the pilot flame in the flare to ensure the destruction of emissions from two 18 MMscfd TEG dehydrators as required by 40 C.F.R. §63.773(d)(3)(i)(C). QGM failed to monitor the closed vent system conveying HAP emissions to the flare to ensure no detectable emissions in accordance with 40 C.F.R. § 63.773(c)(2)(i) and (ii).

194.     QGM failed to keep records of monitoring data as required by 40 C.F.R. § 63.774, including flare design determinations as required by 40 C.F.R. § 63.774(e), and confirming no detectable emissions with 40 C.F.R. § 63.774(b)(7) and (8).

195.     QGM violated numerous other reporting provisions of the Subpart HH regulations

-40-

including the following:

a.        QGM failed to submit a Notification of Compliance Status to EPA, within 180 days after the compliance date of June 17, 2002, of the two 18 MMscfd TEG dehydrators as required by 40 C.F.R. § 63.775(b)(4) and (d), including initial inspection results of the closed vent system as required in 40 C.F.R. § 63.775(d)(2) and flare design calculations as required in 40 C.F.R. § 63.775(d)(2);

b.        QGM failed to submit an initial Periodic Report to EPA within 240 days after the Notification of Compliance Status as required by 40 C.F.R. § 63.775(b)(5) and (e);

c.        QGM failed to submit subsequent semi-annual Periodic Reports to EPA as required by 40 C.F.R. § 63.775(b)(5) and (e); and

d.        QGM failed to prepare a startup, shutdown, malfunction ("s/s/m") plan, follow such plan, keep records that such plan was followed, submit required reports to EPA, and comply with other requirements of 40 C.F.R. §§ 63.6(e) & 63.762.

196.        Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations of the Subpart HH regulations, and QGM is liable for civil penalties for each day of each such violation.

## SEVENTEENTH CLAIM FOR RELIEF
### (Violation of NESHAP Subpart ZZZZ Requirements – River Bend Facility)

197.        Paragraphs 1 through 196 are realleged and incorporated by reference.

198.        The River Bend facility is compressor station that is a "gas production facility" at a "surface site" where natural gas is processed, upgraded, or stored prior to entering the natural gas transmission and storage source category or is delivered to the final user as defined in 40 C.F.R. § 63.6675.

199.        The River Bend facility is a "major source" of HAP emissions within the meaning of Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1), and 40 C.F.R. §§ 63.6585(b) & 63.6675

(definition of "major source"). It became a major HAP source before the effective date of the Subpart ZZZZ regulations.

200.    There are at least two RICE compressor engines at the River Bend facility, designated by QGM as ENG01 and ENG04, that are affected sources under the Subpart ZZZZ regulations as defined by 40 C.F.R. § 63.6590(a).

201.    QGM also failed to submit initial notifications for RICE units ENG01 (due no later than December 13, 2004) and ENG04 (due no later 120 days after startup) as required by 40 C.F.R. §§ 63.9(b) and 63.6645(b) & (c).

202.    As set forth in 40 C.F.R. § 63.6595, because of the dates the RICE units were installed (or replaced), RICE unit ENG01 was to have been in compliance with the Subpart ZZZZ regulations no later than August 16, 2004, and RICE unit ENG04 was to have been in compliance with the Subpart ZZZZ regulations at its startup in April 2005.

203.    Pursuant to 40 C.F.R. §§ 63.7(a)(2) and 63.6610(a) & (b), QGM was required to have conducted an initial performance test or other compliance demonstration for RICE unit ENG01 February 10, 2005, and for RICE unit EBG04 within 180 days of the applicable compliance date. Pursuant to 40 C.F.R. § 63.7(b), QGM was required to provide advance notice of such testing to EPA. QGM was required to submit a Notice of Compliance Status, including the performance test results, to EPA within 60 days after the initial performance test or other compliance demonstration as set forth in 40 C.F.R. §§ 63.6645(f)(2) and 63.10(d)(2).

204.    By letter dated December 3, 2004, QGM submitted a notice for initial performance testing for RICE unit ENG01 for the week of February 7, 2005, but did not submit a notification for the "retesting" that occurred later. QGM did not submit the results of the initial performance test, but only the results of the "retesting" of ENG01. QGM also failed to submit notice of, or conduct an initial performance test or compliance demonstration for RICE unit ENG04 within 180 days of the applicable compliance date as required by 40 C.F.R. §§ 63.7(a)(2)

and 63.6610(a).  QGM failed to submit required Notice of Compliance Status or performance test results to EPA for ENG01 or ENG04 in violation of 40 C.F.R. §§ 63.6630(c), 63.6645(f)(2), and 63.10(d)(2).  QGM also failed to submit a first Compliance report to EPA by January 31, 2005 as required by 40 C.F.R. § 63.6650(b)(1) & (2).

205.    QGM failed to conduct semi-annual performance tests subsequent to the initial performance test as required by 40 C.F.R. § 63.6615.  Pursuant to 40 C.F.R. § 63.6645(e), QGM was required to submit Notification of Intent to conduct these subsequent performance tests 60 days before the tests were to have taken place.  Pursuant to 40 C.F.R. §§ 63.6645(f) and 63.9(h)(2)(ii), QGM was required to submit a Notice of Compliance Status within 60 days of any subsequent test having taken place.  QGM failed to conduct semi-annual performance tests, and failed to submit any required Notification of Intent to conduct performance tests prior to such tests or any required Notice of Compliance Status following such tests.  QGM failed to submit any semi-annual Compliance reports to EPA regarding the compliance status of any of the RICE units at the River Bend facility as required by 40 C.F.R. § 63.6650(b).

206.    QGM failed to install, operate, and maintain a CPMS on any of the RICE units at the River Bend facility in violation of 40 C.F.R. § 63.6625(b).  QGM failed to demonstrate continuous compliance for each RICE unit in violation of 40 C.F.R. § 63.6640.  QGM failed to comply with the reporting requirements regarding, among other things, data from each CPMS system as required by 40 C.F.R. § 63.6640(a) - (e).

207.    QGM failed to prepare a s/s/m plan for each of the RICE units at the River Bend facility by the applicable compliance date, and as applicable to follow such plan, keep records that such plan was followed, submit required reports to EPA, and otherwise comply with other requirements of 40 C.F.R. §§ 63.6(e), 63.6640(c), and 63.6655(a)(2).

208.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of each of the above violations

of the NESHAP Subpart ZZZZ regulations, and QGM is liable for civil penalties for each day of each such violation.

## EIGHTEENTH CLAIM FOR RELIEF
### (Violation of PSD Requirements – River Bend Facility)

209.    Paragraphs 1 through 208 are realleged and incorporated by reference.

210.    The River Bend facility is a "major emitting facility" as defined by Section 169(1) of the Act, 42 U.S.C. 7479(1), and a "major stationary source" as defined by 40 C.F.R. § 52.21(b)(1)(i)(b). .

211.    The River Bend facility became a major emitting facility/major stationary source upon its startup in or around March 1993, having the potential to emit more than 250 tons per year of VOCs.

212.    QGM made a major modification of the River Bend facility, as defined by 40 C.F.R. § 52.21(b)(2), by installing the RICE unit designated by QGM as ENG04 in or around April 2005 which increased the actual potential of the River Bend facility to emit by more than 40 tons per year of NOx and more than 100 tons per year of CO.

213.    QGM failed to comply with the pre-construction application and permit requirements now codified at 40 C.F.R. §§ 52.21(a)(2)(iii), and (j) - (q) (2007) in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a).  QGM has continued to operate the River Bend facility without complying with these requirements in violation of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21(r).

214.    Pursuant to 40 C.F.R. §§ 52.21(r) and 52.23, the construction or operation of a major stationary source without compliance with the applicable requirements of 40 C.F.R. § 52.21 is subject to an enforcement action under Section 113 of the Act, 42 U.S.C. § 7413.

215.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of the construction and continued operation of a major stationary source without complying with the requirements of

-44-

Section 165(a) of the Act, 42 U.S.C. § 7475(a), and 40 C.F.R. § 52.21, and QGM is liable for civil penalties for each day for each violation of the Act.

## NINETEENTH CLAIM FOR RELIEF
### (Violation of Part 71 Requirements – River Bend Facility)

216.    Paragraphs 1 through 215 are realleged and incorporated by reference.

217.    The River Bend facility is a major stationary source, a major emitting source, a major source of HAP emissions, and subject to the requirements of the Subpart HH and ZZZZ regulations. The River Bend facility is therefore both a "Part 71 Source" within the meaning of 40 C.F.R. §§ 71.1 and 71.3, and subject to the operating permit program set forth in Title V of the Act at 42 U.S.C. § 7661 - 7661f.

218.    The River Bend facility became a Part 71 Source upon the effective date of the Part 71 regulations.

219.    QGM failed to file an application to obtain a Part 71 federal operating permit for the River Bend facility within 12 months after the Part 71 regulatory program became effective on March 22, 1999, in violation of Section 503(c) of the Act, 42 U.S.C. § 7661b(c), and 40 C.F.R. §§ 71.3(a)(3), 71.4(i)(1), and 71.5(a)(1)(i).

220.    Commencing on the date the River Bend became subject to Part 71 Source, QGM was subject to the requirements of 40 C.F.R. § 71.9 to: submit an initial calculation work sheet and remit initial fees with its application for a Title V permit; submit an annual emission report to EPA with an emissions calculation worksheet and emission fee calculation worksheet; and remit applicable emission fees. QGM failed to comply with any of these requirements for the calendar years 2000 - 2004.

221.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), permanent injunctive relief is appropriate to secure compliance with the Act on account of QGM's failure to timely apply for a Part 71 federal operating permit and QGM's failure to comply with the requirements of 40 C.F.R. § 71.9., and QGM is liable for civil penalties for each day of each violation of the

-45-

Act. In addition, pursuant to 42 U.S.C. § 2201, the Court should declare the legal obligation of QGM to comply with the requirements of 40 C.F.R. § 71.9, and pursuant to 40 C.F.R. § 71.9(6) to remit a 50% penalty on the unpaid emission fees and interest until applicable emission fees are paid.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully prays that this Court enter judgment against Defendant QGM:

A.    For each violation of the Act, and the regulations promulgated thereunder, a civil penalty pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and The Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, up to $27,500 per day per violation for violations occurring on or after January 30, 1997 through March 15, 2004; and up to $32,500 per day for each violation occurring after March 15, 2004;

B.    For a declaration, pursuant to 42 U.S.C. § 2201, of QGM's obligation to comply with the requirements of 40 C.F.R. § 71.9, and pursuant to 40 C.F.R. § 71.9(6) and to remit a 50% penalty on the unpaid emission fees and interest until applicable emission fees are paid;

C.    Permanently enjoining QGM from continuing to violate the Act, and the regulations promulgated thereunder; and

D.    For such other and further relief as this Court deems just and proper.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

JEREL ("JERRY") L. ELLINGTON
JAMES D. FREEMAN
MARK C. ELMER
Attorneys
Environmental Enforcement Section
United States Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80206
(303) 844-1363 (PHONE)
(303) 844-1350 (FAX)
jerry.l.ellington@usdoj.gov


BRETT L. TOLMAN (#8821)
United States Attorney


DANIEL D. PRICE (#2646)
Assistant United States Attorney
185 South State Street, Suite 300
Salt Lake City, UT 84111
(801) 524-5682 (PHONE)
(801) 524-3269 (FAX)
daniel.price2@usdoj.gov