BRETT L. TOLMAN (#8821), United States Attorney
DANIEL D. PRICE (#2646), Assistant United States Attorney
185 South State Street, Suite 300
Salt Lake City, UT 84111
(801) 524-5682 (PHONE); (801) 325-3269 (FAX)
daniel.price2@usdoj.gov

JEREL ("JERRY") L. ELLINGTON (*Pro hac vice*)
JAMES D. FREEMAN (*Pro hac vice*)
MARK C. ELMER (*Pro hac vice*)
Attorneys, Environmental Enforcement Section
United States Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
(303) 844-1363 (PHONE)    (303) 844-1350 (FAX)
jerry.l.ellington@usdoj.gov

*Attorneys for the United States of America*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | **UNITED STATES' MEMORANDUM** |
| | * | **IN SUPPORT OF MOTION FOR** |
| Plaintiff, | * | **SUMMARY JUDGMENT ON** |
| | * | **DEFENDANT'S FOURTH** |
| | * | **AFFIRMATIVE DEFENSE** |
| QUESTAR GAS MANAGEMENT COMPANY, | * | |
| | * | Case No. 2:08-CV-00167-DAK |
| | * | |
| Defendant. | * | District Judge Dale A. Kimball |
| | * | |

# TABLE OF CONTENTS

INTRODUCTION …………………………………………………………….. 1

STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE
DISPUTE …………………………………………………………………... 3

LEGAL STANDARD …………………………………………………… 9

STATUATORY AND REGULATORY BACKGROUND ……………………..…… 9

   A.  The NESHAP Program ……………………………………… 10

     1.  Oil and Natural Gas Production Facilities NESHAP
      (Subpart HH) …………………………………………… 11

     2.  Reciprocating Internal Combustion Engine NESHAP
      (Subpart ZZZZ) ………………………………………… 12

   B.  The PSD Program ……………………………………………… 13

ARGUMENT …………………………………………………………….. 15

  I.  The Five Facilities' Potential To Emit Must Be Calculated on
    an Uncontrolled Basis Because Questar's Controls Do Not
    Meet Enforceability Requirements Set Forth in Potential
    To Emit ……….......................................................................... 16

   A.  Pollution Controls Must Meet Enforceability Requirements
     To Limit Potential To Emit ........................................................ 16

   B.  Questar's Controls Do Not Meet Enforceability
     Requirements ………………………………………………... 20

  II.  The Questar Facilities Exceed Major Source Thresholds on an
    Uncontrolled Basis ……………………………………………… 20

   A.  Emissions from the Glycol Dehydrators at Each Facility
     Exceed the NESHAP Subpart HH Major Source
     Thresholds ……………………………………………… 21

   B.  Emissions from Each of the Facilities Exceed the NESHAP
     Subpart ZZZZ Major Source Thresholds …………………......... 21

# TABLE OF CONTENTS (continued)

C.      Emissions from Each of the Facilities Exceed the PSD
        Program's Major Source Thresholds ………………………….. 22

CONCLUSION ……………………………………………………………………. 22

## INTRODUCTION

Questar Gas Management Co. ("Questar") owns and operates mid-stream natural gas processing facilities in the Uinta Basin that compress, dehydrate, and process natural gas from upstream producers.  Questar's Uinta Basin operations include the five compressor stations at issue in this action:  Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend (the "Facilities").  The United States alleges that at each of the Facilities Questar failed to comply with requirements of the Clean Air Act's (the "Act") National Emission Standards for Hazardous Air Pollutants ("NESHAP") and Prevention of Significant Deterioration ("PSD") programs intended to minimize emissions of pollutants that can harm human health and the environment.

A key issue in this case is whether the Facilities are "major sources" under the the NESHAP and PSD programs, as both programs have requirements that only apply to larger facilities.  For example, the NESHAP program regulates hazardous air pollutants ("HAPs") and establishes requirements for "major sources" of HAPs at oil and natural gas production facilities, *see* 40 C.F.R. Subpart HH, and at facilities utilizing reciprocating internal combustion engines, *see* 40 C.F.R. Subpart ZZZZ.  The PSD program regulates all significant sources of air pollution and prohibits construction of a "major emitting facility" without the issuance of a permit under its preconstruction review provisions and without installing the best available control technology for each pollutant subject to regulation under the Act.  *See* 42 U.S.C. § 7475(a); 40 C.F.R. § 52.21(a)(2)(iii).

The NESHAP and PSD programs both provide that a facility's major source status must be determined based on its "potential to emit" certain pollutants.  One important factor in determining a facility's potential to emit pollution is whether emission reductions or limitations that result from emissions controls (i.e. pollution control technology) or operating restrictions

1

(e.g., restrictions on hours of operation or types of fuel used) should be considered.   EPA regulations and policy provide the answer:  emission reductions, limitations, or restrictions may only be considered in determining a facility's potential to emit when they are enforceable.

The vitality of this "enforceability" requirement is the subject of this motion.  The United States contends that the Facilities' potential to emit should be calculated on an uncontrolled basis because the controls the company claims to have installed are not subject to enforceable requirements – they are operated at Questar's discretion.  Questar contends in its Fourth Affirmative Defense, however, that the D.C. Circuit eliminated the "enforceability" requirement in challenges to EPA regulations implementing the Act's NESHAP and PSD provisions, and as a result appears to contend that its potential to emit must be calculated on a controlled basis even where there is no enforceable requirement that it actually use the controls.

The amount of pollution the Facilities would emit if not controlled is a factual issue that is not subject to genuine dispute.  Questar has disclosed its "uncontrolled" emissions at the Facilities to EPA in certified documents, and those emissions exceed major source thresholds.  The decisive legal issue – whether emission reductions or restrictions must be enforceable to limit a facility's potential to emit – is subject to dispute, but because it is a purely legal issue the Court may decide it now.  As Questar's interpretation of the D.C. Circuit's rulings and the current vitality of the "enforceability" requirement is incorrect as a matter of law, the United States respectfully requests that this Court grant its motion for summary judgment on Questar's Fourth Affirmative Defense and find on undisputed facts that the Facilities are "major sources" of pollutants under the NESHAP and PSD programs.

Resolution of this legal issue at this stage will streamline the case.  It will allow the parties to focus on issues that are truly in dispute, conserving time and resources in the discovery

process.  It will reduce the need for expert testimony on essentially legal issues.  And most importantly, it will simplify the case presented to the jury.

### STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE

1.   Questar owns and operates the Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend compressor stations at issue in this case.  Answer ¶ 7 (Docket No. 19).

2.   The Facilities compress, dehydrate, and process (by removing natural gas liquids) natural gas gathered from upstream areas and transmits it to one or more gas processing plants for further processing.  Ex. 1, Beeler Decl. ¶ 7.

3.   The Facilities each utilize glycol dehydrators (which remove water from the natural gas stream), compressor engines (which compress the natural gas), and condensate storage tanks (which store liquids removed from the natural gas stream through dehydration or compression).  Ex. 1, Beeler Decl. ¶ 8.

4.   The Facilities are "oil and gas production facilities" as that phrase is defined in 40 C.F.R. § 63.6675.  Ex. 1, Beeler Decl. ¶ 11.

5.   Neither the State of Utah nor any local entity assert regulatory authority over the amount of air pollution the Facilities emit.  Ex. 1, Beeler Decl. ¶ 12; Ex. 4, DeJulis Decl.  *See also* Ex. 3, Ingerson Dep. at 249-50 (recounting conversation in which the Utah Department of Environmental Quality informed Questar that it was "declining jurisdiction" over the River Bend compressor station).

6.   None of the Facilities have enforceable state or local permits that limit their air emissions.  Ex. 1, Beeler Decl. ¶ 12.

7.   Questar contends that the Clean Air Act's NESHAP provisions do not apply to the Facilities.  *See, e.g.,* Answer ¶¶ 54, 65, 90, 101, 125, 136.

8.  Benzene, toluene, ethylbenzene, xylene, n-Hexane, 2,2,4-Trimethylpentane and formaldehyde are HAPs under the Clean Air Act.  *See* 42 U.S.C. § 7412(b)(1).

9.  Nitrogen dioxide ("$NO_2$"), carbon monoxide ("CO"), and ozone are "criteria" air pollutants for which national ambient air quality standards have been established under the Clean Air Act.  *See* 42 U.S.C. § 7409(a); 40 C.F.R. Part 50.  Volatile organic compounds ("VOCs") and nitrogen oxides ("NOx") are precursors of ozone.  *See* 40 C.F.R. 52.21(b)(50)(i)(a).  NOx, VOCs, and CO emissions are considered – among others – in determining whether a source is a major emitting facility under the PSD program.  *See* 42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(50).

## Material Facts Regarding the Coyote Wash Compressor Station

10.  In October 2005, Questar installed and began operating two Caterpillar G3608 reciprocating internal combustion engines (designated C-100 and C-200), each with over 500 brake horsepower, at the Coyote Wash compressor station.  *See* Ex. 2, Questar Gas Management Company's Supplemental Objections and Responses To Plaintiff, United States' First Set of Interrogatories ("Questar's Response to First Set of Interrogatories"), Exhibit 1.

11.  Formaldehyde emissions from the C-100 and C-200 engines referenced in Paragraph 10 would collectively exceed 10 tons per year if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 17 and Attach. 1 at STIP_0214 (Questar Part 71 Permit Application certification that C-100 and C-200 each would emit 9.15 tons per year of formaldehyde, for total HAP emissions of 18.3 tons per year, if not controlled).[1]

---

[1] The United States does not contend in this motion that C-100 and C-200 (or any of the other emitting units discussed in this statement of facts) are in fact uncontrolled.  Whether Questar installed controls – and the effectiveness of any controls that Questar contends it installed – is a disputed fact.  As explained in the background section, a facility's "potential to emit" drives the

12.  In addition to the two engines referenced in Paragraph 10, Questar has installed and at various times operated the following reciprocating internal combustion engines with over 500 brake horsepower at the Coyote Wash compressor station:  four Waukesha L7042 GSI engines (BC-100, C-250, C-500, C-600); three Caterpillar G3616 engines (C-300, C-400, C-500); one Waukesha L5794 GSI engine (C-400, C-800); one Caterpillar 3516 engine (C-700); and one Caterpillar 3606 engine (C-900).  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

13.  In November 2006, Questar installed and began operating a glycol dehydrator unit (SK-1000) at the Coyote Wash compressor station.  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

14.  HAP emissions from SK-1000 would exceed 25 tons per year if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 17 and Attach. 1 at STIP_0214 (Questar Part 71 Permit Application certification that SK-1000 would emit 36.3 tons per year of HAPs if not controlled).

15.  Engines and condensate storage tanks installed at the Coyote Wash compressor station on or before March 2006 would collectively emit more than 250 tons per year of NOx and CO if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 18 and Attach. 1 at STIP_0214 (Questar Part 71 Permit Application certification that C-100, C-200, C-400, C-500, TK-200, and TK-300 would have NOx and CO emissions totaling 346.99 and 751.02 tons per year, respectively, if not controlled).

---

applicability of many PSD and NESHAP requirements.  As controls that are not "enforceable" do not limit a facility's potential to emit, EPA and regulated entities often calculate a facility's emissions on an uncontrolled basis (i.e., without accounting for controls that may exist).  It is those calculations which are referenced in this statement of facts.

**Material Facts Regarding the Chapita Compressor Station**

16.  In May 2004, Questar installed and began operating a glycol dehydrator unit (DEHY01) at the Chapita compressor station.  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

17.  HAP emissions from the DEHY01 unit referenced in Paragraph 16 would exceed 25 tons per year if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 19 and Attach. 2 at STIP_0061 (Questar Part 71 Permit Application certification that DEHY01 would have HAP emissions of 230 tons per year if not controlled) and STIP_0008 (summary of uncontrolled emissions).

18.  Questar has installed and at various times operated three Caterpillar G3606 (C-100, C-200 and C-300) reciprocating internal combustion engines with over 500 brake horsepower at the Chapita compressor station.  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

19.  The engines, glycol dehydrator, and condensate storage tanks installed at the Chapita compressor station on or before May 2004 would collectively emit over 250 tons per year NOx and VOCs if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 20 and Attach. 2 at STIP_0061 (Questar Part 71 Permit Application certification that NOx and VOC emissions from C-100, C-200, Generator, DEHY01, T01, and T02 would total 375.59 and 497.53 tons per year, respectively, if not controlled) and STIP_0008 (summary of uncontrolled emissions).

**Material Facts Regarding the Island Compressor Station**

20.  In September 2004, Questar installed and began operating a glycol dehydrator unit (DEHY01) at the Island compressor station.  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

21.  HAP emissions from the DEHY01 unit referenced in Paragraph 20 would exceed 25 tons per year if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 21 and Attach. 3 at STIP_0493 (Questar Part 71 Permit Application certifying that DEHY01 would have HAP emissions of 74.2 tons per year if not controlled) and STIP_0438 (summary of uncontrolled emissions).

22.  Questar has installed and at various times operated the following reciprocating internal combustion engines with over 500 brake horsepower at the Island compressor station: two Waukesha L7042GSI engines (C-100 and C-200) and one Caterpillar G399 (Recompressor) engine.  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

23.  The engines, glycol dehydrator, and condensate storage tanks installed at the Island compressor station on or before September 2004 would collectively emit over 250 tons per year NOx and CO if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 22 and Attach 3 at STIP_0493 (Questar Part 71 Permit Application certification that NOx and CO emissions from C-100, C-200, Generator, Recompressor, DEHY01, T01, and T02 would total 706 and 1000.02 tons per year, respectively, if not controlled) and STIP_0438 (summary of uncontrolled emissions).

**Material Facts Regarding the Wonsits Valley Compressor Station**

24.  In July 2001, Questar installed a glycol dehydrator unit (D-1) at the Wonsits Valley compressor station.  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

25.  HAP emissions from the D-1 unit referenced in Paragraph 24 would exceed 25 tons per year if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 23 and Attach. 4 at STIP_0908 (Questar Part 71 Permit Application certification that D-1 would have HAP emissions of 138 tons per year if not controlled) and STIP_0840 (summary of uncontrolled

emissions).

26.  Questar has installed and at various times operated the following reciprocating

internal combustion engines with over 500 site-rated brake horsepower at the Wonsits Valley

compressor station:  eight Waukesha AT-27GL engines; one Waukesha AT25-GL engine; one

Caterpillar G3606 engine; one Caterpillar G3608 engine; two Caterpillar G3612 engines; and one

Caterpillar G3616 engine.  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit

1.

27.  The engines, glycol dehydrator, and condensate storage tanks installed at the Wonsits

Valley compressor station on or before September 2001 would collectively emit over 250 tons

per year VOCs if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 24 and Attach. 4

at  STIP_0908 (Questar Part 71 Permit Application certification that VOC emissions from C-

202, C-204, C-205, C-206, and D-1 would total 357.73 tons per year if not controlled) and

STIP_0840 and STIP_0844 (summaries of uncontrolled emissions).

**Material Facts Regarding the River Bend Compressor Station**

28.  In March 1993, Questar installed two glycol dehydrator units (DEH-01 and DEH-02)

at the River Bend compressor station.  *See* Ex. 2, Questar's Response to First Set of

Interrogatories, Exhibit 1.

29.  HAP emissions from the DEH-01 and DEH-02 units referenced in Paragraph 28

would collectively exceed 25 tons per year if calculated on an uncontrolled basis.  *See* Ex. 1,

Beeler Decl. ¶ 25 and Attach. 5 at STIP_0600 (Questar Part 71 Permit Application certification

that DEH-01 and DEH-02 would have HAP emissions totaling 68.4 tons per year if not

controlled) and STIP_0538 (summary of uncontrolled emissions).

30.  Questar has installed and at various times operated the following reciprocating

internal combustion engines with over 500 site-rated brake horsepower at the River Bend compressor station:  four Waukesha L5790GL engines (three designated ENG01 and one designated ENG04); one Waukesha L7042GL engine (ENG02); and one Waukesha F817GU engine (ENG-03).  *See* Ex. 2, Questar's Response to First Set of Interrogatories, Exhibit 1.

31.  The engines, glycol dehydrator, and condensate storage tanks installed at the River Bend compressor station on or before March 1993 would collectively emit over 250 tons per year VOCs if calculated on an uncontrolled basis.  *See* Ex. 1, Beeler Decl. ¶ 26 and Attach. 5 at STIP_0600 (Questar Part 71 Permit Application certification that VOC emissions from ENG-01, ENG-03, DEHY-01, DEHY-02, T-08, T-09, and T-13 would total 303.54 tons per year if not controlled) and STIP_0538 (summary of uncontrolled emissions).

## LEGAL STANDARD

Summary judgment is proper under Federal R. Civ. P. 56 where the court finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Although evidence must be viewed in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), the non-moving party must go beyond pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  Rule 56(d) authorizes a court to "determine what material facts are not genuinely at issue" in cases not fully adjudicated on the motion.  Fed. R. Civ. P. 56(d)(1).

## STATUTORY AND REGULATORY BACKGROUND

The Clean Air Act was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its

population." 42 U.S.C. § 7401(b)(1). The CAA requires the Environmental Protection Agency

("EPA") to set National Ambient Air Quality Standards ("NAAQS") specifying allowable

concentrations of certain air pollutants, including $NO_2$, CO, and ozone. 42 U.S.C. § 7409; 40

C.F.R. Part 50. The CAA establishes various additional programs to protect air quality,

including the NESHAP and PSD programs at issue in this case.

### A.     The NESHAP Program

Section 112 of the Act requires EPA to set emission standards for hazardous air

pollutants. *See* 42 U.S.C. § 7412(d). HAPs are listed in Section 112(b) of the Act, 42 U.S.C. §

7412(b), and include benzene, toluene, ethyl benzene, xylene, and hexane (five toxic air

pollutants typically contained in emissions from oil and natural gas production facilities) and

formaldehyde (typically emitted from compressor engines at such facilities). In 1990, Congress

amended Section 112 to require EPA to promulgate technology-based National Emission

Standards for Hazardous Air Pollutants ("NESHAP") for categories of sources that emit such

pollutants. 42 U.S.C. § 7412(d). "These emission standards are to be based not on an

assessment of the risks posed by HAPs, but instead on the maximum achievable control

technology (MACT) for sources in each category." *Sierra Club v. EPA*, 353 F.3d 976, 980 (D.C.

Cir. 2004).

EPA has adopted two sets of emissions standards applicable to mid-stream natural gas

processing facilities – the facilities at issue in this case – pursuant to the authority under Section

112 of the Act, 42 U.S.C. § 7412. The first is the NESHAP for Oil and Natural Gas Production

Facilities, codified at 40 C.F.R. Part 63, Subpart HH. The second is the NESHAP for Stationary

Source Reciprocating Internal Combustion Engines, codified at 40 C.F.R. Part 63, Subpart

ZZZZ. The effective date of the Subpart HH regulations was June 17, 1999; the effective date of

Subpart ZZZZ was June 15, 2004.  In addition, EPA has promulgated General Provisions,

codified at 40 C.F.R. Part 63, Subpart A, establishing definitions, reporting requirements, and

other general procedures applicable to all NESHAP source categories.

### 1.  Oil and Natural Gas Production Facilities NESHAP (Subpart HH)

The Subpart HH standards, among other things, limit emissions from glycol dehydration

units that are major sources of HAPs.  40 C.F.R. § 63.760(b).  A "major source" of HAPs is "any

stationary source . . . that emits or has the potential to emit considering controls, in the aggregate,

10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any

combination of hazardous air pollutants."  Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1);

40 C.F.R. § 63.2 (definition of "major source" in NESHAP General Provisions).  HAP emissions

from glycol dehydration units are aggregated for a major source determination under Subpart

HH.  40 C.F.R. § 63.761 (definition of major source).  EPA defines "potential to emit" in the

General Provisions as:

> the maximum capacity of a stationary source to emit a pollutant under its physical
> and operational design.  Any physical or operational limitation on the capacity of
> the stationary source to emit a pollutant, including air pollution control equipment
> and restrictions on hours of operation or on the type or amount of material
> combusted, stored, or processed, shall be treated as part of its design if the
> limitation or the effect it would have on emissions is federally enforceable.

40 C.F.R. § 63.2 (definition of "potential to emit").  The D.C. Circuit subsequently remanded the

definition of potential to emit in the NESHAP General Provisions because EPA did not explain

"why the criteria for federal approval and the consequences of that approval are related to

ensuring the practical effectiveness of state controls such that the set of controls considered under

112 should be limited in that fashion."  *Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351, 1365 (D.C.

Cir. 1995).  The Court did not, however, vacate the rule.  *See Nat'l Mining Ass'n v. EPA*, 1996

WL 10101 (D.C. Cir. Jan. 2, 1996) (unpublished).  Accordingly, the definition remains in place

pending agency reconsideration on remand.  *See* 64 Fed. Reg. 32,610, 32,621 (June 17, 1999)

(referencing *National Mining* in the preamble to the Subpart HH final rule).  Even before the

*National Mining* ruling, however, EPA had recognized certain state-enforceable limits on a

source's potential to emit during a transition period to give states the opportunity to design and

implement federally enforceable mechanisms to limit potential to emit.  *See* Ex. 1, Beeler Decl. ¶

13 and Attach. 8, Options for Limiting the Potential to Emit (PTE) of a Stationary Source Under

Section 112 and Title V of the Clean Air Act (January 25, 1995) at EPA_00024735 - 00024737.

The so-called "transition policy" remains in effect.  *See* Ex. 1, Beeler Decl. ¶ 13 and Attach. 9,

Third Extension of January 25, 1995 Potential To Emit Transition Policy (December 1999) at

EPA_00052888.

Once a facility is determined to be a major source of HAPs, Subpart HH requires it to,

among other things, install MACT level controls on certain sources of pollution, *see* 40 C.F.R.

§ 63.771; demonstrate the effectiveness of such controls, *see* 40 C.F.R. § 63.772; continuously

monitor the controls, *see* 40 C.F.R. § 63.773; record applicable monitoring data, *see* 40 C.F.R.

§ 63.774; and submit various notifications and reports regarding the source to assure compliance

with applicable pollution control requirements, *see* 40 C.F.R. § 63.775.

### 2. Reciprocating Internal Combustion Engine NESHAP (Subpart ZZZZ)

Subpart ZZZZ regulations limit HAP emissions from stationary reciprocating internal

combustion engines ("RICE") with a site-rating of more than 500 brake horsepower located at

major sources of hazardous air pollutants.  40 C.F.R §§ 63.6580, 63.6590(a).  The definitions of

"major source" and "potential to emit" found in the Act and the General Provisions discussed in

the Supart HH discussion above also apply to Subpart ZZZZ.  In particular, the "major source"

threshold is a 'stationary source . . . that emits or has the potential to emit considering controls, in

the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more

of any combination of hazardous air pollutants."  Section 112(a)(1) of the Act, 42 U.S.C. §

7412(a)(1); 40 C.F.R. § 63.2 (definition of "major source" in NESHAP General Provisions); 40

C.F.R. § 63.6675 (definition of "major source" in Subpart ZZZZ).  For purposes of determining

whether a source is "major" for purposes of Subpart ZZZZ, emissions of HAPs from glycol

dehydrators, certain storage vessels, combustion turbines, and RICE located at the same "oil and

gas production facility" must be added together.  40 C.F.R. § 63.6675 (definition of "major

source").  An "oil and gas production facility" is "any grouping of equipment . . . where natural

gas is processed, upgraded, or stored prior to entering the natural transmission and storage source

category."  *See* 40 C.F.R §§ 63.761 (defining "facility"); 40 C.F.R § 63.6675 (definition of "oil

and gas production facility").  Both Subparts HH and ZZZZ list "a compressor station that

transports natural gas to a natural gas processing plant" as an example of an "oil and gas

production facility."  *See* 40 C.F.R. §§ 63.761 (defining "facility") and 63.6675 (defining "oil

and gas production facility").

Engines at facilities subject to Subpart ZZZZ requirements must meet specified emission

and operating limitations (depending on the type of engine operated), 40 C.F.R § 63.6600;

conduct engine performance testing to verify compliance with the limitations, 40 C.F.R

§ 63.6610; and monitor specified operational parameters, 40 C.F.R § 63.6635.

### B.      The PSD Program

As a result of concerns that existing law did not protect air quality in areas that met air

quality standards, Congress amended the Act in 1977 to establish a statutory PSD program

"aimed at giving added protection to air quality," *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567-68 (2007), while fostering economic growth in a manner consistent with preservation of existing clean air resources. 42 U.S.C. § 7470(3). The PSD program directly addresses the impact on ambient air quality resulting from new construction of, and modifications to, large pollutant-emitting facilities in areas of the country that have not violated air quality standards. *Envtl. Def.*, 549 U.S. at 567-68; 42 U.S.C. §§ 7470, 7475(a)(3). The PSD program can be implemented by a state as part of an approved state implementation plan or by EPA. Under the PSD program, "[n]o major emitting facility . . . may be constructed[2] . . . unless" various requirements are met, including obtaining a preconstruction permit setting forth emission limitations and applying the "best available control technology." 42 U.S.C. §§ 7475(a), 7479(3). The term "major emitting facility" includes any source with the potential to emit 250 tons per year or more of any air pollutant. 42 U.S.C. § 7479(1).

Whether a given facility is a "major emitting facility" subject to the Act's PSD requirements thus also depends on its "potential to emit" air pollutants. EPA's PSD regulations define a source's "potential to emit" the same way it is defined under the NESHAP program:

> the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable.

40 C.F.R. § 52.21(b)(4). In 1995, the D.C. Circuit vacated this definition, *see Chem. Mfrs. Ass'n v. EPA*, 70 F.3d 637 (D.C. Cir. 1995), and remanded it to EPA for reconsideration in light of its

---

[2] The Act defines "construction" to include "modification," which "means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not

decision in *National Mining*, which (as discussed above) questioned why state-enforceable controls were insufficient to limit a source's potential to emit in the Section 112/NESHAP context.  EPA subsequently issued a guidance document responding to the two D.C. Circuit rulings.  *See* Ex. 1, Beeler Decl. ¶ 13 and Attach. 10, EPA Interim Policy on Federal Enforceability of Limitations on Potential To Emit (January 1996).  The interim policy (which is distinct from the "transition policy" addressing state-enforceability issues in the Section 112 context, discussed above) provides that when determining PSD applicability, the term "federally enforceable" shall be read to mean "federally enforceable or legally and practicably enforceable by a state or local air pollution control agency."  *Id*. at EPA_00004401.  The January 1996 interim policy is still in effect.  *See* 72 Fed. Reg. 2930, 2936 n.2 (Jan. 23, 2007).

## ARGUMENT

It is undisputed that emissions at Questar's Wonsits Valley, Chapita, Island, Coyote Wash, and River Bend compressor stations exceed major source thresholds for the NESHAP and PSD programs when calculated on an uncontrolled basis.  Indeed, Questar's own calculations – submitted to EPA under penalty of perjury – demonstrate  the exceedances.  *See* Statement of Material Fact Nos. 10-31.  However, Questar contends in its Fourth Affirmative Defense that:

> The claims asserted and relief sought by Plaintiff are barred, in whole or in part, because the requirement for emissions controls to be "federally enforceable" is, by court remand in *National Mining Ass'n v. EPA*, 59 F.3d 1351, 1365 (D.C. Cir. 1995), and vacatur in *Chemical Mfrs. Ass'n v. EPA*, 1995 U.S. App. LEXIS 31475, Case No. 89-1514 (D.C. Cir. Sept. 15, 1995), and by EPA's own admission, no longer effective, and consequently, when taking into account QGM's emission controls, the compression facilities at issue were not "major sources" under the PSD or NESHAP programs, as alleged in the complaint.

Answer at ¶ 225.  In other words, Questar contends that as a result of two D.C. Circuit decisions

---

previously emitted."  42 U.S.C. §§ 7411(a)(4), 7479(2)(C).

its major source status should be assessed considering emissions controls that are not enforceable within the meaning of EPA regulations and related guidance.  This position is incorrect as a matter of law.  Even assuming for the purpose of summary judgment that Questar has installed controls as it claims, and that the controls have been faithfully operated (which the United States does not concede[3]), the D.C. Circuit rulings and EPA policy make clear that controls (or other restrictions on operations that reduce emissions) must be enforceable to limit a source's potential to emit.  As Questar's facilities do not have enforceable controls, their major source status must be determined on an uncontrolled basis.

I.      **The Five Facilities' Potential To Emit Must Be Calculated on an Uncontrolled Basis Because Questar's Controls Do Not Meet Enforceability Requirements Set Forth in EPA Regulations and Policy.**

        A.      **Pollution Controls Must Meet Enforceability Requirements To Limit Potential To Emit.**

        The Clean Air Act does not specify how to calculate "potential to emit" for the purpose of determining "major source" status under the two programs.  *See* 42 U.S.C. § 7412(a)(1) (defining "major source" under the Act's NESHAP provisions); 42 U.S.C. §§ 7475(a), 7479(1) (defining "major emitting facility" under the Act's PSD provisions).  However, EPA regulations do.  The NESHAP General Provisions define "potential to emit" as:

> [T]he maximum capacity of a stationary source to emit a pollutant under its physical and operational design.  Any physical or operational limitation on the capacity of the stationary source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design *if*

---

[3]  The United States will contend at trial that on numerous occasions Questar did not install on a timely basis the controls it claims to have installed; that when installed such controls were operated inconsistently and haphazardly; and that Questar did not conduct sufficient monitoring and recordkeeping to demonstrate the efficacy of its controls.  Proof of these facts is not necessary for the success of the current motion, which rests on the contention that the controls cannot be considered as a matter of law because they were not enforceable.

>*the limitation or the effect it would have on emissions is federally enforceable*.

40 C.F.R. § 63.2 (definition of "potential to emit") (emphasis added).  The definition of

"potential to emit" in EPA's PSD regulations is identical.  *See* 40 C.F.R. § 52.21(b)(4).  Thus

both regulatory programs originally required that the use of pollution controls be "federally

enforceable" to be used when determining a source's potential to emit.

The definitions of "potential to emit" in both programs were challenged in the D.C.

Circuit.  *See Nat'l Mining*, 59 F.3d at 1361-65; *Chem. Mfrs.*, 70 F.3d at 637.  The petitioners in

*National Mining* contended that the definition of "potential to emit" in the NESHAP regulations

was contrary to the language of the Clean Air Act because it disregarded emissions limitations

imposed by state or local regulations that are effective but not "federally enforceable."  *See Nat'l

Mining*, 59 F.3d at 1362.  The D.C. Circuit noted that there was no dispute that Congress

intended "major source" status to be assessed "considering controls" and that it intended the

word "controls" to refer to "governmental regulations and not, for instance, operational

restrictions that an owner might voluntarily adopt."  *Id*.  The Court also noted that Congress

intended the words "considering controls" to "stand for *effective* controls" and that "EPA clearly

is not obligated to take into account controls that are only chimeras and do not really restrain an

operator from emitting pollution."  *Id*.  The court concluded, however, that EPA had "not made

[the] case" that Congress "intended for state emissions controls to be disregarded in determining

whether a source is classified as 'major'" and remanded the definition for further explanation.

*Id*. at 1365; *Nat'l Mining*, 1996 WL 10101. at *1.  The petitioners in *Chemical Manufacturers*

challenged the "potential to emit" definition in the PSD regulations on the same grounds.  *Chem.

Mfrs.*, 70 F.3d at 637.  The D.C. Circuit remanded the definition in the PSD regulations for

reconsideration in light of the *National Mining* decision, and also vacated the underlying

definition.  *Id.*

Questar's Fourth Affirmative Defense contends that pollution controls need not be enforceable to limit a facility's potential to emit in the aftermath of the D.C. Circuit's two "federal enforceability" rulings.  Answer at ¶ 225.  This is wrong.  The D.C. Circuit made clear that its concern was that EPA's focus on *federal* enforceability precluded consideration of controls required by state or local authorities – even when effective and enforceable – when assessing a facility's potential to emit.  *See Nat'l Mining*, 59 F.3d at 1363-64.  The court did not take issue with the requirement that controls be enforceable *per se*, but that they be *federally* enforceable.  Nothing in the D.C. Circuit's rulings suggests that controls that are not enforceable by *any* governmental authority may be considered when calculating a facility's potential to emit.  In fact, the D.C. Circuit expressly acknowledged that it was "common ground" that Congress did *not* intend non-enforceable actions that might limit emissions to reduce a facility's potential to emit.  *See id.* at 1362 ("controls" do not include "operational restrictions that an owner might voluntarily adopt").  Questar's Fourth Affirmative Defense thus misapplies the D.C. Circuit's "potential to emit" rulings.

The Fourth Affirmative Defense also implicitly assumes that the D.C. Circuit rulings have left a regulatory vacuum in which there is no viable definition of "potential to emit."  This assumption ignores two EPA policy statements, which allow state-enforceable limitations to reduce a source's potential to emit where the limitation is enforceable as a practical matter.  *See* Ex. 1, Beeler Decl. ¶ 13 and Attach. 9, Third Extension of January 25, 1995 Potential To Emit Transition Policy, at 2 (for the NESHAP program, "state enforceable limits that are enforceable as a practical matter" may be used to reduce a source's potential to emit); Ex. 1, Beeler Decl. ¶ 13 and Attach. 10, EPA Interim Policy on Federal Enforceability of Limitations on Potential To

Emit, at EPA_00004401 (for the PSD program, the term "federally enforceable" shall be read to mean "federally enforceable or legally and practicably enforceable by a state or local air pollution control agency").[4]  The two policy statements thus square EPA's interpretation of "potential to emit" with the D.C. Circuit's rulings.  The policies do *not*, however, permit consideration of limitations that are not enforceable by a government entity.  In this regard, the policy statements are consistent with the original NESHAP and PSD rules and with the D.C. Circuit's assessment of congressional intent.  *See Nat'l Mining*, 59 F.3d at 1362 (noting that Congress intended the word "controls" to refer to "governmental regulations and not, for instance, operational restrictions that an owner might voluntarily adopt.").  There is no reason for this Court to disturb EPA's long-held interpretation.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (weight given informal agency interpretation depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade); *McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006) (*Skidmore* deference given to longstanding and well-reasoned agency interpretation that is "consistent with" circuit court authority).

In sum, there is simply no basis to conclude, as Questar does in its Fourth Affirmative Defense, that the D.C. Circuit's rulings in the *National Mining* and *Chemical Manufacturers* cases require the consideration of controls that do not meet enforceability requirements when determining a source's potential to emit.

---

[4] While the two policies are designated "transitional" and "interim," respectively, both are in effect until EPA completes a new rulemaking on the definition of "potential to emit."  *See* Ex. 1, Beeler Decl. Attach. 10, EPA Interim Policy on Federal Enforceability of Limitations on Potential To Emit, at EPA_00004401; 72 Fed. Reg. 2930, 2936 n.2 (Jan. 23, 2007).

**B.      Questar's Controls Do Not Meet Enforceability Requirements.**

Questar's Fourth Affirmative Defense implicitly recognizes that controls installed at the Facilities are not federally enforceable.  If they were federally enforceable (and if Questar was in compliance with the applicable requirements), the resulting pollution reductions would reduce the Facilities' potential to emit for the purpose of determining their major source status under the regulations and policy implementing the NESHAP and PSD programs, and the Fourth Affirmative Defense would be unnecessary.[5]  Nor are the Facilities subject to any state laws or regulations that limit their emissions.  *See* Ex. 1, Beeler Decl. ¶ 12; Ex. 4, DeJulis Decl.  Therefore, even assuming for purposes of summary judgment that Questar has voluntarily installed pollution controls, and that those controls have operated continuously and effectively, they do not meet the enforceability requirements set forth in EPA policy and regulations and articulated by the D.C. Circuit.  Accordingly, they cannot be considered when calculating the Facilities' potential to emit for purposes of the NESHAP and PSD programs.

**II.      The Questar Facilities Exceed Major Source Thresholds on an Uncontrolled Basis.**

Questar cannot in good faith dispute that the five compressor stations at issue in this case exceed major source thresholds when emissions are calculated on an uncontrolled basis.  Questar's own emissions calculations demonstrate the Facilities are major for both hazardous air pollutants and criteria pollutants on an uncontrolled basis.

---

[5]  The United States recognizes that the NESHAP requirements themselves could serve as a federally enforceable limitation on Questar's emissions in some circumstances, which could limit the potential to emit at the five facilities for PSD purposes.  But Questar has consistently argued that the NESHAP provisions do not apply to the Facilities.  *See, e.g.,* Answer ¶¶ 54, 65, 90, 101.  Questar cannot simultaneously contend that the regulations do not apply to the Facilities and that they represent enforceable restrictions on the Facilities' emissions.

A.      **Emissions from the Glycol Dehydrators at Each Facility Exceed the NESHAP Subpart HH Major Source Threshold.**

A glycol dehydrator at an oil and gas production facility is a major source of hazardous air pollutants if it "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  *See* Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2 (definition of "major source" in NESHAP General Provisions). HAP emissions from multiple glycol dehydration units at a source are aggregated to determine major source status under Subpart HH.  40 C.F.R. § 63.761 (definition of "major source.") According to certified emissions data that Questar has submitted to EPA, the glycol dehydrators at each Facilities would emit hazardous air pollutants in excess of 25 tons per year if calculated on an uncontrolled basis.  *See* Statement of Fact Nos. 14, 17, 21, 25, and 29.  Accordingly, the glycol dehydrators at each of the five facilities are major sources of hazardous air pollutants for purposes of NESHAP Subpart HH requirements.

B.      **Emissions from Each of the Facilities Exceed the NESHAP Subpart ZZZZ Major Source Thresholds.**

Subpart ZZZZ regulations limit emissions of hazardous air pollutants from stationary reciprocating internal combustion engines with a site-rating of more than 500 brake horsepower located at major sources of hazardous air pollution.  40 C.F.R §§ 63.6580, 63.6590(a).  A "major source" includes an "oil and gas production facility" that "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  Section 112(a)(1) of the Act, 42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2 (definition of "major source" in NESHAP General Provisions); 40 C.F.R. § 63.6675 (definition of "major source" in Subpart ZZZZ); 40

C.F.R. § 63.6585.  Emissions of HAPs from glycol dehydrators, certain storage vessels,

combustion turbines, and RICE must be added together to determine major source status.  40

C.F.R. § 63.6675 (definition of "major source "in Subpart ZZZZ).  According to certified

emissions data that Questar has submitted to EPA, the Facilities each would emit HAPs in excess

of 25 tons per year if calculated on an uncontrolled basis.  *See* Statement of Fact Nos. 11, 17, 21,

25, and 29.  Accordingly, the Facilities are major sources of HAPs for purposes of the NESHAP

regulations and, therefore, RICE with a site-rating of more than 500 brake horsepower at the

facilities are subject to Subpart ZZZZ requirements.

    **C.    Emissions from Each of the Facilities Exceed the PSD Program's Major Source Thresholds.**

Each of the Facilities is a "major emitting facility" under the PSD program if it has the

potential to emit 250 tons per year or more of any air pollutant, including VOCs, NOx and CO.

42 U.S.C. §§ 7475(a), 7479(3).  According to certified emissions data that Questar has submitted

to EPA, each Facility would emit NOx, VOC's and/or CO in excess of 250 tons per year if

calculated on an uncontrolled basis.  *See* Statement of Fact Nos. 15, 19, 23, 27, and 31.

Accordingly, the Facilities are major emitting facilities for purposes of PSD applicability.

**CONCLUSION**

For the reasons discussed above, the United States is entitled to partial summary

judgment on Questar's Fourth Affirmative Defense and a finding – on undisputed facts – that the

Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend compressor stations are "major

sources" of hazardous air pollution under the Clean Air Act's NESHAP program (and thus

subject to Subparts HH and ZZZZ) and "major emitting facilities" under the PSD program (and

thus subject to PSD program requirements).

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


  s/ Jerel L. Ellington
JEREL ("JERRY") L. ELLINGTON
MARK C. ELMER
JAMES D. FREEMAN
Attorneys
Environmental Enforcement Section
United States Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80206
(303) 844-1363 (PHONE)
(303) 844-1350 (FAX)
jerry.l.ellington@usdoj.gov


BRETT L. TOLMAN (#8821)
United States Attorney

DANIEL D. PRICE (#2646)
Assistant United States Attorney
185 South State Street, Suite 300
Salt Lake City, UT 84111
(801) 524-5682 (PHONE)
(801) 325-3269 (FAX)
daniel.price2@usdoj.gov