George M. Haley, #1302
E. Blaine Rawson, #1986
HOLME ROBERTS & OWEN LLP
299 South Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 521-5800
E-mail: *george.haley@hro.com*
E-mail: *blaine.rawson@hro.com*

Colin G. Harris (*Pro Hac Vice*)
Holme Roberts & Owen LLP
One Boulder Plaza
1801 13th Street, Suite 300
Boulder, CO 80302
Telephone:   (303) 444-5955
Facsimile:    (303) 866-0200
E-mail: *colin.harris@hro.com*

John D. McCarthy (*Pro Hac Vice*)
Holme Roberts & Owen LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203-4541
Telephone:   (303) 861-7000
Facsimile:    (303) 866-0200
E-mail: *jay.mccarthy@hro.com*

*Attorneys for Defendant Questar Gas Management Company*

IN THE UNITED STATES JUDICIAL DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>QUESTAR GAS MANAGEMENT COMPANY,<br><br>  Defendant. | **REPLY IN SUPPORT OF MOTION UNDER RULE 26(b)(5)(B) FOR DETERMINATION THAT THE PLAINTIFF HAS WAIVED PRIVILEGE OVER INADVERTENTLY PRODUCED DOCUMENTS AND MOTION UNDER RULE 37(a)(3)(B) TO COMPEL DISCOVERY RESPONSES REGARDING INADVERTENTLY PRODUCED DOCUMENTS**<br>Case No. 2:08CV-00167-DAK<br>Judge Dale A. Kimball |

#1446138 v2 den

**INTRODUCTION**

Consistent with its passive approach to protecting its privilege documents, the United States did not file a motion for protective order, but waited for Questar Gas Management Company ("QGM") to file a motion. The United States' strategy is to wait until QGM relies on, or points out, privileged documents that the United States has produced before claiming privilege and then demanding their return or destruction. This strategy unfairly prejudices QGM from defending itself and should result in a waiver. *Cf., Laetham Equip. Co. v. Deere and Co.*, No. 2:05-cv-10113, 2008 U.S. Dist. LEXIS 107635, at \*\*28-29 (E.D. Mich. Nov. 21, 2008) (the disclosing party took prompt actions included securing from the Court an order compelling defendants to return the documents within three weeks of learning of the inadvertent disclosure).

**The United States Did Not Take Reasonable Steps to Prevent Disclosure.**

The United States claims that it has produced only ten inadvertently produced documents. After search of the QGM database of the United States production, QGM has identified over 1200 documents with the names of known EPA or Department of Justice attorneys on them. While QGM recognizes that not all documents with attorney names are privileged, the United States could at least have conducted this simple and obvious step of searching for attorney names and then double-checking these documents once it became aware that it was inadvertently producing documents. The United States Opposition reflects a continuing lack of confidence over its production. It would not be opposing QGM's request for a finding of waiver with respect to other documents that may in the future be found to have been inadvertently produced if it had taken adequate steps to prevent disclosure.

1

QGM's search of the United States production, in fact, has identified many additional produced documents where the United States has sloppily provided inconsistent redactions. *See* Exhibit A. QGM's search has also identified many enforcement-type documents that are similar to Contested Document 7,[1] including penalty calculations prepared for settlement discussions. *See* Exhibit C. Moreover, the United States has produced many documents that are similar to the other six contested documents over which the United States is claiming privilege, including documents to and from EPA Office of General Counsel lawyers, and other documents that appear to contain the mental impressions of government lawyers or that seek legal advice. *See* Exhibit D.[2] QGM asks the Court for a ruling prohibiting the United States from continuing to claim inadvertent production, because QGM must have finality over the universe of documents it can use in its defense and not be in the position of guessing which documents the United States may seek to be returned as inadvertently produced.

---

[1] Mr. Ellington never asserted a strong privilege claim over Contested Document 7. As he stated in the deposition of Ms. Beeler, he would have allowed QGM to keep the document and ask questions if QGM agreed not to assert subject matter waiver, which QGM declined. *See* Exhibit B (Beeler Depo. 290:25-293:6).

[2] As noted above, QGM, after only recently being provided a list of United States attorneys, searched its database for those names and had over 1600 "hits." While some of those documents (almost exclusively emails) involve third parties and could not possibly be privileged, most are internal communication. Of those, many are of the transmittal variety or where an attorney was merely copied far down a lengthy "cc" list, and would not likely be privileged. However, many involve direct communications between counsel, obvious requests for legal advice, or situations where an attorney potentially has been copied with an expectation of confidentiality. Exhibit D below is only a representative showing of additional documents we have discovered in the database through simple searching of attorney names, based on the potential relevance of the documents to this case. There are numerous additional documents that may involve an attorney's mental impressions or requests for legal advice. QGM is simply at a loss to understand the basis for the United States' assertions, and non-assertions, of privilege in this case.

2

Aside from the United States' insistence that it should be able to claim inadvertent production over even more documents than the seven contested documents, other factors suggest that the United States did not take reasonable steps to prevent disclosure. It is critical to understand that the parties have exchanged electronic copies of all of the documents in this case. The United States has uploaded all of the documents into the searchable databases Concordance and Lotus Notes. Opp. (Doc. 131), Exhibit B at 2. The simplest and quickest method to locate privileged documents is to perform an electronic search of the data using names of attorneys as search terms. If this search had been conducted, presumably the privileged emails at issue, such as the emails by EPA lawyer Carol Holmes, concerning her admissions about the status of "federal enforceability" would have been discovered, and withheld. The United States presents absolutely no evidence that it took such a simple and effective step, which failure the production of such emails strongly tends to confirm. Remarkably, it appears that the United States still refuses to take such an obvious and reasonable step to conduct a privilege review.

In preparing this Reply QGM has discovered additional examples, besides the ones identified in the Memorandum in Support of Its Motion, of the contested documents being produced on multiple occasions, showing lack of reasonable steps. Contested Document 2 was produced four other times (EPA_00136108-13, EPA_00176458-63, EPA_00130345-48, and EPA_00176603-04). Contested Document 3, in addition to the five times identified in QGM's Memorandum, was produced four other times (EPA_00176562-64, EPA_00175193-95, EPA_00176711-15, EPA_00176550-57), for a total of nine times. Contested Document 4 was produced at least one other time (EPA_00176571-74). The United States has never notified

QGM of the existence of these additional "inadvertently" produced copies. Apparently, even after the filing of QGM's Motion, the United States never bothered to look, or to look diligently.

The United States admits that it used law students, including first year law students, in the privilege review. *See* Opp., Exhibit E, ¶ 6 and Exhibit F, ¶ 6. The type of individuals who review the disclosed documents may be a factor in determining inadvertence in some cases. *Heriot v. Byrne*, 257 F.R.D. 645, 660 (N.D. Ill. 2009). This factor may be relevant if the initial review by non-lawyers resulted in inadvertent disclosure. *Id.* at 660 n.10. The use of non-lawyers under these circumstances shows the failure to take reasonable steps to prevent disclosure.

**The United States Did Not Promptly Take Reasonable Steps To Rectify the Error.**

Contrary to the United States' position, in evaluating the time taken to rectify the error courts also consider the time elapsed from production, not only from discovery, before rectifying the error. *See Central Die Casting and Mfg. Co. v. Tokheim Corp.*, No. 93-C-7692, 1994 W.L. 444796, at *5 (Aug. 15, 1994) ("despite the fact that [producing party] moved quickly after the error was discovered *three months after production*, [the document] was produced to plaintiff without restriction, duplicated, disseminated, and incorporation into [the Opponent's] motion for summary judgment") (emphasis in original); *Figueras v. Puerto Rico Elec. Power Auth.*, 250 F.R.D. 94, 97 (D.P.R. 2008) ("More than a month and a half passed between [the producing party's] production of the privileged communication and its request for return of the privileged communication."); *Rhoades v. YWCA*, No. 09-261, 2009 U.S. Dist. LEXIS 95486, at *8 (W.D. Pa. Oct. 14, 2009) (letter requesting documents sent only five days after documents provided to Plaintiff); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 258 F.R.D. 684, 700 (S.D.

4

Fla. 2009) ("The fact [the producing party] took no action for almost two months after disclosing the Valuation E-mail to [the Opponent], including a three-week lag after [the Opponent used the document in its motion for sanctions], is inconsistent with [the producing party's] claim that it is a protected, confidential communication."); *Relion, Inc. v. Hydra Fuel Cell Corp.*, No. CV06-607-HW, 2008 U.S. Dist. LEXIS 98400, at *8 (D. Or. Dec. 4, 2008) ("[the Producing party] did not assert that the two e-mails at issue here were subject to attorney-client privilege until February 18, 2008, four months after they were initially produced and then only in response to a letter . . . discussing the two e-mails.").

The United States argues that notice as early as April 2, 2008 that it was producing privileged documents should be ignored because the documents were produced in response to FOIA requests.  The documents provided to QGM under FOIA, however, are relevant to when the United States had notice that it was producing privileged documents.  In *Multiquip, Inc. v. Water Mgt. Sys., LLC*, No. CV-08-403-S-EJL-REB, 2009 U.S. Dist. LEXIS 109148, at *16 n.4 (D. Idaho Nov. 23, 2009), the Court rejected the argument that Fed. R. Evid. 502 applies only to documents produced in the discovery context.  According to the Court, whether a privilege and waiver takes place within the discovery context is immaterial in maintaining the privilege under Fed. R. Evid. 502(b).

Even if the FOIA documents are not considered evidence of notice, the United States admits that it had notice as early as April 3, 2009 that it was producing privileged documents. *See* Opp. at 3.  In *Preferred Care Partners,* 258 F.R.D. 684, 699-700, the Court held that the producing party waived privilege over a document when it earlier had become aware of three

5

#1446138 v2 den

other documents that had evaded its review before noticing that the document at issue was included in a motion.

**The Interests of Justice Support Waiver.**

The United States makes a similar argument to one of the arguments rejected in *Spieker v. Quest Cherokee, LLC*, No. 07-1225-EFM, 2009 U.S. Dist. LEXIS 62073 (D. Kan. July 21, 2009). It asserts that QGM can use other evidence to identify mechanisms (or lack thereof) available to sources in Indian Country for creating effective potential to emit ("PTE') limits, such as the 30(b)(6) deposition. Opp. at 20. *Speiker*, however, refused to limit discovery of e-mail correspondence, stating that "documents and correspondence are powerful evidence and a party is generally entitled to review relevant documents rather than 'take a opposing party's word.'" *Spieker,* 2009 U.S. Dist. LEXIS 62073, at \*\*15-16. It rejected the argument from the party resisting discovery that the party seeking discovery could more efficiently secure information through interrogatories and Rule 30(b)(6) depositions.

**The Documents Are Vital to QGM's Defense, Which Provides an Independent Grounds For Waiver.**

Contrary to the United States' assertion that the documents are not relevant, the documents at issue are in fact vital and necessary to QGM's defense. Those documents are particularly important here where EPA has regulated inconsistently by making various PTE-limiting mechanisms available to operators on other reservations, but has declined to make those mechanisms available or to implement them on the asserted Uncompahgre Reservation. The attorney-client and work-product privilege is waived when the material to be discovered is both relevant to the issues in the case and either vital or necessary to the defense of the case. *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695 (10th Cir. 1998). *Frontier Refining*

provides a separate ground for waiver aside from failing to meet Rule 502(b)'s test for non-waiver.  Under the *Frontier Refining* test, the following conditions must exist to find waiver:

> (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; *and* (3) application of the privilege would have denied the opposing party access to information vital to [its] defense.

163 F.3d at 701 (citing *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975)).

The seven contested documents that were produced by the United States meet this test. The United States took the affirmative act of filing suit.  It put at issue whether a source in Indian Country needs federally enforceable, or even otherwise enforceable, restrictions on pollution control equipment to limit potential to emit.  All of the documents are vital to QGM's defense. They demonstrate that EPA is in a state of confusion regarding how any source in Indian Country, and even outside of Indian Country, can limit potential to emit in the wake of decisions striking down its regulatory definition of potential to emit and in the circumstances where EPA has failed to make, or has inconsistently made, mechanisms to limit potential to emit available in Indian Country.

Contested Document 1 addresses the issue of federal enforceability.  Specifically, it concerns EPA's view of what emission controls need to be enforceable, and what emission controls are inherent in the process, and therefore do not need to be enforceable**.**

Contested Document 2 is a long e-mail addressing precisely the meaning of "potential to emit" raised by the United States in its pending Motion for Summary Judgment on Defendant's Fourth Affirmative Defense, including comments on timing of "potential to emit" rulemaking and the meaning of "potential to emit."

7

Contested Document 3 also deals with the meaning of potential to emit. Specifically, it addresses the effect of the *Alabama Power* decision[3], the options to limit potential to emit in non-tribal areas as opposed to tribal areas, the ability of a New Source Performance Standard or Maximum Achievable Control Technology (MACT) requirement to limit potential to emit, whether limits have to be enforceable by EPA on tribal lands, whether *Alabama Power* gives EPA the authority to ignore control equipment, and the meaning of equipment "inherent in the design" which EPA agrees does not need to be enforceable.

Contested Document 4 addresses when the EPA Transition Policy can be used to limit potential to emit in order to avoid MACT requirements. The sentence following the redacted sentence of page EPA_00175757, in fact, makes little sense without reading the prior sentence. The document also addresses EPA Region 8's unwillingness to use mechanisms to limit potential to emit in Indian Country even though it had approval from EPA Headquarters to do so.

Contested Document 5 deals with the confusion and disagreement within EPA regarding whether an Administrative Order on Consent ("AOC") can be used create federally enforceable limits before a Title V permit creates them. An AOC is another mechanism which EPA refused to make available to QGM.

Contested Document 6 also deals with confusion within EPA regarding whether a Part 71 permit can be issued to limit potential to emit for purposes of MACT. Again, EPA has refused to make this mechanism available to QGM.

Contested Document 7 is EPA's calculation of uncontrolled emissions at the Coyote Wash facility, a document also vital to preparing QGM's defense.

---

[3] *Alabama Power Co. v. Costle*, 635 F.2d 323 (D.C. Cir. 1979).

## **CONCLUSION**

For these reasons, QGM requests that the Court grant its motion that the United States has waived privilege over seven inadvertently produced documents as well as any other inadvertently produced documents that the United States identifies in the future, and to compel discovery responses concerning inadvertently produced documents.

<div style="text-align: right">

HOLME ROBERTS & OWEN LLP


*/s/ Colin G. Harris*
George M. Haley
Colin G. Harris
E. Blaine Rawson
John D. McCarthy
*Attorneys for Defendants*

</div>

Case 2:08-cv-00167-TS-PMW   Document 139   Filed 01/04/10   Page 11 of 18


# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 4th day of January, 2010, a true and correct copy of the foregoing **REPLY IN SUPPORT OF MOTION UNDER RULE 26(b)(5)(B) FOR DETERMINATION THAT THE PLAINTIFF HAS WAIVED PRIVILEGE OVER INADVERTENTLY PRODUCED DOCUMENTS AND MOTION UNDER RULE 37(a)(3)(B) TO COMPEL DISCOVERY RESPONSES REGARDING INADVERTENTLY PRODUCED DOCUMENTS,** was served via CM/ECF as follows:

Brett L. Tollman
United States Attorney
Daniel D. Price
Assistant United States Attorney
185 South State Street, Suite 300
Salt Lake City, Utah  84111
*daniel.price2@usdoj.go*v

Jerel L. Ellington
James D. Freeman
Mark C. Elmer
Paul Gormley
Attorneys, Environmental Enforcement Section
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, Colorado  80294
*jerry.l.ellington@usdoj.gov*
*james.freeman2@usdoj.gov*
*mark.elmer@usdoj.gov*
*paul.gormley@usdoj.gov*

*Attorneys for Plaintiff*

/s/ Ramona Bailey

#1446138 v2 den

## EXHIBIT A

### Examples of Inconsistent Redactions

**A.    EPA 00184671-75, EPA 00183630-33, EPA 00183214-17, EPA 00187140-42 (Attachment 1 to this Exhibit A).**

These May 2001 emails relate to: EPA's concerns with granting Tribes the ability to limit potential to emit, even though the Tribes question why they should be treated differently than States; disagreement within EPA about whether Tribes should have the ability of other permitting authorities to creatively achieve synthetic minor status for sources; and whether EPA has breached its federal trust responsibilities to Tribes by its failure to promulgate Indian Country New Source Review rules. In EPA_00183216-17, EPA_00183632-33 and EPA_00187141-42, this language is unredacted. It is redacted on EPA_00184674-75.

**B.    EPA 0182483-87, EPA 00183227-32, EPA 00183088-92 (Attachment 2 to this Exhibit A).**

These 2002-2003 emails address the ability to avoid MACT standards if a request for approval of a modification to a Title V permit is sent in beforehand. EPA_00183090-91 and EPA_00183230-31 contain redactions of Joanna Swanson's November 18, 2002 and September 30, 2003 emails (the documents contain blank spaces, rather than clearly stamping the portion as "redacted"), while EPA_00182485-86 contains the unredacted copy.

**C.    EPA 00010999-02, EPA 00067736-40 (Attachment 3 to this Exhibit A).**

In these EPA emails, dated September 2002, from Jonah Staller, EPA Region 8 lawyer, and Rick Vetter, EPA Office of General Counsel lawyer, Mr. Staller asks if EPA should give the QGM Wonsits compressor station "some slack and issue a PTE-limiting Title V permit." Mr. Staller also stated that "there are instances in which we have not applied the once-in, always-in policy." (EPA_00011002.) In EPA_00067739, a portion of the email from Jonah Staller is redacted.

**D.    EPA_00096968-69, EPA_00064806-07 (Attachment 4 to this Exhibit A).**

These documents are internal EPA emails, dated in March 2004, regarding Indian Country jurisdictional matters. In one (EPA_00096968), EPA redacted an email from Monica Morales to Jasmine LeDesma, an EPA attorney, while the other document (EPA_00064806) includes the unredacted copy.

**E.    EPA_00003605-06, EPA_00095522-23 (Attachment 5 to this Exhibit A).**

This document is EPA employee Cindy Beeler's recap of a meeting, dated June 9, 2004, regarding EPA regulation of air emissions of the oil and gas industry. In one (EPA_00095522),

A-1

EPA redacted a section regarding aggregation, while the other document (EPA_00003605) includes the unredacted text.

F.  **EPA_00051943-48, EPA_00051949-51, EPA_00051987-05, EPA_00052135-38, EPA_00052150-53, EPA_00052160-62, EPA_00052163-64, EPA_00067720-22, EPA_00067723-24, EPA_00067725-27, EPA_00067728-31, EPA_00067732-35, EPA_00067741-44, EPA_00067745-46, EPA_00098098-99, EPA_00073325-28, EPA_00107261-65, EPA_00110567-71, EPA_00110587-92, EPA_00110587-92, EPA_00110593-96, EPA_00110599-602, EPA_00112145-48, EPA_00112975-80, EPA_00112982-84, EPA_00131114-17, EPA_00132258-62, EPA_00133666-68, EPA_00135854-56, EPA_00138755-58, (Attachment 6 to this Exhibit A).**

These documents are July, 2002 emails between EPA permit engineer Mike Owens and EPA Office of Enforcement and Compliance Assurance lawyer Charlie Garlow and others at EPA regarding whether EPA can impose a limit in an operating permit to limit potential to emit for QGM's SEI facility and whether EPA should enforce against QGM, including Charlie Garlow's response on EPA_00052163 that "[y]ou may well have bigger fish to fry." Mr. Garlow's response appears to be redacted in EPA_00067723. Inconsistent redactions also appear on the e-mail requesting advice from Charlie Garlow. On the following documents, the portion requesting the advice is redacted: EPA_00067721, EPA_0067726, EPA_00067730, EPA_0067734, and EPA_00067743. Many other documents show the email requesting the advice without the redaction: EPA_00051945-46, EPA_00051950, EPA_00051989, EPA_00052137, EPA_00052152, EPA_00052160-61, EPA_00052163, EPA_00073327, EPA_00110569-70, EPA_00110589, EPA_00110591, EPA_00110595, EPA_00110601, EPA_00107263-64, EPA_00112147, EPA_00112976, EPA_00112982-83, EPA_00131115-16, EPA_00132260-61, EPA_00133666-67, EPA_00135854-55, and EPA_00138757. EPA_00067745-46 likely redacts both Mr. Garlow's response and the request for advice from him. Moreover, the email string contains another email from EPA lawyer Charlie Garlow answering Mr. Owen's question about a "generic policy" of "once in, always in" that EPA hasn't "gotten around" to making into a regulation (EPA_00112975), to which Mike Owens responded at EPA_00052150 that he had "never actually looked at it before."

G.  **EPA 00153102-103, EPA 00188334-35 (Attachment 7 to this Exhibit A).**

These documents are October 30, 2008 EPA emails to and from EPA counsel Carrie Thomas regarding federal enforceability, in which Carrie Thompson's advice is redacted on one (EPA_00188334 [the document contains a blank space, rather than clearly stamping the portion as "redacted"]) but are not redacted on the other (EPA_00153102).

A-2

# EXHIBIT C

## Examples of Similar Enforcement Documents as Contested Document 7

A. **EPA 00026948-51 (Attachment 1 to this Exhibit C).**

This is a chart of "Coyote Wash CS -- PTE (Controlled)" stamped "Enforcement Confidential," which is very similar to Contested Document 7.

B. **EPA 00110885-90 (Attachment 2 to this Exhibit C).**

This is an economic benefit and penalty declaration prepared by Cindy Beeler for the River Bend facility.  Beeler Depo. 298:10-302:16 (Exhibit 22 to Deposition).

C. **EPA 00026813-15 (Attachment 3 to this Exhibit C).**

This is an economic benefit and penalty calculation for the River Bend facility prepared by Cindy Beeler for settlement talks.  Beeler Depo. 302:17-305:13 (Exhibit 23 to Deposition).

D. **EPA 00026718-19) (Attachment 4 to this Exhibit C).**

This document was prepared by Cindy Beeler for the Island Station to support settlement talks. Beeler Depo. 305:14-24 (Exhibit 24 to Deposition).

E. **EPA 00026650-57 (Attachment 5 to this Exhibit C).**

This is an economic benefit run prepared by Cindy Beeler for the Wonsits Station in support of settlement talks.  Beeler Depo. 305:25-307:20 (Exhibit 25 to Deposition).

F. **EPA 00061259-64 (Attachment 6 to this Exhibit C).**

This is a spreadsheet for penalty calculations prepared by Cindy Beeler for the River Bend Station.  Beeler Depo. 307:21-309:22 (Exhibit 26 to Deposition).

G. **EPA 00005010-11 (Attachment 7 to this Exhibit C).**

These are EPA March and April 2004 emails, including to EPA Region 8 lawyer Jim Eppers, regarding control technology at QGM Wonsits Valley Compressor Stations.

**H.      EPA 00073375-84 (Attachment 8 to this Exhibit C).**

This is a memorandum from Cindy Beeler to EPA Region 8 lawyer to Jim Eppers and to EPA employee Martin Hestmark, dated March 30, 2005, entitled "Addendum to Questar Litigation Referral Package sent to Sansonetti on 9/29/04."

**I.      EPA 00058535-40 (Attachment 9 to this Exhibit C).**

These are April and May 2002 referrals to the Department of Justice and a response regarding an administrative enforcement action involving S.G. Interests I, LTD.

**J.      EPA 00083908-09 and EPA 00083910 (Attachment 10 to this Exhibit C).**

These are March 2003 emails from and to EPA Region 8 lawyers David Rochlin and David Janik about recommendations regarding further enforcement and the lack of economic benefit for the Red Cedar Bondad compressor station.

**K.      EPA 00166220-22, EPA 00166180-81 (Attachment 11 to this Exhibit C).**

These are April 14, 2008 and September 28, 2007 emails to and from EPA Region 8 lawyer Jim Eppers regarding potential enforcement against El Paso Corporation.

#1446138 v2 den

# EXHIBIT D

## Examples of Documents that Are Similar to the Contested Documents

A.   **EPA 00174947 (Attachment 1 to this Exhibit D).**

This document is an undated email from Carol Holmes, an EPA Office of General Counsel lawyer, regarding the status of federal enforceability. Carol Holmes' emails are the subject of Contested Document 2 and Contested Document 3.

B.   **EPA 00176997 (Attachment 2 to this Exhibit D).**

These are July 7, 1999 emails between the EPA Office of General Counsel lawyers Lea Anderson and Carol Holmes regarding limiting potential to emit on tribal lands.

C.   **EPA 00171234-36  (Attachment 3 to this Exhibit D).**

These are EPA internal emails, dated November 1999, indicating that the final potential to emit rule "may never be promulgated (at least not in my [Carol Holmes'] life time" (EPA_00171234), and "this regulatory event" (the potential to emit rulemaking) "increasingly shows no hope of ever coming to pass" (EPA_00171236).

D.   **EPA 00175044-45 (Attachment 4 to this Exhibit D).**

These December 1999 emails to and from EPA Office of Enforcement and Compliance Assurance lawyer Charlie Garlow, with a copy to EPA Office of General Counsel lawyer Carol Holmes, regard whether actual emissions from a malfunction occurring before an effective date impose major source status.

E.   **EPA 00173432-33 (Attachment 5 to this Exhibit D).**

These June 7, 2001 email exchanges with EPA Office of General Counsel lawyer Carol Holmes regard rulemaking to address federal enforceability.

F.   **EPA 00178250-53 (Attachment 6 to this Exhibit D).**

These EPA July 2001 emails to and from EPA counsel, including EPA Office of General Counsel lawyers Carol Holmes, Apple Chapman, and Lea Anderson, and EPA Region 10 lawyer Julie Vergernont, regard responding to questions about limiting potential to emit on tribal lands.

G. **EPA 00176536-38, EPA 00176716-17 (Attachment 7 to this Exhibit D).**

These October 23, 2001 emails with EPA Office of General Counsel lawyer Carol Holmes regard federal enforceability.

H. **EPA 00174057-65 (Attachment 8 to this Exhibit D).**

These EPA September 2004 to October 2005 emails, including to and from EPA counsel Amy Branning, Maria Malave, and Charlie Garlow, regard whether flares at a Chevron facility can be considered federally enforceable limits.

I. **EPA 00141734 (Attachment 9 to this Exhibit D).**

This January 6, 2005 email to, among others, EPA Region 8 lawyer Sara Laumann, discuss Carol Holmes' advice regarding whether the enforceability provisions in HH for the benzene limit satisfy practical enforceability.

J. **EPA 00176565 (Attachment 10 to this Exhibit D).**

This August 26, 2005 email from EPA lawyer David Orlin, with copies to EPA lawyers Lea Anderson, Brian Dostor, and Elliott Zenick, stated that "OGC has supported the view that PTE limits may be used in Part 71 permits to create a synthetic minor source (although they cannot be used to remedy past noncompliance with preconstruction requirements)."

K. **EPA 00178474, EPA 00178477-78, EPA 00178493-94 (Attachment 11 to this Exhibit D).**

These August 31, 2005 EPA emails, including ones from EPA Region 1 lawyer Jonathan Averback and copied to EPA lawyer David Orlin, regard using a Tribal Implementation Plan to limit potential to emit of a Mohegan Sun casino and hotel.

L. **EPA 00145360-61, EPA 00146459-60 (Attachment 12 to this Exhibit D).**

These September 2006 emails to EPA Office of Enforcement and Compliance Assurance lawyer Charlie Garlow, EPA Office of General Counsel lawyer Rick Vetter, and EPA Office of General Counsel lawyer Wendy Blake, among others, and response from William Nickerson, EPA Office of Policy, Economics and Innovation, regard the "Once In Always In" Proposal.

M. **EPA 00175188-90 (Attachment 13 to this Exhibit D).**

These EPA October 2008 emails, regarding "requiem for the PTE rule," include emails to and from EPA Office of Enforcement and Compliance Assurance lawyer Robert Dresdner.

**N.** **EPA 00138157-59 (Attachment 14 to this Exhibit D).**

This October 7, 2008 EPA email is from EPA Office of General Counsel lawyer Apple Chapman to EPA employees, including 29 other EPA lawyers, regarding a conference call to discuss what mechanisms "if any, are Regions using to limit the PTE of smaller sources in Indian Country to avoid PSD."

**O.** **EPA 00114336, EPA 00114350, EPA 00134998-00, EPA 00136467-68 (Attachment 15 to this Exhibit D).**

This EPA October 8, 2008 email from EPA Region 8 lawyer Sara Laumann to EPA employee Claudia Smith, copied to EPA Region 8 lawyer Jonah Staller, state that Region 8 in the past issued Part 71 permits with potential to emit limits (EPA_00135000, EPA_00114336, EPA_00114350, EPA_00114367-68).  Claudia Smith's response stated that Region 8 has done that for formaldehyde emissions and "hourly rate emission limits to avoid PSD." (EPA_00134999, EPA_00136467).

**P.** **EPA 00111653-64 (Attachment 16 to this Exhibit D).**

This December 16, 2008 email from Mike Owens of EPA Region 8 to, among others, Mark Elmer, a Department of Justice lawyer involved in this case, regard whether an earlier email addressed whether Part 71 permit issuance could be used to establish a PTE limit and avoid PSD.

**Q.** **EPA 00178766-82, EPA-00178581-96, EPA 00178724-43 (Attachment 17 to this Exhibit D).**

These February to April 2009 EPA emails, including to and from EPA Office of General Counsel lawyer Carol Holmes, regard the types of pollution controls that should be considered part of potential to emit, stating that "[t]he PTE definition does not provide a basis for treating add on controls differently from other physical or operational limitations"  (EPA_00178767, EPA_00178581, EPA_00178728), EPA's Intel guidance on when controls should be considered inherent "doesn't jive with regulatory language" (EPA_00178770, EPA_00178731), and "if it is physical equipment which cannot be bypassed or run poorly, it seems inherent" (EPA_00178768, EPA_00178582, EPA_00178729).