IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,<br><br>    Plaintiff-Intervenor,<br><br>vs.<br><br>QUESTAR GAS MANAGEMENT COMPANY,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:08CV167DAK<br><br>Judge Dale A. Kimball |

       This matter is before the court on Plaintiff United States' Motion for Summary Judgment on Defendant Questar Gas Management Company's Fourth Affirmative Defense. Questar opposed the motion and filed an Affidavit pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. The court held a hearing on the motion on March 18, 2010. At the hearing, the United States was represented by Jerel L. Ellington and Mark C. Elmer, Questar was represented by Colin Harris, George Haley, and Blaine Rawson, and Plaintiff-Intervenor the Ute Indian Tribe of the Uintah and Ouray Reservation was represented by Jeremy Patterson. The court heard argument and took the motion under advisement. After carefully considering the memoranda submitted by the parties and the facts and law relevant to the motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Questar Gas Management Co. ("Questar") owns and operates five natural gas compressor stations in the Uintah Basin: Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend (the "Stations"). The United States alleges that at each of the Stations Questar failed to comply with requirements of the Clean Air Act's (the "Act") National Emission Standards for Hazardous Air Pollutants ("NESHAP") and Prevention of Significant Deterioration ("PSD") programs intended to minimize emissions of harmful pollutants.

The NESHAP and PSD programs apply to "major sources" of pollution and provide that a facility's major source status must be determined based on its "potential to emit" certain pollutants. The parties in this case, however, dispute how to calculate Questar's "potential to emit" at each of its compressor stations. The government contends that emission reductions, limitations, or restrictions may only be considered when they are enforceable by a governmental entity. Questar, however, argues that the government's method for determining whether a source has the "potential to emit" at "major" levels ignores the reality that the compressor stations were designed and built with in-place emission reduction control equipment.

Questar contends that most of the "material facts" outlined by the government attempt to prove that Questar is subject to NESHAP and DSP, and such facts go beyond the Fourth Affirmative Defense on which the government seeks summary judgment. Questar's Fourth Affirmative Defense states:

> The claims and relief sought by Plaintiff are barred, in whole or in part, because the requirement for emissions controls to be "federally enforceable" is, by court remand in *National Mining Assoc. v. EPA*, 59 F.3d 1351, 1365 (D.C. Cir. 1995), and vacatur in *Chemical Mfrs. Ass'n v. EPA*, 1995 U.S. App. LEXIS 31475, Case No. 89-1514 (D.C. Cir. Sept. 15, 1995), and by EPA's own admission, no longer

effective, and consequently, when taking into account [Questar's] emission controls, the compression facilities at issue were not "major sources" under the PSD or NESHAP programs, as alleged in the Complaint.

The focus of the Fourth Affirmative Defense, therefore, is the effect of the D.C. Circuit rulings on how to determine the status of the Stations at issue in this case. Questar's Fourth Affirmative Defense does not require Questar to prove that it is not a "major source" under the PSD or NESHAP programs. Rather, it is the government's initial claims under the CAA that require the government to prove that Questar's Stations are "major sources" under the programs. The court agrees with Questar that many of the material facts outlined by the government go beyond the affirmative defense and relate to the government's claims under the CAA.

Specifically, the parties dispute whether the Stations are oil and gas production facilities as that phrase is defined in 40 C.F.R. § 63.6675 and whether the Stations dehydrate, upgrade, or process natural gas. The parties also dispute what type of technology and equipment is or has been used at various times at the Stations. The government asserts that the amount of pollution the Stations would emit if not controlled is a factual issue that is not subject to genuine dispute because Questar has disclosed its "uncontrolled" emissions at the Stations to EPA in certified documents. But Questar does, in fact, dispute those calculations because they are out-of-date and were submitted to the government for different purposes than what they are now being attempted to be used. The parties also dispute the actual annual throughput at the Stations and whether such limits bring the stations within the NESHAP regulatory program. Furthermore, the parties dispute whether the State of Utah or any local entity assert regulatory authority over the amount of air pollution the Stations emit.

**DISCUSSION**

The United States argues that resolution of Questar's Fourth Affirmative Defense at an early stage in this litigation will streamline the case. Questar has responded to the motion on the merits, stating that this is not a simple legal issue, but is complex and fact intensive. Questar has also filed a Rule 56(f) motion requesting additional discovery prior to the court ruling on the issue.

Questar contends in its Fourth Affirmative Defense that as a result of two D.C. Circuit decisions its major source status should be assessed considering emissions controls that are built in to the design of the facility. *See National Mining Assoc. v. EPA*, 59 F.3d 1351, 1365 (D.C. Cir. 1995); *Chemical Mfrs. Ass'n v. EPA*, 70 F.3d 637 (D.C. Cir. 1995). The government, however, contends that under the D.C. Circuit rulings and EPA policy controls must be enforceable by a governmental entity before they can be used to limit a source's potential to emit.

The Clean Air Act defines "major source" for purposes of the NESHAP program and "major emitting facility" for purposes of the PSD programs by referring to a facility's "potential to emit." *See* 42 U.S.C. § 7412(a)(1) (defining "major source" under the Act's NESHAP provisions); 42 U.S.C. §§ 7475(a), 7479(1) (defining "major emitting facility" under the Act's PSD provisions). In implementing the statutory directives, the EPA promulgated regulations defining "potential to emit" to include consideration of only those pollution controls that are "federally enforceable." *See* 40 C.F.R. § 63.2 (definition of "potential to emit" for NESHAP); 40 C.F.R. § 52.21(b)(4) (definition of "potential to emit" for PSD).

The EPA's definitions of "potential to emit" in both programs were challenged in the D.C. Circuit. *See Nat'l Mining*, 59 F.3d at 1361-65; *Chem. Mfrs.*, 70 F.3d at 637. The petitioners

in *National Mining* contended that the definition of "potential to emit" in the NESHAP regulations was contrary to the language of the CAA because it disregarded emissions limitations imposed by state or local regulations that are effective but not "federally enforceable." *See Nat'l Mining*, 59 F.3d at 1362. The court recognized that Congress clearly directed the EPA to calculate a source's potential to emit "considering controls." *Id.* at 1361. The court decided to remand the EPA's definition of "potential to emit" for further explanation because the definition only recognized federal controls. *Id.* at 1365. The court concluded that the EPA had failed to demonstrate that Congress intended for state emissions controls to be disregarded in considering "major source" status. *Id.*

In making its determination, the D.C. Circuit noted that "it was common ground" that Congress intended the word "controls" to refer to "governmental regulations and not, for instance, operational restrictions that an owner might voluntarily adopt." *Id*. But the court also noted that Congress intended the words "considering controls" to "stand for effective controls," stating that the "EPA clearly is not obligated to take into account controls that are only chimeras and do not really restrain an operator from emitting pollution." *Id.*

The petitioners in *Chemical Manufacturers* challenged the "potential to emit" definition in the PSD regulations on the same grounds. *Chem. Mfrs*., 70 F.3d at 637. The D.C. Circuit remanded the definition in the PSD regulations for reconsideration in light of the *National Mining* decision and vacated the underlying definition. *Id.*

The parties dispute the applicability of these cases to the present case. *National Mining* did not expressly address built-in pollution control equipment like Questar has in place. Rather it only referenced operational restrictions. In addition, *National Mining* addressed the effectiveness

5

of state controls and did not address the situation of a source located in "Indian Country." Although the government contends that the court's resolution of Questar's affirmative defense will streamline the case, the court has significant concerns regarding the propriety of addressing the applicability of the D.C. Circuit rulings in this case prior to the completion of discovery and separate from Questar's other affirmative defenses. Questar has raised several affirmative defenses that could impact the applicability of the D.C. Circuit's rulings to this case. For example, Questar contends that the State of Utah has a valid state CAA program that applies to the Stations in this litigation and that Utah's, not the EPA's, regulatory scheme and enforcement power should be the subject of this Court's review. *See generally* Defendant's Opposition Memorandum to Plaintiff's Motion for Protective Order Limiting Deposition Discovery ("Indian Country Discovery Memorandum", Doc #37).

Questar believes that the facts discovered in this case will demonstrate that the State of Utah has jurisdiction over the disputed stations because (1) the State of Utah has in the past, and continues to, regulate environmental affairs for various stations in the disputed "Indian Country" area Plaintiff claims is within EPA's exclusive jurisdiction; (2) the Uncompahgre Reservation may have been disestablished by acts of Congress more than one hundred years ago (and is therefore an area under State regulatory control); (3) even if the Uncompahgre Reservation was not disestablished, the Ute Indian Tribe disclaimed its authority (and therefore EPA's) to the State of Utah over civil and regulatory environmental matters on lands where the stations are located; and (4) at a minimum, because the jurisdictional status of the lands is "in question," EPA cannot assert jurisdiction until it makes a determination of the "Indian Country" status of the land after public notice and comment. *See Michigan v. EPA*, 268 F.3d 1075, 1085-86 (D.C.

Cir. 2001). Accordingly, whether the stations are located within "Indian Country" is a critical fact of consequence in this dispute that directly affects what law the court should apply.

The court concludes that it would be inappropriate to rule on the Fourth Affirmative Defense separate from the other claims and issues presented in the case. The issues raised by the Fourth Affirmative Defense are significantly intertwined with several other defenses and claims. The defense also raises several factual questions that are presently in dispute. As a result, the court concludes that the government's request for summary judgment is premature.

The court concludes that Questar's request for additional time to conduct discovery on various issues that are material to Plaintiff's motion pursuant to Federal Rule of Civil Procedure 56(f) is appropriate. *Burke v. Utah Transit Authority*, 462 F.3d 1253, 1264 (10th Cir. 2006). The United States never responded to Questar's Rule 56(f) Affidavit. Nonetheless, Questar makes an adequate showing that the government's summary judgment is premature in its Rule 56(f) Affidavit of Colin G. Harris in Opposition to Plaintiff's Motion for Summary Judgment on Defendant's Fourth Affirmative Defense.

The United States did not formally respond to Questar's Motion to Strike Declaration of Cynthia K. Beeler, but presented arguments in opposition to the motion at the hearing. The court, however, concludes that the Declaration was not necessary or relevant to the court's determination of the motion. Accordingly, the motion to strike is moot.

## CONCLUSION

For the foregoing reasons, the court concludes that the government's Motion for Summary Judgment on Defendant's Fourth Affirmative Defense is DENIED as premature. Questar's Motion to Strike Declaration of Cynthia K. Beeler is MOOT.

DATED this 29th day of March, 2010.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge