IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,<br><br><br><br>Plaintiff-Intervenor,<br><br>FRANCES M. POOWEGUP, IRENE C. CUCH AND PHILLIP CHIMBURAS,<br><br>Plaintiff-Intervenor,<br><br>vs.<br><br><br><br>QUESTAR GAS MANAGEMENT COMPANY,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON EPA'S REGULATORY AUTHORITY AND DEFENDANT'S TWENTY-FOURTH AFFIRMATIVE DEFENSE<br><br><br><br><br><br><br><br><br><br>Case No. 2:08-CV-167 TS |

This matter is before the Court on Plaintiff's Motion for Summary Judgment on EPA's Regulatory Authority and Defendant's Twenty-Fourth Affirmative Defense. For the reasons discussed below, the Court will grant the Motion.

1

## I. BACKGROUND

The government brought this action against Defendant alleging violations of the Clean Air Act ("CAA") at five natural gas compressor stations Defendant owns and operates in the Uintah basin. Plaintiff's Complaint alleges violations of the CAA's Prevention of Significant Deterioration ("PSD"), National Emission Standard for Hazardous Air Pollutants ("NESHAP"), and Title V programs. The compressor station facilities are known as Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend (collectively, the "Facilities"). The Facilities are all "located within the historic boundaries of that portion of the Uintah and Ouray Indian Reservation known as the Uncompahgre Reservation."[1]

In its Twenty-Fourth Affirmative Defense Defendant alleges:

Plaintiff's claims are barred or limited because it and the Ute Tribe disclaimed regulatory authority over some or all of the lands at issue in this case in 1998 in favor of the State of Utah, and, therefore, Plaintiff lacks jurisdictional authority to bring claims under the federal provisions of the Clean Air Act against some or all of the facilities at issue in this case.[2]

This affirmative defense is based on a Disclaimer executed by the Chairman of the Ute Tribal Business Committee, General Counsel for the Tribe, and approved by the then-Superintendent of the Uintah and Ouray Agency for the BIA in an attempt to settle long-running litigation concerning the boundaries of the Reservation. That Disclaimer provides, in pertinent part:

---

[1] Docket No. 263, ¶ 7.

[2] *Id*. ¶ 246.

> [T]he tribe hereby disclaims all civil and/or regulatory authority over land determined to be part of the Reservation and "Indian country", as defined by 18 U.S.C. § 1151, under the decision of the United States Court of Appeals for the Tenth Circuit in the case of Ute Indian Tribe v. Utah, 114 F.3d 1513 (1997), which is owned by persons who are not members of federally recognized Indian tribes. This disclaimer includes any right that the Tribe might otherwise assert to . . . regulate activities thereon from the standpoint of their environmental effects.[3]

The government seeks summary judgment on this affirmative defense arguing: (1) that only the EPA can approve Tribes or States to implement Clean Air Act ("CAA") Programs, that the EPA has not approved the Tribe or the State to implement CAA on the reservation, therefore EPA has regulatory authority over the five facilities; (2) the EPA is not bound by the Disclaimer because the former Superintendent of the Uintah and Ouray Agency for the Bureau of Indian Affairs ("BIA") did not have the authority to bind the EPA or the entire United States when he approved the disclaimer; and (3) the Disclaimer does not apply to the Uncompahgre Reservation where the facilities are located.

The Court agrees that summary judgment is appropriate because the authority to administer CAA programs on the Reservation lies with the EPA.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[4] In considering whether a genuine issue of material fact exists, the Court determines whether a reasonable jury could return

---

[3] Docket No. 284, Ex. 2.

[4] FED.R.CIV.P. 56(a).

a verdict for the nonmoving party in the face of all the evidence presented.[5]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[6]

### III.  DISCUSSION

To properly understand the Disclaimer, it must be put in context.  In 1975, the Ute Tribe brought suit against the State of Utah and others "seeking declaratory and injunctive relief establishing the exterior boundaries of the Uintah and Ouray Reservation."[7]  In 1981, this Court, per the Honorable Judge Jenkins, held that the Uncompahgre Reservation, where Defendants' facilities are located, was disestablished and that the Uintah Valley Reservation was diminished.

In 1983, the Tenth Circuit Court of Appeals affirmed the district court's holding that the Uncompahgre Reservation had been disestablished, but reversed as to the Uintah Valley Reservation, holding that it had also been disestablished.[8]  After the Supreme Court issued its decision in *Solem v. Bartlett*,[9] the Tenth Circuit, sitting en banc, again considered these issues in

---

[5]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[6]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[7]*Ute Indian Tribe v. Utah*, 521 F.Supp. 1072, 1075 (D. Utah 1981) (hereinafter "*Ute I*").

[8]*Ute Indian Tribe v. Utah*, 716 F.2d 1298, 1315 (10th Cir. 1985) (hereinafter "*Ute II*").

[9]465 U.S. 463 (1984).

*Ute III*.[10] In *Ute III*, the Tenth Circuit held that neither the Uncompahgre Reservation nor the Uintah Reservation had been disestablished or diminished.[11]

The issue of the boundaries of the Reservation was also litigated in the Utah state courts. In *State v. Hagen*,[12] the Utah Supreme Court held that the Uintah Indian Reservation had been diminished.[13] The United States Supreme Court granted certiorari "to resolve the direct conflict between the[] decisions of the Tenth Circuit and the Utah Supreme Court on the question whether the Uintah Reservation has been diminished."[14] The Supreme Court affirmed the judgment of the Utah Supreme Court, ultimately concluding that the Uintah Indian Reservation had been diminished.[15]

After the United States Supreme Court issued its decision in *Hagen*, this Court found that the mandate issued by the Tenth Circuit in *Ute III* remained in full force and effect, but requested further instruction from the Court of Appeals on how best to proceed in light of *Hagen*.[16] This

---

[10] *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (hereinafter "*Ute III*").

[11] *Id*. at 1093

[12] 858 P.2d 925 (Utah 1992).

[13] *Id*. at 926.

[14] *Hagen v. Utah*, 510 U.S. 399, 409 (1994).

[15] *Id*. at 421-22.

[16] *Ute Indian Tribe v. Utah*, 935 F.Supp. 1473, 1529-30 (D. Utah 1996) (hereinafter "*Ute IV*").

5

Court noted, however, that the status of the Uncompahgre Reservation was not raised as an issue before the Supreme Court.[17]

The Tenth Circuit Court of Appeals once again considered the boundaries of the Reservation in *Ute V*.[18] In that case, the Tenth Circuit found it appropriate to modify its earlier decision in *Ute III* "to the extent that it directly conflicts with the holding in *Hagen*."[19] The court held that "[t]o the extent that the boundary determinations made in *Ute Indian Tribe III* do not directly conflict with *Hagen*, they remain in effect."[20] The Tenth Circuit stated that "[b]ecause *Hagen* did not directly address our holding in *Ute Indian Tribe III* as it relates to . . . the Uncompahgre Reservation, we have no reason to depart from that part of our prior judgment."[21] Therefore, the Tenth Circuit left in place its prior ruling that the Uncompahgre Reservation was neither disestablished nor diminished.

The Tenth Circuit then went on to address the direct conflicts between *Ute III* and *Hagan*.[22] "In particular, [the court had to] decide which lands within the Uintah Valley Reservation are no longer Indian country after *Hagen*."[23] The court focused on four categories of

---

[17]*Id*. at 1528.

[18]*Ute Indian Tribe v. Utah*, 114 F.3d 1513 (10th Cir. 1997) (hereinafter "*Ute V*").

[19]*Id*. at 1527.

[20]*Id*. at 1528.

[21]*Id*. at 1529.

[22]*Id*.

[23]*Id*.

non-trust lands: (1) lands that passed from trust to fee status pursuant to non-Indian settlement under the 1902-1905 allotment legislation; (2) lands apportioned to the "Mixed Blood" Utes under the Ute Partition Act; (3) lands allotted to individual Indians that have passed into fee status after 1905; and (4) lands that were held in trust after the Uintah Valley Reservation was opened in 1905 but that were later exchanged into fee status by the Tribe in order to consolidate the Tribe's land holdings.[24] The Tenth Circuit modified its mandate in *Ute III* with regard to the first category of lands—lands that passed from trust to fee status pursuant to non-Indian settlement under the 1902-1905 allotment legislation—holding that these lands were no longer "Indian country" under 18 U.S.C. § 1151.[25] The court went on to state that "*Hagen* did not erase the boundaries of the Uintah Valley Reservation and that the current 'limits of [the] reservation' thus embrace the three categories of non-trust lands at issue. In sum, *Hagen* does not conflict with our holding in *Ute Indian Tribe III* that these categories of non-trust lands remain within Indian country under section 1151(a)."[26] The court concluded that "Indian country extends to all trust lands, the National Forest Lands, the Uncompahgre Reservation, and the three disputed categories of non-trust lands discussed above."[27]

With this background in mind, the Court turns to the issues before it. As stated, the Disclaimer provides:

---

[24]*Id*.

[25]*Id*. at 1530.

[26]*Id*.

[27]*Id*. at 1531.

> [T]he tribe hereby disclaims all civil and/or regulatory authority over land determined to be part of the Reservation and "Indian country", as defined by 18 U.S.C. § 1151, under the decision of the United States Court of Appeals for the Tenth Circuit in the case of Ute Indian Tribe v. Utah, 114 F.3d 1513 (1997) [*Ute V*], which is owned by persons who are not members of federally recognized Indian tribes. This disclaimer includes any right that the Tribe might otherwise assert to . . . regulate activities thereon from the standpoint of their environmental effects.[28]

Three of the facilities here are located on BLM land within the Uncompahgre Reservation and two are located on tribal trust lands.

Plaintiff and Intervenor argue that the Disclaimer does not apply to the facilities because the Disclaimer is limited to the Uintah Valley Reservation and because the United States is not a "person" within the plain meaning of the Disclaimer. The Court need not resolve these disputes. Even assuming that the Disclaimer does apply, the Court finds that the authority to administer CAA programs on the Reservation lies with the EPA.

"Tribal environmental authority in Indian country stems from two interrelated sources. First, Indian tribes possess inherent powers to govern their territories. . . . Second, Indian tribes may exercise powers authorized by Congress."[29]

The Clean Air Act, like a number of environmental regulations, establishes a federal-state partnership to regulate air quality, giving the states the primary responsibility for ensuring that

---

[28]Docket No. 284, Ex. 2.

[29]Felix S. Cohen, HANDBOOK OF FEDERAL INDIAN LAW, § 10.01[1] (Matthew Bender, 2005 ed.) (hereinafter "Cohen Handbook").

ambient air meets the EPA-established national ambient air quality standards ("NAAQS").[30] The EPA is the agency primarily responsible for administering the CAA.[31]

Under the CAA, the states are directed to develop and submit for EPA approval state implementation plans ("SIPs") providing for the implementation, maintenance, and enforcement" of NAAQS.[32]

Congress has authorized the EPA to treat Indian tribes as states ("TAS") when certain conditions are met.[33] The EPA has promulgated regulations, known as the Tribal Authority Rule ("TAR"), which "identif[ies] those provisions of the Clean Air Act . . . for which Indian tribes are or may be treated in the same manner as States."[34] TAS designation is something for which an Indian Tribe must apply to the EPA.[35] 40 C.F.R. § 49.9 establishes procedures for the EPA's review of applications for TAS.[36]

Along with its TAS application, "[a] tribe may simultaneously submit a request for an eligibility determination and a request for approval of a Clean Air Act program."[37] "A request

---

[30] 42 U.S.C. §§ 7407(a); 7409.

[31] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863 (1984).

[32] 42 U.S.C. § 7410(a)(1).

[33] *Id*. § 7601(d)(2).

[34] 40 C.F.R. § 49.1.

[35] *Id*. § 49.7(a).

[36] *Id*. § 49.9.

[37] *Id*. § 49.7(b).

for Clear Air Act program approval must meet any applicable Clean Air Act statutory and regulatory requirements."[38] Tribal applications for program approvals are "reviewed by EPA in accordance with applicable statutory and regulatory criteria in a manner similar to the way EPA would review a similar State submittal."[39]

The tribal implementation plan ("TIP") framework is similar to that of the SIPs.[40] When a TIP becomes effective, it generally applies to all areas located within the exterior boundaries of the reservation.[41]

Tribes, however, are not required to engage in this process. Where a tribe chooses not to develop a program, does not adopt an adequate program, or does not adequately implement a CAA program, the EPA generally issues permits and otherwise administers the CAA in Indian country in accordance with federal regulations.[42]

---

[38] *Id*. § 49.7(c).

[39] *Id*. § 49.9(h); 42 U.S.C. § 4710(o).

[40] 42 U.S.C. §§ 7601(d)(3), 7410(o).

[41] *Id*. § 4710(o).

[42] *Id*. §§ 7601(d)(4), 7661a; *see also Michigan v. EPA*, 268 F.3d 1075, 1079 (D.C. Cir. 2001) ("[I]n the absence of an EPA-approved tribal implementation program, EPA may adopt a federal implementation program."); Cohen Handbook at § 10.01[2][a] ("[T]he EPA retains implementation authority in Indian country under statutes authorizing tribes to take primary regulatory control unless and until the tribes do so."); *id*. § 10.02[1] ("When a tribe does not take primacy, the EPA will administer the environmental programs in Indian country . . . ."); Environmental Protection Agency, EPA Policy for the Administration of Environmental Programs on Indian Reservations (1984) ("Until Tribal Governments are willing and able to assume full responsibility for delegable programs, the Agency will retain responsibility for managing programs from reservations (unless the State has an express grant of jurisdiction from Congress sufficient to support delegation to the State Government).").

The following facts are undisputed. The Ute Tribe has never applied to EPA for a determination of TAS eligibility to administer any regulatory program under the CAA. The Ute Tribe has never submitted to the EPA or requested that the EPA approve any TIP, any operating permit program under CAA Title V, or any other mechanism for the Tribe to administer any CAA regulatory program. The EPA has never received, reviewed, or approved any TIP, any operating permit program under CAA Title V, or any other mechanism for the Ute Tribe to administer any CAA programs. The EPA has never granted the Tribe the authority to administer CAA regulatory programs on the reservation. Further, the EPA has specifically limited its approval of Utah CAA programs so that they do not apply on Indian country.[43]

Under these undisputed facts, it is clear that the authority to administer CAA programs on the reservation lies with the EPA. As has been made clear in both statute and case law, if the Tribe does not implement CAA programs on the reservation, the authority to do so reverts to the EPA. Here, neither the Tribe nor the state has been authorized to implement CAA programs on the reservation. Therefore, Defendant's arguments to the contrary must be rejected.

Defendant, however, argues that the Tribe has given up its authority in favor of the State of Utah. Defendant's argument rests on the inherent authority a tribe has over matters having a

---

[43] 40 C.F.R. § 52.2346(a); 47 Fed. Reg. 6427; 60 Fed. Reg. 30192, 30195; 67 Fed. Reg. 58998, 58999; 74 Fed. Reg. 1899, 1903. Defendant disputes that the EPA has not approved the State of Utah to administer CAA programs on the Reservation. Defendant points to the fact that the state has, in fact, regulated facilities on the Reservation. However, the simple fact that the state has regulated facilities on the Reservation does not mean that the EPA has approved the practice or that the state had the authority to do so. As stated, the EPA has specifically provided that Utah's CAA programs do not apply in Indian country.

direct effect on the health and welfare of the tribe.[44] Defendant argues that, by signing the Disclaimer, the Tribe has chosen to give up this inherent authority to the State of Utah. However, even assuming that the Tribe had the authority to do so and did seek to turn over control of matters related to environmental regulation on the reservation, this is something that cannot be done by the Disclaimer.

States may not generally exercise jurisdiction over Indian lands without the consent of Congress.[45] Here, there is nothing to show any congressional intent to allow the State to control the environmental affairs on the reservation. Indeed, as set forth above, the congressional intent shows just the opposite: that the EPA administers the programs under the CAA unless and until the Tribe chooses to do so.[46] Therefore, this argument must be rejected.

Defendant also argues that the State of Utah has authority to regulate on the Reservation under its own emissions permitting program. However, as stated, states may not generally exercise jurisdiction over Indian lands without the consent of Congress. Here, there is no indication that Congress has consented to the State of Utah regulating the environmental affairs on the Reservation. Defendant points to the fact that the State has, in fact, regulated facilities on

---

[44] *See Montana v. United States*, 450 U.S. 544, 566 (1981).

[45] *Washington v. EPA*, 752 F.2d 1465, 1469-70 (9th Cir. 1985); *see also* Cohen Handbook at § 10.02[1] ("In general, states may exercise jurisdiction over Indians and Indian lands only as authorized by Congress . . . ."); *id*. at § 7.079[4] ("Because of federal supremacy over Indian affairs, tribes and state may not make agreements altering the scope of their jurisdiction in Indian Country absent congressional consent.").

[46] 42 U.S.C. § 7601(d)(4).

the Reservation. While this would certainly lead to confusion over the proper regulatory authority, it does not show that the State has the authority to so regulate.

Defendant also argues that confusion over the boundaries of the Reservation creates a genuine issues of material fact, precluding summary judgment. This argument fails for a number of reasons. First, it was Congress, not the courts, that established the boundaries of the Reservation. The various courts' differing interpretations of congressional action did not alter the boundaries of the Reservation. Second, as stated above, the boundaries of the Uncompahgre Reservation, where all of the facilities are located, have been clear since 1985. Based on all of these considerations, the Court finds that the EPA has the authority to regulate the facilities at issue here.

## IV.  CONCLUSION

It is therefore

ORDERED that Plaintiff's Motion for Summary Judgment on EPA's Regulatory Authority and Defendant's Twenty-Fourth Affirmative Defense (Docket No. 283) is GRANTED. It is further

ORDERED that Plaintiff's Motion to Strike the Affidavit of Philip C. Pugsley (Docket No. 338) is DENIED AS MOOT.

DATED   May 11, 2011.

BY THE COURT:

_____
TED STEWART
United States District Judge