IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,<br><br>Plaintiff-Intervenor,<br><br>FRANCES M. POOWEGUP, IRENE C. CUCH AND PHILLIP CHIMBURAS,<br><br>Plaintiff-Intervenor,<br><br>vs.<br><br>QUESTAR GAS MANAGEMENT COMPANY,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S FOURTH AFFIRMATIVE DEFENSE<br><br><br><br><br><br>Case No. 2:08-CV-167 TS |

This matter is before the Court on Plaintiff's Renewed Motion for Summary Judgment on Defendant's Fourth Affirmative Defense. For the reasons discussed below, the Court will grant the Motion.

## I. BACKGROUND

The government brought this action against QEPFS alleging violations of the Clean Air Act ("CAA") at five natural gas compressor stations QEPFS owns and operates in the Uintah basin. The compressor station facilities are known as Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend (collectively, the "Facilities"). Plaintiff's Complaint alleges violations of the CAA's Prevention of Significant Deterioration ("PSD"), National Emission Standard for Hazardous Air Pollutants ("NESHAP"), and Title V programs. The NESHAP and PSD programs apply to "major sources" of pollution and provide that a facility's major source status must be determined based on its "potential to emit."

> Defendant's Fourth Affirmative Defense states:
>
> The claims asserted and relief sought by Plaintiff are barred, in whole or in part, because the requirement for emissions controls to be "federally enforceable" is, by court remand in *National Mining Assoc. v. EPA*, 59 F.3d 1351, 1365 (D.C. Cir. 1995), and vacatur in *Chemical Mfrs. Ass'n. v. EPA*, 1995 U.S. App. LEXIS 31475, Case No. 89-1514 (D.C. Cir. Sept. 15, 1995), and by EPA's own admission, no longer effective, and consequently, when taking into account QGM's emission controls, the compression facilities at issue were not "major sources" under the PSD or NESHAP programs, as alleged in the Complaint.[1]

Plaintiff previously moved for summary judgment on Defendant's Fourth Affirmative Defense,[2] which the Court denied as being premature.[3] Plaintiff now renews its Motion. Plaintiff frames the issue as a dispute as to "the legal standard to be applied to calculate a

---

[1] Docket No. 263, ¶ 225.

[2] Docket No. 54.

[3] Docket No. 163.

facility's potential to emit."[4] Plaintiff argues that limitations on a facility's emissions may only be considered when they are enforceable by a governmental entity, while Defendant argues that emissions controls should be considered regardless of whether use of the controls is enforceable. Plaintiff's Motion seeks "guidance on how to present [the parties'] factual contentions on the Five Facilities' potential to emit."[5]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[6] In considering whether a genuine issue of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[7] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[8]

---

[4] Docket No. 287 at 1.

[5] *Id*. at 2.

[6] FED.R.CIV.P. 56(a).

[7] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[8] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

III.  DISCUSSION

As stated, the NESHAP and PSD programs apply to "major sources" of pollution and provide that a facility's major source status must be determined based on its "potential to emit."[9] The EPA has promulgated regulations defining "potential to emit" to include consideration of only those pollution controls that are "federally enforceable."[10]

The EPA's definitions of "potential to emit" in both programs were challenged in the D.C. Circuit.[11] The petitioners in *National Mining* contended that the definition of "potential to emit" in the NESHAP regulations was contrary to the language of the CAA because it disregarded emissions limitations imposed by state or local regulations that are effective but not "federally enforceable."[12] The D.C. Circuit noted that "it was common ground" that Congress intended the word "controls" to refer to "governmental regulations and not, for instance, operational restrictions that an owner might voluntarily adopt."[13] The court also noted that Congress intended the words "considering controls" to "stand for *effective* controls," stating that the "EPA clearly is not obligated to take into account controls that are only chimeras

---

[9] 42 U.S.C. §§ 7412(a)(1), 7475(a), 7479(1).

[10] 40 C.F.R. §§ 63.2, 52.21(b)(4).

[11] *See Nat'l Mining Ass'n v. EPA*, 59 F.3d 1351, 1365 (D.C. Cir. 1995); *Chem. Mfrs. Ass'n v. EPA*, 70 F.3d 637 (D.C. Cir. 1995).

[12] *Nat'l Mining*, 59 F.3d at 1362.

[13] *Id*. at 1362.

4

and do not really restrain an operator from emitting pollution."[14] The court concluded that the EPA had failed to demonstrate that Congress intended for state emissions controls to be disregarded in considering "major source" status and remanded the definition for further explanation.[15] The court did not, however, vacate the regulation.[16]

Before the *National Mining* decision, EPA had recognized certain state-enforceable limits on a source's potential to emit during a transition period to give states the opportunity to design and implement federally enforceable mechanisms to limit potential to emit.[17] That policy remains in effect until new rulemaking has been completed.[18]

The petitioners in *Chemical Manufacturers* challenged the "potential to emit" definition in the PSD regulations on the same grounds.[19] The D.C. Circuit remanded the definition in the PSD regulations for reconsideration in light of the *National Mining* decision and, unlike *National Mining*, vacated the underlying definition in the PSD regulations.[20]

---

[14]*Id*.

[15]*Id*. at 1365.

[16]*Nat'l Mining Ass'n v. EPA*, 1996 WL 10101, at *1 (D.C. Cir. Jan. 2, 1996).

[17]Docket No. 287, Ex. 5.

[18]*Id*., Ex. 6.

[19]*Chem. Mfrs.*, 70 F.3d at 637.

[20]*Id*.

After the *Chemical Manufacturers* decision, the EPA issued an Interim Policy on Federal Enforceability Requirement for Limitations on Potential to Emit.[21] That Interim Policy provided that "the term 'federally enforceable' should now be read to mean 'federally enforceable or legally and practicably enforceable by a state or local air pollution control agency.'"[22] That policy remains in effect.[23]

The EPA has not promulgated a new definition of "potential to emit."

With this background in mind, the Court turns to the analysis of the issues presented in Plaintiff's Motion. The key question is how the Court should define "potential to emit" under the two sets of regulations. This determination requires the Court to interpret and attempt to give meaning to *National Mining* and *Chemical Manufacturers*.

The Court will first consider the issue under the NESHAP regulations. As stated above, the regulation defining "potential to emit" in the NESHAP regulations was remanded to the EPA, but was not vacated. Therefore, despite Defendant's arguments to the contrary, that regulation remains in existence.

The parties present differing positions concerning how "potential to emit" should be defined. While Plaintiff argues that only the "federal" requirement of the federal enforceability requirement was at issue in *National Mining*, Defendant argues that the entire enforceability requirement should be disregarded.

---

[21]Docket No. 287, Ex. 7.

[22]*Id*. at 3.

[23]*Id*. at 1.

6

The Court agrees with Plaintiff's interpretation. A close reading of *National Mining* reveals that the court was concerned with EPA's failure to consider state and local controls and EPA's limiting the enforceability requirement to controls that are federally enforceable. There is nothing in that case to suggest that the court was concerned with enforceability in general. Indeed, the court emphasized that Congress meant for controls to be effective and that "it [was] certainly permissible for EPA to have refused to take into account ineffective controls."[24] Defendant's argument that *National Mining* did away with the requirement of enforceability altogether simply reads too much into that decision. Therefore, it will be rejected.

Defendant also argues that *National Mining* distinguished between operation controls and physical controls. As set forth above, the D.C. Circuit stated that "it was common ground" that Congress intended the word "controls" to refer to "governmental regulations and not, *for instance*, operational restrictions that an owner might voluntarily adopt."[25] This precise issue was addressed in *Ogden Projects, Inc. v. New Morgan Landfill Company, Inc*.[26] In that case, the defendant argued that *National Mining* only governed assessment of operational restrictions.[27] The court disagreed with this position. The court held that "*National Mining Association* established a framework for evaluating operational as well as physical restrictions. The opinion

---

[24]*Nat'l Mining*, 59 F.3d at 1363.

[25]*Id*. at 1362 (emphasis added).

[26]911 F.Supp. 863 (E.D. Pa. 1996).

[27]*Id*. at 875.

7

makes clear that the court was dealing with both types of pollution controls."²⁸ *Ogden Projects* goes on to explain that "[i]f the court intended to limit its decision to only operational restrictions, it would have said so explicitly. It did not."²⁹

The Court agrees with this assessment. The use of the phrase "for instance" shows that the *National Mining* court was using operational restrictions as but one example of types of controls. The Court believes that physical controls and operational controls are largely similar in nature and are distinguishable from controls enforced by a governmental entity. *National Mining* addressed both types of controls. Therefore, the Court disagrees with Defendant's assessment that *National Mining* only addressed operational restrictions.

The Court must still determine how to define "potential to emit." To do so, the EPA points the Court to certain policy statements it has issued. As set out above, the EPA has provided policy statements, both before and after *National Mining*, in which the EPA provided clarification that controls must be legally and practicably enforceable. Defendant argues that the Court should give no deference to these policy statements.

"Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."³⁰ "Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in *Skidmore v. Swift & Co.* . . . , but

---

²⁸*Id.*

²⁹*Id.* at 875-76.

³⁰*Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

only to the extent that those interpretations have the 'power to persuade.'"³¹ In determining whether to apply *Skidmore* deference, the Court affords weight to an agency's decision "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."³²

Considering these factors, the Court finds that the EPA policy statements concerning "potential to emit" are entitled to *Skidmore* deference. These policy statements appropriately take into consideration those concerns addressed by the court in *National Mining* and *Chemical Manufacturers*. The policy statements align EPA's determination of "potential to emit" with the decisions from the D.C. Circuit. While it certainly would have been better for the EPA to promulgate a new definition, the fact that the EPA has not done so does not mean that these policy statements are not entitled to some deference.

Defendant raises a number of arguments in arguing that no deference should be given, pointing out the various ways that the EPA has allegedly acted inconsistently and unfairly. These arguments are largely irrelevant to the issue before the Court and do nothing to suggest that deference should not be given in this instance.

At least one other court has seemingly given deference to the EPA's policy statements on this issue. The Second Circuit, in *Weiler v. Chatham Forest Products, Inc*,³³ specifically relied

---

³¹*Id*. (citing *Skidmore*, 323 U.S. 134, 140 (1944)).

³²*Skidmore*, 323 U.S. at 140.

³³392 F.3d 532 (2d Cir. 2004).

9

on the EPA's policy statement when interpreting "potential to emit" in other EPA regulations. That court stated:

> In short, then, a proposed facility that is physically capable of emitting major levels of the relevant pollutants is to be considered a major emitting facility under the Act unless there are legally and practicably enforceable mechanisms in place to make certain that the emissions remain below the relevant levels.[34]

As in that case, the Court finds that, as it relates to the NESHAP regulations, limitations on a facility's emissions may only be considered when they are legally and practicably enforceable by a governmental entity.

The more difficult question is what definition should be applied to "potential to emit" under the PSD program. As set forth above, *Chemical Manufacturers* vacated the definition of "potential to emit" under the PSD regulations. As a result, that regulation is void.[35] Despite the procedural differences in the definitions, however, there is no legitimate reason that the definition under the PSD program should be any different from that under NESHAP. Therefore, the same definition will be applied to the PSD claims.

Based on the above, the Court finds that limitations on a facility's emissions may only be considered when they are enforceable by a governmental entity. As neither party has sought summary judgment on the issue, the Court does not decide whether Defendant's facilities are considered "major sources" under this definition.

---

[34]*Id*. at 535.

[35]*See Ala. Power Co. v. EPA*, 40 F.3d 450, 456 (D.C. Cir. 1994) ( "To 'vacate' . . . means to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside." (quotation marks and citation omitted)).

## IV. CONCLUSION

It is therefore

ORDERED that Plaintiff's Renewed Motion for Summary Judgment on Defendant's Fourth Affirmative Defense (Docket No. 285) is GRANTED.

DATED   May 11, 2011.

BY THE COURT:

_____
TED STEWART
United States District Judge