IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,<br><br>    Plaintiff-Intervenor,<br><br>FRANCES M. POOWEGUP, IRENE C. CUCH AND PHILLIP CHIMBURAS,<br><br>    Plaintiff-Intervenor,<br><br>    vs.<br><br>QUESTAR GAS MANAGEMENT COMPANY,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br><br><br><br><br><br><br><br><br>Case No. 2:08-CV-167 TS |

    This matter is before the Court on Defendant Questar Exploration and Production Field Services' ("QEPFS") Motion for Partial Summary Judgment. QEPFS seeks summary judgment in its favor on: (1) Plaintiff's claims for Prevention of Significant Deterioration ("PSD") violations at its Wonsits Valley and River Bend facilities; (2) Plaintiff's PSD claims for volatile organic compounds ("VOCs") related to the JT-Skid projects at the Island and River Bend facilities; (3) Plaintiff's claims that Best Available Control Technology ("BACT") and associated

1

costs should have been imposed due to JT-Skid additions at the Island, River Bend, and Coyote Wash facilities; and (4) Plaintiff's claims that QEPFS is in violation of the National Emissions Standard for Hazardous Air Pollutants ("NESHAP") for Oil and Gas Production Facilities ("Subpart HH") at the Coyote Wash, Chapita, and River Bend facilities. For the reasons discussed below, the Court will deny the Motion.

## I. BACKGROUND

Plaintiff brought this action against QEPFS in 2008 alleging violations of the Clean Air Act ("CAA") at five natural gas compressor stations QEPFS owns and operates in the Uintah basin. The compressor station facilities are known as Coyote Wash, Chapita, Island, Wonsits Valley, and River Bend (collectively, the "Facilities"). Plaintiff's Complaint alleges violations of the CAA's PSD, NESHAP, and Title V programs.

A.  PSD PROGRAM

The PSD program is designed to prevent the deterioration of air quality by requiring authorization for the construction of any new or modified source of air pollution. The PSD program provides that "[n]o major emitting facility . . . may be constructed in any area to which this part applies" unless certain conditions are met.[1] Construction includes the modification of any source or facility.[2] The conditions require that the facility obtain a permit setting forth applicable emission limitations and be subject to BACT.[3] BACT is defined as "an emission

---

[1] 42 U.S.C. § 7475(a).

[2] *Id*. § 7479(2)(C).

[3] *Id*. §§ 7475(a)(1), (a)(4).

limitation based on the maximum degree of reduction of each pollutant subject to regulation . . . which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility."[4]

B.   NESHAP PROGRAM

NESHAP is a program established for controlling emissions of hazardous air pollutants ("HAPs") through the use of maximum achievable control technology ("MACT") to minimize HAP emissions.[5] HAPs are listed in 42 U.S.C. § 7412(b). A "major source" of HAPs is "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."[6]

Plaintiff alleges that two NESHAP standards apply to the compressor stations. The standard at issue in this Motion is titled National Emission Standards for Hazardous Air Pollutants from Oil and Natural Gas Production Facilities, the Subpart HH regulations.[7] The Subpart HH regulations, among other things, limit emissions from glycol dehydration units that

---

[4] *Id*. § 7479(3).

[5] *Id*. § U.S.C. § 7412.

[6] *Id*. § 7412(a)(1); 40 C.F.R. § 63.2.

[7] *Id*. § 63.760–63.779.

are major sources of HAPs.[8] A facility that is a major source of HAPs is required to, among other things: install MCAT level controls on certain sources of pollution;[9] demonstrate the effectiveness of such controls;[10] continuously monitor the controls;[11] record applicable monitoring data;[12] and submit various notifications and reports regarding the source to assure compliance with applicable pollution control requirements.[13]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[14] In considering whether a genuine issue of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[15] The Court is

---

[8]*Id*. § 63.760(b).

[9]*Id*. § 63.771.

[10]*Id*. § 63.772.

[11]*Id*. § 63.773.

[12]*Id*. § 63.774.

[13]*Id*. § 63.775.

[14]FED.R.CIV.P. 56(a).

[15]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[16]

### III. DISCUSSION

A.    PSD STATUTE OF LIMITATIONS

QEPFS first argues that Plaintiff's causes of action for civil remedies for alleged violations of the PSD program at the Wonsits Valley and River Bend facilities are barred by the statute of limitations. Plaintiff has now withdrawn its PSD claim with respect to the initial construction of the River Bend facility. Therefore, the only statute of limitations issue before the Court relates to the Wonsits Valley facility.

    *1.*    *Wonsits Valley*

When viewed in the light most favorable to Plaintiff as the non-moving party, the facts concerning the construction of the Wonsits Valley facility are as follows. Construction at the Wonsits Valley facility began in October 2000 and was completed in either June or July of 2001. The parties entered into a series of tolling agreements, agreeing that the period from March 1, 2006, to February 29, 2008, would not be included in the computation of the statute of limitations.

The CAA contains no statue of limitations. As a result, courts apply the general five-year statute of limitations found in 28 U.S.C. § 2462 to claims under the CAA, including PSD

---

[16]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

claims.[17] The PSD program states that "[n]o major emitting facility . . . may be constructed in any area to which this part applies unless" certain conditions are met, including the requirement that a permit be obtained.[18]

The issue presented by this Motion is whether the statute of limitations begins to run at the time the initial construction begins, as argued by Defendant, or whether the limitations period does not begin until construction is completed, as advocated by Plaintiff. If the relevant date is the beginning of construction, October 2000, then the five-year statute of limitations will have run in October 2005, prior to the tolling agreements and the filing of this action. If, however, the relevant date is the completion of construction, June or July 2001, then not all claims would be barred by the statute of limitations.

Though a number of courts have addressed the issue of whether PSD violations are one-time events or continuing violations,[19] no court appears to have addressed the precise issue before the Court. Certain courts have stated, however, that violations do not continue past the completion of construction.[20] Other cases implicitly recognize that the statute of limitations

---

[17] *See Nat'l Parks & Conservation Assoc., Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007).

[18] 42 U.S.C. § 7475(a).

[19] For a discussion of the cases on this issue *see* Ivan Lieben, *Catch Me if You Can—The Misapplication of the Federal Statue of Limitations to Clean Air Act PSD Permit Program Violations*, 28 ENVT. L. 667 (2008).

[20] *United States v. Cinergy Corp.*, 397 F.Supp. 2d 1025, 1030 (S.D. Ind. 2005) ("a violation of the Act's preconstruction permit regulations is complete at the time the construction project is completed"); *New York v. Niagra Mohawk Power Corp.*, 263 F.Supp. 2d 650, 661 (W.D.N.Y. 2003) ("[T]he requirement to secure a preconstruction permit applies prior to construction or modification. Once the construction or modification is complete, the window in

6

begins to run when construction is completed.[21] Still others have stated that a preconstruction violation occurs when construction is commenced.[22] All of these cases, however, addressed situations where the construction had commenced and been completed long before the suit was brought. No case appears to have addressed the situation where certain activities may fall within the limitations period and some activities fall outside that period.

The Court finds that the relevant date for consideration of the statute of limitations is the completion of construction. While the statute of limitations begins to run at the time construction begins, the limitations period is tolled until construction is completed. This conclusion only makes sense. An example clearly illustrates this point. If the Court were to conclude that the only date that matters is the initial date of construction, an owner or operator of a major emitting facility might purposely draw out the construction period in an effort to avoid the PSD requirements. Under Defendant's proposed construction, a major emitting facility built

---

which to apply for and obtain a preconstruction permit is gone. Thus, a violation of the Clean Air Act's preconstruction permit requirement is singular in nature, and does not constitute an ongoing violation."); *United States v. Ill. Power Co.*, 245 F.Supp. 2d 951, 956 (S.D. Ill. 2003) (stating that courts have "concluded that preconstruction permit violations do not constitute violations that continue past the completion of construction"); *United States v. Westvaco Corp.*, 144 F.Supp. 2d 439, 444 (D. Md. 2001) ("a violation for failure to obtain a construction permit does not continue once the unpermitted construction is completed").

[21]*United States v. Cemex, Inc.*, 2010 WL 1348769, at *3 (D. Colo. Mar. 31, 2010) (noting that any violation for modifications taking place between 1997 and 1999 accrued no later than 1999 and became untimely in 2004); *United States v. Campbell Soup Co.*, 1997 WL 258894, at *1-3 (E.D. Cal. Mar. 11, 1997) (finding that complaint filed seven years after completion of modifications was untimely).

[22]*Ill. Power Co.*, 245 F.Supp. 2d at 957 ("[T]he plain language of the provisions demonstrates that any preconstruction violation occurs when the actual construction is commenced, and not at some later point in time.").

over a longer period of time would not be subject to PSD requirements so long as the first day of construction occurred more than five years earlier. Such a result is absurd. The Court believes that the better approach is to toll the limitations period until construction is completed. This approach would allow for compliance if, during construction, it becomes evident that the facility will become a major emitting facility upon start-up. As one court stated: "Once the construction or modification is complete, the window in which to apply for and obtain a preconstruction permit is gone."[23] Further, the Court's conclusion would allow an owner or operator of a facility the ability to avoid PSD requirements by avoiding construction of a major emitting facility before construction on that facility is complete.

Therefore, the Court finds that not all of Plaintiff's PSD claims in relation to the Wonsits Valley facility are barred by the statute of limitations. Those claims from March 1, 2001, to the completion of the construction at the Wonsits Valley facility in June or July of 2001 remain. As a result, the Court need not resolve the parties' dispute as to whether PSD violations constitute one-time or continuing violations.

### 2. Injunctive Relief

Plaintiff urges the Court to rule that its claim for injunctive relief is not time-barred. In its Motion for Partial Summary Judgment, Defendant briefly mentions that Plaintiff's claims for injunctive relief may also be time-barred. Defendant did not, however, request summary judgment on Plaintiff's claim for injunctive relief. Because neither party has actually moved for summary judgment on the claim for injunctive relief, the Court declines to rule on it.

---

[23] *Niagra Mohawk Power Corp.*, 263 F.Supp. 2d at 661.

B.   PSD CLAIMS FOR JT-SKID PROJECTS

PSD is triggered for a "major modification."[24] Major modification "means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase . . . of a regulated NSR pollutant . . . ; and a significant net emissions increase of that pollutant from the major stationary source."[25] A significant net emissions increase for Nox and VOCs is 40 tons per year ("tpy") and for CO is 100 tpy.[26]

Defendant installed JT-Skid units at the Island, River Bend, and Coyote Wash facilities between 2005 and 2007. Defendant argues that it should be granted summary judgment on Plaintiff's PSD claims related to volatile organic compound ("VOC") emissions allegedly resulting from the JT-Skid projects at the River Bend and Island Facilities. Defendant argues that there were no significant net emissions increase for VOCs as a result of the JT-Skid additions, which would trigger PSD.

   *1.   Island*

Defendant argues that the installation of the JT-Skid units at Island did not trigger PSD. In response, the government argues that the Island facility was subject to PSD requirements at the time of its initial construction in 2004 and, therefore, the issue of whether the JT-Skid project resulted in significant net VOC emissions is irrelevant. In reply, Defendant clarifies that it is

---

[24] 40 C.F.R. § 52.21(a)(2)(iv)(a).

[25] *Id*. § 52.21(b)(2)(i).

[26] *Id*. § 52.21(b)(23)(i).

only moving for summary judgment on the issue that the JT-Skid installation did not result in a significant net increase of VOC emissions.

The problem with Defendant's Motion for Partial Summary Judgment on this ground is that it is requesting summary judgment on a non-existent claim. The Complaint makes clear that Plaintiff's argument is that "[t]he Island facility became a major emitting facility/major stationary source when it started up in or around September 2004."[27] Plaintiff's Amended and Supplemental Response to Second Set of Interrogatories makes no claim that the J-T Skid Project at the Island facility resulted in a significant increase of VOCs.[28] Thus, Defendant's argument that there were no significant net emissions increase for VOCs as a result of the JT-Skid project at the Island facility is irrelevant to any issue before the Court. Therefore, Defendant's Motion seeks judgment on a claim that simply does not exist and will be denied.

### 2. *River Bend*

Defendant argues that there was no significant net emissions increase for VOCs as a result of the JT-Skid project. Plaintiff, however, has presented evidence that the JT-Skid project did result in significant increases of Nox, CO, and VOCs.[29] This is sufficient to overcome summary judgment.

---

[27] Docket No. 1, ¶ 146.

[28] Docket No. 289, Ex. 1 at 16-17. Plaintiff does, however, assert that the JT-Skid Project at the Island Facility did result in a significant increase of NOx emissions. *Id*. Defendant has not moved for summary judgment on this issue.

[29] Docket No. 289, Ex. 8 at 34; Docket No. 316, Ex. 8.

Defendant argues that the Court should disregard the Revised Table 13 provided by Plaintiff's expert Heather Brown, which provides the basis of Plaintiff's claim that PSD was triggered at the River Bend facility as a result of the JT-Skid project. Defendant's arguments concerning Ms. Brown's opinion and allegedly faulty calculations are matters better left for cross-examination, not summary judgment. As Plaintiff has provided some evidence from which a fact finder could find in its favor on this claim, summary judgment is inappropriate.

C.  BACT CLAIMS

Defendant also argues that summary judgment should be granted as to the BACT element of Plaintiff's PSD claims at the Coyote Wash, Island, and River Bend facilities. Defendant only seeks summary judgment on the issue of whether the addition of the JT-Skid units at these facilities requires the use of BACT.[30]

As set forth above, PSD is triggered for a "major modification."[31] Major modification "means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase . . . of a regulated NSR pollutant . . . ; and a significant net emissions increase of that pollutant from the major stationary source."[32] The regulations provide: "A major modification shall apply best available control technology for each regulated NSR pollutant for which it would result in a significant net emissions increase at the

---

[30]Plaintiff claims that both the Island and Coyote Wash facilities were major sources at initial construction, therefore BACT was already required. *See* 40 C.F.R. § 52.21(j)(2). Defendant has not moved for summary judgment on this claim.

[31]*Id*. § 52.21(a)(2)(iv)(a).

[32]*Id*. § 52.21(b)(2)(i).

source. This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit."[33] Emissions unit "means any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant and includes an electric utility steam generating unit as defined in paragraph (b)(31) of this section."[34]

Defendant argues that the JT-Skids do not emit any pollutants. Rather, it is the condensate storage tanks which are the actual emitting units. Defendant goes on to argue that the tanks did not undergo any physical change or change in the method of operation associated with the installation of the JT-Skids. Therefore, no emissions unit was changed or modified and BACT was not required as a result of the JT-Skid projects.

The Court finds that there are genuine issues of material fact as to whether the JT-Skid units can be considered part of the "emissions unit" which underwent a physical change or change in the method of operation in the unit. Therefore, the Court will deny summary judgment on this ground.

D.   NESHAP SUBPART HH

Defendant's final argument is that the River Bend, Coyote Wash, and Chapita facilities are not subject to NESHAP Subpart HH because they contain no affected sources. Defendant argues that the only potential affected sources—glycol dehydration units—have been removed from each of these facilities. Plaintiff responds that the fact that the glycol dehydration units

---

[33] *Id.* § 52.21(j)(3).

[34] *Id.* § 52.21(b)(7).

have been removed does not alter the fact that there may have been past violations. In its Reply, Defendant appears to abandon its argument that it is entitled to summary judgment on this ground. Because QEPFS may have violated NESHAP Subpart HH before removing the glycol dehydration units, the Motion for Partial Summary Judgment will be denied on this ground. While removal of the glycol dehydration units may render future compliance issues moot, removal does not terminate Plaintiff's penalty claims based on past violations of Subpart HH.

## IV. CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Partial Summary Judgment (Docket No. 288) is DENIED.

DATED May 11, 2011.

BY THE COURT:

_____
TED STEWART
United States District Judge